IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

FUTURE MAE JEFFERS, et al.                                                                       PLAINTIFFS

v.                                  Case No. 2:12-cv-00016
                    Three-Judge Court:  Hon. Holmes, Smith, and Wright

MIKE BEEBE, in his official capacity as
Governor of Arkansas and Chairman of
the Arkansas Board of Apportionment;
MARK MARTIN, in his capacity as Secretary
of State of Arkansas and as a member of
the Arkansas Board of Apportionment;
DUSTIN McDANIEL, in his capacity as Attorney
General of Arkansas and a member of the
Arkansas Board of Apportionment; and
THE ARKANSAS BOARD OF APPORTIONMENT                                                  DEFENDANTS

**BRIEF IN SUPPORT OF GOVERNOR MIKE BEEBE,
ATTORNEY GENERAL DUSTIN MCDANIEL, AND THE
ARKANSAS BOARD OF APPORTIONMENT'S MOTION TO
DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Plaintiffs have sued the Arkansas Board of Apportionment, Governor Mike Beebe, Attorney General Dustin McDaniel ("Separate Defendants"), and Secretary of State Mark Martin, challenging the Board's plan for a new Senate District 24 in the Delta area of eastern Arkansas.  Plaintiffs claim that, in drafting the boundaries of Senate District 24, Separate Defendants (1) diluted the voting strength of African American residents in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and (2) intentionally discriminated against African Americans in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution. Plaintiffs maintain that Separate Defendants violated federal law even though the total African American population in new Senate District 24 is 57.05%, and the total black voting-age population ("BVAP") of the new district is 52.88%.  *See* 2011 Senate Matrix, attached to Sep. Defs.' Motion to Dismiss as Exhibit 1; Am. Compl., ¶ 70.

Plaintiffs' amended complaint fails to state a claim upon which relief can be granted. *First*, because Senate District 24 is admittedly a majority-minority district under any definition, Separate Defendants' enactment of that district did not violate Section 2 as a matter of law. *Second*, Plaintiffs' allegations of intentional discrimination are insufficient and do not give rise to a plausible claim for relief under the Fourteenth and Fifteenth Amendments. For these reasons, this Court should dismiss the amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## I.   BACKGROUND

**A.   The Arkansas Board of Apportionment's Redistricting Plan**

Article 8 of the Arkansas Constitution requires that the Board of Apportionment—comprised of the Governor, Secretary of State, and Attorney General—convene promptly after each federal census for the purpose of determining the state's legislative district boundaries. The Board of Apportionment held its first meeting on March 16, 2011, a few weeks after the U.S. Census Bureau made census data available.[1]

The federal census data showed that Arkansas's 2010 population was 2,915,918, which represented a 9.1% increase over the 2000 population.[2] The black population comprised 15.4% of Arkansas's total population.[3] *See* Map of Black BVAP by County, attached to Sep. Defs.'

---

[1] Meeting minutes, comments, district maps, demographic profiles of districts, and other useful documents are available at http://www.arkansasredistricting.org/Pages/default.aspx. In addition, UALR's Global Information Systems Lab has visual representations of the Arkansas census data available at http://argis.ualr.edu/maps.htm.

[2] http://quickfacts.census.gov/qfd/states/05000.html

[3] *Id.*

Mot. to Dismiss as Exhibit 2; Map of Black Population by County, attached to Sep. Defs.' Mot. to Dismiss as Exhibit 3. The census data also revealed significant demographic changes in the population distribution. To give just a few examples:

- The total population of Benton County (Northwest Arkansas) increased by 44.3%, and its black population increased by 347.4%.

- The total population of Washington County (Northwest Arkansas) increased by 28.8%, and its black population increased by 69.7%.

- The total population of Faulkner County (Central Arkansas) increased by 31.6%, and its black population increased by 58.5%.

- The total population of Pulaski County (Central Arkansas) increased by 5.9%, and its black population increased by 16.2%.

- The total population of Lonoke County (Central Arkansas) increased by 29.4%, and its black population increased by 19.7%.

- The total population of Lee County (Delta) *decreased* by 17.1%, and its black population *decreased* by 20%.

- The total population of Phillips County (Delta) *decreased* by 17.7%, and its black population *decreased* by 12.1%.

*See* Map of Percent Change in Total Population by County, attached as Exhibit 4; Map of Percent Change in Black Population by County, attached as Exhibit 5.

Thus, the Board of Apportionment was tasked with redrawing the district boundaries to account for significant population changes and demographic shifts. The difficulty of this task is underscored by a map depicting the extent to which the old Senate district boundaries deviated from the "ideal" district size of 83,311 under the principle of "one person, one vote" set forth in

*Baker v. Carr*, 369 U.S. 186 (1962), and subsequent cases. *See* 2010 Senate Variance Map, attached to Sep. Defs.' Mot. to Dismiss as Exhibit 6. For example, if the boundaries of old Senate District 5 and old Senate District 16 were to remain the same after the 2010 census, they would each fall short of the ideal population size by over 14,000 people, thereby giving voters in those districts a disproportionate share voting power under the principle of one person, one vote.

On July 29, 2011, after receiving numerous comments and holding public meetings, the Board of Apportionment voted 2 to 1 to approve a final plan for both legislative chambers. *See* 2011 Senate Plan, attached to Sep. Defs.' Mot. to Dismiss as Exhibit 7. Governor Beebe and Attorney General Dustin McDaniel voted in favor of the plan; Secretary of State Mark Martin voted against it.

Like the 2001 plan, the 2011 Senate Plan has four[4] majority-minority districts. The new majority-minority districts are as follows:

- **Senate District 24**, which is the only district that Plaintiffs challenge, has a total African American population of 57.05% and a BVAP of 52.88%. District 24 includes Crittenden County and the eastern parts of Cross, St. Francis, Lee, and Phillips Counties. This district includes West Memphis, Helena-West Helena, and part of Forrest City.[5] Senator Jack Crumbly,[6] an African American and plaintiff, is the incumbent senator of old District 16 and resides in new District 24.

---

[4] *Compare Jeffers v. Clinton*, 756 F. Supp. 1195, 1200 (E.D. Ark. 1990) (upholding the Arkansas Board of Apportionment's proposed plan for two majority-minority Senate districts but modifying the borders).

[5] *See* interactive map of Senate Districts, *available at* http://geocommons.com/users/AR-Apportionment/maps?page=1.

[6] *See* http://www.arkleg.state.ar.us/assembly/2011/2011R/Pages/MemberProfile.aspx?member=Crumbly

- **Senate District 25** has a total African American population 58.37% and a BVAP of 55.85%. District 25 includes parts of Phillips, Desha, Lincoln, Arkansas, Monroe, and Jefferson Counties. The City of Pine Bluff is in District 25. Senator Stephanie Flowers,[7] an African American, is the incumbent senator of old District 5 and resides in new District 25.

- **Senate District 30** has a total African American population of 56.33% and a BVAP of 53.19%. District 30 is in Pulaski County and includes part of Little Rock. Linda Chesterfield,[8] an African American, is the incumbent senator of old District 34 and resides in new District 30.

- **Senate District 31** has a total African population of 61.53% and a BVAP of 58.26%. District 31 is in Pulaski County and includes part of Little Rock. Joyce Elliot,[9] an African American, is the incumbent senator of old District 33 and resides in new District 31.

**B.    Plaintiffs' Lawsuit**

Plaintiffs' lawsuit is the latest in a series of cases spanning over three decades regarding the Arkansas Board of Apportionment. In the first round of litigation, the Plaintiffs prevailed in their efforts to establish court-ordered districts that had a Black Voting Age Population ("BVAP") of 58-60%. In the second round, however, the Plaintiffs switched positions and

---

[7] *See* http://www.arkleg.state.ar.us/assembly/2011/2011R/Pages/MemberProfile.aspx?member=S. Flowers

[8] *See* http://www.arkleg.state.ar.us/assembly/2011/2011R/Pages/MemberProfile.aspx?member=L. Chesterfield

[9] *See* http://www.arkleg.state.ar.us/assembly/2011/2011R/Pages/MemberProfile.aspx?member=Elliott

argued that those very districts diluted their voting strength by packing African-Americans into too few districts. *See Jeffers v. Tucker*, 839 F. Supp. 612, 613 (E.D. Ark. 1993). The *Jeffers* Plaintiffs urged this Court to draw districts in the Delta that would give them a bare majority and thereby disperse their voting influence more broadly. *Id.*

Nineteen years later, a new set of *Jeffers* Plaintiffs has filed this lawsuit in which they argue that Section 2 compelled the Board of Apportionment to pack the new Senate District 24 with more African Americans in order to better ensure a "safe" seat for their preferred candidate. Plaintiffs waited until January 23, 2012, to file their lawsuit—approximately 6 months after the Board of Apportionment enacted the new redistricting plan, only four months before the primary elections on May 22, 2012, and only one month before the February 23, 2012, start of the candidate filing period.

After Separate Defendants moved to dismiss, Plaintiffs filed an amended complaint on the date of their February 22, 2012, deadline to respond to the motion. This Court denied Separate Defendants' original motion as moot, and Separate Defendants now move to dismiss the amended complaint.

## II.   ARGUMENT

A.   **The Pleading Standard Under Rules 8 and 12(b)(6)**

    1.   *Twombly* and *Iqbal*

Under the U.S. Supreme Court's most recent decisions on Rules 8 and 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). This pleading standard "demands more than an unadorned,

the-defendant-unlawfully-harmed-me accusation." *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 555).

The Supreme Court's plausibility test involves two steps. First, this Court must determine which allegations in the complaint are conclusory and, therefore, should be ignored. The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 55. In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Allegations that "are no more than conclusions" are "not entitled to the assumption of truth." *Id*. at 1950.

Second, the non-conclusory allegations must be evaluated to determine whether they contain sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id*. (quoting *Twombly*, 550 U.S. at 557). The allegations must be sufficient to "nudge" the claims "across the line from conceivable to plausible." *Id.* at 1951 (quoting *Twombly*, 550 U.S. at 570).

   2.   **The Court's Consideration Of Materials Outside The Pleadings**

The U.S. Court of Appeals for the Eighth Circuit has held that, when addressing a motion to dismiss, "[t]he court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig v. Union Electric Company*, 652 F.3d 971, 976 (8th Cir. 2011); *see also Stahl v. United States Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) ("The district court may take judicial notice of public records and may thus consider them on a motion to dismiss."); *United States v. Southern*

*California Edison Co.*, 300 F.Supp.2d 964, 970 (E.D. Cal. 2004) ("The court need not accept as true allegations that contradict facts which may be judicially noticed.  For example, matters of public record may be considered, including pleadings, orders, and other papers filed with the court or records of administrative bodies . . . .").  The Eighth Circuit has also has also held that courts may consider whether a claim is barred by an affirmative defense that is apparent from either the face of the complaint or public records.  *See Noble Systems Corp. v. Alorica Central, LLC*, 543 F.3d 978, 983 (8th Cir. 2008) (citing *Owen v. Kronheim*, 304 F.2d 957, 958 (D.C. Cir. 1962)).

**B.     The Amended Complaint Does Not State A Plausible Claim Under Section 2 Of The Voting Rights Act (Count 1).**

    **1.     The *Gingles* Framework**

Under Section 2 of the Voting Rights Act, States may not use voting practices and procedures that "result[] in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color . . . ."  42 U.S.C. § 1973(a).  Following the 1982 amendments to the statute, a violation of Section 2 is established if, "based on the totality of circumstances, it is shown that the political processes leading to the nomination or election in the State . . . are not equally open to participation by members of a class of citizens protected by subsection (a) . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  42 U.S.C. § 1973(b).  The statute closes with this proviso:  "[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."  *Id.*

The Supreme Court first construed the amended version of Section 2 in *Thornburg v. Gingles*, 478 U.S. 30 (1986).  Under the *Gingles* framework, a Section 2 plaintiff must first establish three "necessary preconditions" for a claim of vote dilution:   (1) the minority group

must be "sufficiently and geographically compact to constitute a majority in a single-member district," (2) the minority group must be "politically cohesive," and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id*. at 50-51.  Under the third factor, a plaintiff must show that white bloc voting is so intense that it "normally will defeat the combined strength of minority support plus white 'crossover' votes." *Id.* at 57.

Once the plaintiff has established the threshold preconditions, the plaintiff must prove vote dilution under the totality of the circumstances.  *Bartlett v. Strickland*, 556 U.S. 1, 11-12 (2009) ("[O]nly when a party has established the *Gingles* requirements does a court proceed to analyze whether a violation has occurred based on the totality of the circumstances.").  The Senate Committee report that accompanied the 1982 amendments to the Voting Rights Act contains a list of factors—often called the "Senate Report" factors—for courts to consider.  S.R. No. 97-417, at 28-29 (1982); *Gingles*, 478 U.S. at 44-45 (referring to Senate Report factors such as the history of official discrimination, the extent to which minority group members have been elected to public office, and the unresponsiveness of elected officials).

When applying the *Gingles* framework, courts must be mindful that redistricting "is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court."  *Growe v. Emison*, 507 U.S. 25, 34 (1993).  "[T]he underlying districting decision is one that ordinarily falls within a legislature's sphere of competence.  Hence, the legislature must have discretion to exercise the political judgment necessary to balance competing interests, and courts must exercise *extraordinary caution* in adjudicating claims that a State has drawn district lines on the basis of race."  *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (emphasis in original) (internal citations and quotations omitted).

### 2. Because Senate District 24 Is A Majority-Minority District, It Does Not Violate Section 2 As A Matter Of Law.

The U.S. Supreme Court's decisions have consistently presumed that a Section 2 plaintiff's "submergence" theory of vote dilution (also called "fragmenting" or "cracking") requires a redistricting body's complete failure to create a majority-minority district. *See, e.g., Thornburg v. Gingles*, 478 U.S. 30, 51 (1986) ("[T]he minority must be able to demonstrate that *the white majority* votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate") (emphasis added) (citations omitted); *id.* at 68 ("The essence of a submergence claim is that minority group members prefer certain candidates whom they could elect were it not for the interaction of the challenged electoral law or structure *with a white majority* that votes as a significant bloc for different candidates.") (emphasis added); *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993) (stating that, if a cohesive minority group is large enough to constitute a "majority" in a single-member district, the minority group "has a good chance of electing its candidate of choice, if the group is placed in a district where it constitutes a majority"). Thus, in *Gingles* and *Voinovich*, the Court's analytical framework for determining Section 2 liability under a submergence theory presumed a threshold showing that the redistricting body has drawn a white-majority district when, in fact, a compact black-majority district could have been created.

More recently, in *Bartlett v. Strickland*, 556 U.S. 1 (2009), the Supreme Court addressed the extent to which Section 2 requires "crossover" districts in which minority voters, who make up less than a majority of a district's population, could theoretically combine with white voters to elect the minority's preferred representatives. Although the issue in *Bartlett* was different than the issue in this case, the Court's language and reasoning is highly instructive.

10

The *Bartlett* Court adopted a "majority-minority rule" for analyzing Section 2 liability under the first *Gingles* precondition. The majority-minority rule "relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting age population in the relevant geographic area." *Bartlett*, 556 U.S. at 18. The majority-minority rule "has its foundation in the principles of democratic governance." *Id.* The Court elaborated: "The special significance, in a democratic process, of a majority means it is a special wrong when a minority group has 50 percent or more of the voting population and could constitute a compact voting majority but, despite racially polarized bloc voting, that group is not put into a district." *Id*.

The Supreme Court's majority-minority rule has the virtue of allowing for "workable standards and sound judicial and legislative administration." *Id.* at 17. Every decision by a redistricting body should not result in litigation and its inevitable upheaval of the electoral process, but that is the unfortunate result of amorphous and "suspect" liability standards that defy predictability and invite courts to "make inquiries based on racial classifications and race-based predictions." *Id*. at 18. District courts should not be placed in the "untenable position of predicting many political variables and tying them to race-based assumptions," which would be involved in answering questions such as "What are the historical turnout rates among white and minority voters and will they stay the same?" *Id*. at 17. Those types of questions, the Court concluded, "are speculative, and the answers (if they could be supposed) would prove elusive." *Id.* At bottom, "[a] requirement to draw election districts on answers to these and like inquiries ought not to be inferred from the text or purpose of § 2." *Id*.

The *Bartlett* Court also emphasized the importance of legislative choice and discretion in redistricting. "Assuming a majority-minority district with a substantial minority population," the Court held, "a legislative determination, based on proper factors, to create two crossover districts

11

may serve to diminish the significance and influence of race by encouraging minority and majority voters to work together toward a common goal." *Id.* at 23. As the Supreme Court has explained elsewhere, "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground." *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994). Thus, "[t]he option to draw [cross-over and influence] districts gives legislatures a choice that can lead to less racial isolation, not more." *Bartlett*, 556 U.S. at 23; *see also Voinovich*, 507 U.S. at 154 ("[C]reating majority-black districts necessarily leaves fewer black voters and therefore diminishes black-voter influence in predominately white districts."); *Page v. Bartles*, 144 F. Supp. 2d 346 (D.N.J. 2001) (holding that a state's decision to reduce the African-American voting age population in a district from 53% to 27% would not prevent minorities from electing their preferred candidate and, instead, would help ensure minority influence in an additional district).

In summary, *Bartlett* stands for the propositions that Section 2 does not guarantee minority voters an electoral advantage; that deference is owed to legislative decisions that may lead to more coalition building and less racial isolation; and that judicial decisionmaking under the Voting Rights Act should be based on clear and predictable rules rather than speculative, race-based assumptions. The import of these principles is that there is no liability under Section 2 if the minority-race voters constitute a majority in the district at issue.

The majority-minority rule is ultimately grounded in the text of Section 2, which is concerned about situations in which minority groups have "*less* opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973 (emphasis added). When a district's black voting-age population exceeds 51% (or, as here, 52.8%), it is implausible that members of the minority group have less

of an opportunity to participate in the political process than the white voters in the district. To demand more misses the point of Section 2. *Bartlett*, 556 U.S. at 20 ("Section 2 does not guarantee minority voters an electoral advantage."); *see also De Grandy,* 512 U.S. at 1016 ("Failure to maximize cannot be the measure of § 2."); *Little Rock School Dist. v. Pulaski Co. Special School District No. 1*, 831 F. Supp. 1453, 1462 (E.D. Ark. 1993) (Wright, J.) ("The [Voting Rights Act] is not an affirmative action statute, and it is not violated by a state legislature simply because that legislature does not enact a districting plan that maximizes black political power and influence.") (citations omitted).

C. **The Amended Complaint Does Not State A Plausible Claim That Separate Defendants Violated The U.S. Constitution Or Section 1983 (Count 2).**

   1. **The Fourteenth Amendment**

Plaintiffs contend that Separate Defendants violated the Equal Protection Clause of the Fourteenth Amendment, which provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Am. XIV, § 1. A claim under the Fourteenth Amendment is more onerous than a statutory claim under the Voting Rights Act. A redistricting plan violates the Fourteenth Amendment if it was "conceived or operated as [a] purposeful devic[e] to further racial . . . discrimination" and has the intended effect. *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971); *see also City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980); *Roberts v. Wamser*, 883 F.3d 617, 623 (8th Cir. 1989) (noting that a voting rights plaintiff proceeding under 42 U.S.C. § 1983 for constitutional violations must prove purposeful discrimination). The plaintiff's burden is to show that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). In addition, the term "'discriminatory purpose' . . . implies more than intent as volition or intent as awareness of

13

consequences. It implies that the decisionmaker[s] . . . selected or reaffirmed a particular course of conduct at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeny*, 442 U.S. 256, 279 (1979).

Focusing on the amended complaint's non-conclusory allegations, Plaintiffs' primary concern is apparently that the Board of Apportionment kept Crittenden County whole—a race-neutral practice that follows the traditional redistricting principle set forth in the Arkansas Constitution. Am. Compl., ¶ 58; Ark. Const., Art. 8, § 3. Nor do Plaintiffs dispute that Crittenden County has a majority-black population of 51.2% according to the 2010 census data. *See* Map of Black Population by County, attached to Sep. Defs.' Mot. to Dismiss as Exhibit 3. Finally, Plaintiffs admit that the new Senate District 24 has a black voting-age population of 53% and a total black population of 57%. Am. Compl., ¶¶ 31, 69.

Despite these uncontroverted facts, Plaintiffs contend that Separate Defendants should have made race a more predominate factor in their decisionmaking by focusing on the goal of placing an even larger number of African Americans within Senate District 24. Anything less, Plaintiffs contend, is invidious racial discrimination against African Americans. *See* Am. Compl., ¶ 42 (alleging that the BVAP must exceed 55%); *but see Miller*, 515 U.S. at 904 (stating that the Equal Protection Clause's "central mandate is racial neutrality in governmental deicionmaking," and this imperative "obtains with equal force regardless of the race of those burdened or benefited by a particular classification"). In this regard, a decision to split Crittenden County would allegedly have resulted in racial demographics more to Plaintiffs' liking and thereby insulated the African American incumbent from white competition. *See* Compl., ¶ 41 (alleging that, as long as the BVAP has approached 60%, no white candidates have filed to run against Senator Crumbly). But Plaintiffs fail to acknowledge that their super-

14

majority, race-centered approach to redistricting "engages in the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls." *Miller*, 515 U.S. at 911-12 (citations and quotations omitted).

Plaintiffs also allege that three white state representatives—Jerry Brown, Clark Hall, and Keith Ingram—were "likely to consider running for Senate in 2012 if given a favorable district." Am. Compl., ¶ 80. According to the same paragraph, Plaintiffs' basis for that allegation is merely Plaintiffs' "information and belief"—classic legal jargon for speculation. *Stephens v. Halliburton Co.*, No. 3:2-civ-1442-L, 2003 WL 22077752, *8 (N.D. Tex. 2003) (stating that the phrase "information and belief" should not "be mistaken for a license to base claims of fraud on speculation and conclusory allegations"). In addition, Plaintiffs properly admit that only Brown and Hall (not Ingram) were "term-limited from running for the House again in 2012" and that Ingram was serving in his second term as state representative and, therefore, a possible candidate for another term as representative. Am. Compl., ¶¶ 77, 79. In the end, the Board of Apportionment allegedly placed two white representatives (Hall and Ingram) as *possible* challengers for Crumbly's senate seat, thus potentially pitting two white candidates and a black candidate against each other according to Plaintiffs' theory. Am. Compl., ¶¶ 82. But one of those white candidates (Ingram) might have sought reelection to a state House seat, while the other (Hall) is running for U.S. Congress. Am. Compl., ¶ 85. The amended complaint thus alleges three possibilities at the time of the Board of Apportionment's decision in July 2011: (1) a three-way race for state Senate involving a black incumbent and two white challengers, (2) a race between one black incumbent and one white challenger, or (3) a contest involving no white challengers at all. With the benefit of hindsight, of course, Plaintiffs now know that Ingram has

15

decided to run for the state Senate seat and that Hall has decided to run for Congress, which explains why Plaintiffs have carved out the Ingram residence from their two alternative proposals. *See* Close-Up View of Plaintiffs' Alternative Maps (northern boundary of Jeffers_01 and Jeffers_03, with star designating Ingram residence), attached as Exhibit 8. Plaintiffs' allegations regarding Separate Defendants' alleged pre-decision conspiracy, however, are inconsistent and implausible on their face.

In the final analysis, Plaintiffs allege nothing more than their preference for dividing Crittenden County (and possibly Monroe County) instead of St. Francis County (and possibly Lee County) *via* alternative Senate plans that either invade another majority-minority district (*i.e.*, Plaintiffs' first alternative or "Jeffers-01")[10] or were never proposed by Plaintiffs during the redistricting process (*i.e.*, Plaintiffs' second alternative or "Jeffers-03"). *See* Jeffers_01 Map, attached to Pls.' Am. Compl. as Exhibit 1; Jeffers_03 Map, attached to Pls.' Am. Compl. as Exhibit 5. What is more, Plaintiffs do not dispute that Senate District 24 is a "majority-minority district" under any definition of that term.[11]

No matter how many times Plaintiffs use the phrase "information and belief," their sparse allegations regarding intentional discrimination fail to nudge their claim "across the line from

---

[10] *See De Grandy*, 512 U.S. at 1019 (stating that the notion of trading the rights of some minority voters under Section 2 against the rights of other members of the same minority class is "of highly suspect validity").

[11] Although Plaintiffs allege that new Senate District 24 includes a prison (*see* Am. Compl., ¶ 52), they do not (and cannot) allege that the prison's black voting-age population materially exceeded the prison's non-black voting-age population at the time of the April 2010 census. Specifically, Plaintiffs do not (and cannot) allege that the Board's inclusion of the prison had the result of artificially inflating District 24's BVAP or that exclusion of the prison would have made the BVAP fall below 52.88% (much less 51%). *See* 2010 Census Block Information for East Arkansas Regional Unit, attached to Sep. Defs.' Mot. to Dismiss as Exhibit 9 (showing a prisoner black population of 849 and a non-black population of 832 such that, if the prison figures are excluded from the analysis of new District 24, the BVAP in the district actually *increases* to a figure slightly above 52.88%).

conceivable to plausible." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). On its face, Plaintiffs' amended complaint fails to state a claim that Separate Defendants enacted Senate District 24 with the goal subverting or disenfranchising black voters.

### 2.     The Fifteenth Amendment

The Fifteenth Amendment states: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const., Amend. XV, § 1. The Supreme Court has "never held any legislative apportionment inconsistent with the Fifteenth Amendment." *Voinovich*, 507 U.S. at 146*; see also Reno v. Bossier Parish School Board*, 528 U.S. 320, 334 n.3 (2000) ("[W]e have never held that vote dilution violates the Fifteenth Amendment."); *Bolden*, 446 U.S. at 84, n.3 (Stevens, J., concurring) (characterizing the plurality opinion as concluding that the Fifteenth Amendment applies only to practices that directly affect access to the ballot).

Even if the Fifteenth Amendment were applicable to Plaintiffs' claim (and it is not), Plaintiffs would have to demonstrate that there was a discriminatory purpose behind the 2011 Senate Plan. *See Bolden*, 446 U.S. at 63 ("While other of the Court's Fifteenth Amendment decisions have dealt with different issues, none has questioned the necessity of showing purposeful discrimination in order to show a Fifteenth Amendment violation."). As explained above, Plaintiffs have not come close to alleging facts giving rise to an inference of purposeful race discrimination.

### III.    CONCLUSION

The U.S. Supreme Court has held that dilution of minority voting strength may occur in two ways: "by the dispersal of blacks into districts in which they constitute an ineffective

minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *Gingles*, 478 U.S. at 46.  This case does not involve either category of dilution under *Gingles*.  Senate District 24 will not disperse African Americans into districts where they constitute an ineffective minority (or *any* minority for that matter).  Nor will it pack African Americans into a district where they have an excessive majority.  Although Plaintiffs may have preferred a district with a super-majority BVAP that would, in their view, be a safe seat for their preferred candidate or candidates—even at the expense of other majority-minority districts—"Section 2 does not guarantee minority voters an electoral advantage." *Bartlett*, 556 U.S. at 20.  Moreover, Plaintiffs' sparse allegations of intentional discrimination in support of their constitutional claims do not state a plausible claim for relief.  This Court should dismiss Plaintiffs' amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

DUSTIN MCDANIEL
Attorney General of Arkansas

By: /s/ *David A. Curran*
David A. Curran, Ark. Bar No. 2003031
Assistant Attorney General
Warren T. Readnour, Ark. Bar No. 93224
Senior Assistant Attorney General
Office of the Arkansas Attorney General
323 Center St., Suite 500
Little Rock, AR 72201
Phone: (501) 682-1681
Fax: (501) 682-2591
Email: david.curran@arkansasag.gov

## CERTIFICATE OF SERVICE

      I hereby certify that on March 6, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following:

James F. Valley
james@jamesfvalley.com

W. Asa Hutchinson, Esq.
asa@ahlawgroup.com

W. Asa Hutchinson, III
ahutchinson@ahlawgroup.com

                                                /s/ David A. Curran