**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION**

FUTURE MAE JEFFERS, et al.                                                    PLAINTIFFS

v.                                          Case No. 2:12-cv-00016
                            Three-Judge Court:  Hon. Holmes, Smith, and Wright

MIKE BEEBE, in his official capacity as
Governor of Arkansas and Chairman of
the Arkansas Board of Apportionment;
MARK MARTIN, in his official capacity as Secretary
of State of Arkansas and as a member of
the Arkansas Board of Apportionment;
DUSTIN McDANIEL, in his official capacity as Attorney
General of Arkansas and a member of the
Arkansas Board of Apportionment; and
THE ARKANSAS BOARD OF APPORTIONMENT                       DEFENDANTS

## BRIEF IN SUPPORT OF SEPARATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs have brought this lawsuit against the Arkansas Board of Apportionment

and its members, challenging the Board's plan for a new Senate District 24 in the Delta

area of eastern Arkansas.  Plaintiffs claim that, in drafting the boundaries of new Senate

District 24, Governor Mike Beebe, Attorney General Dustin McDaniel, and the Arkansas

Board of Apportionment ("Separate Defendants") diluted the voting strength of African

American residents in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973,

and intentionally discriminated on the basis of race in violation of the Fourteenth and

Fifteenth Amendments to the U.S. Constitution.  Plaintiffs maintain that Separate

Defendants violated federal law even though new Senate District 24 has a black

population of 57.05%, a black voting-age population ("BVAP") of 52.88%, and a

minority voting-age population of 55.72%.  *See* BOA 2011 Senate Matrix (Exhibit 1).

Plaintiffs' Section 2 claim fails as a matter of law.  *First*, the U.S. Supreme Court's framework for Section 2 liability presumes that the redistricting body has failed to create a majority-minority district.  Plaintiffs have yet to cite a case in which a court has held that a redistricting body's failure to create a district with a large super-majority of minority residents constitutes a Section 2 violation.  *Second*, Plaintiffs cannot prove an essential element of their Section 2 claim—namely, that bloc voting by whites in the relevant region has usually defeated the combined strength of black voters with the help of white cross-over voters.  The bloc-voting analysis undertaken by Plaintiffs' expert witness, Dr. Lisa Handley, is fatally flawed and violates important legal precedents. What is more, the undisputed electoral results show that African American, black-preferred candidates have almost always received a majority of the votes cast in the relevant region.  Black-preferred candidates can—and do—win with regularity.  *Third*, Plaintiffs cannot show that black voters within new District 24 will not have an equal opportunity to elect their preferred candidates in the future.  In relevant regions where the BVAP has been within the range of 46-53%, black-preferred candidates have almost always received the most votes.  The BVAP in new Senate District 24 is at the top of this range.   Moreover, Dr. Handley's published model for determining the future effectiveness of a district (which she failed to use in this case) predicts that a 49.9% BVAP will be sufficient to provide equal opportunity.   Under these undisputed facts, Separate Defendants are entitled to summary judgment on Count I of Plaintiffs' amended complaint.

Plaintiffs' claims of intentional discrimination under the Fourteenth and Fifteenth Amendment also fail as a matter of law.  Plaintiffs have no evidence that Separate

Defendants enacted new Senate District 24 because of—not merely in spite of—its allegedly adverse effects on African Americans.  Nor do Plaintiffs have any evidence that Separate Defendants intended to create a district with favorable demographics for Representative Keith Ingram or other individuals who might run for a seat in the Senate.  At most, Plaintiffs can show only that Separate Defendants failed to maximize the BVAP by enacting the various maps that Plaintiffs' lawyers prepared after filing this lawsuit—one of which was prepared two days before the discovery cut-off date.  However, just as a failure to maximize minority voting strength is not a Section 2 violation, such facts also do not establish a claim of intentional discrimination under the U.S. Constitution.   Under these undisputed facts, Separate Defendants are entitled to summary judgment on Count II of Plaintiffs' amended complaint.

## I.      BACKGROUND

### A.      The Arkansas Board of Apportionment's Redistricting Plan

Article 8 of the Arkansas Constitution requires that the Board of Apportionment—comprised of the Governor, Secretary of State, and Attorney General—convene promptly after each federal census for the purpose of determining the state's legislative district boundaries.  The Board of Apportionment held its first meeting on March 16, 2011, a few weeks after the U.S. Census Bureau made census data available.[1]

---

[1] Meeting minutes, comments, maps, demographic profiles of districts, and other useful documents are available at http://www.arkansasredistricting.org/Pages/default.aspx.  In addition, UALR's Global Information Systems Lab has visual representations of the Arkansas census data available at http://argis.ualr.edu/maps.htm.

The federal census data showed that Arkansas's 2010 population was 2,915,918, which represented a 9.1% increase over the 2000 population.[2]  The black population comprised 15.4% of Arkansas's total population.[3]  The census data also revealed significant demographic changes in the population distribution.  To give just a few examples:

- The total population of Benton County (Northwest Arkansas) increased by 44.3%.

- The total population of Washington County (Northwest Arkansas) increased by 28.8%.

- The total population of Faulkner County (Central Arkansas) increased by 31.6%, and its black population increased by 58.5%.

- The total population of Pulaski County (Central Arkansas) increased by 5.9%, and its black population increased by 16.2%.

- The total population of Lonoke County (Central Arkansas) increased by 29.4%, and its black population increased by 19.7%.

- The total population of Lee County (Delta) *decreased* by 17.1%, and its black population *decreased* by 20%.

- The total population of Phillips County (Delta) *decreased* by 17.7%, and its black population *decreased* by 12.1%.

---

[2] http://quickfacts.census.gov/qfd/states/05000.html.  *See also* U.S. Census data, 2010 Map of Total Population (Exhibit 30).

[3] *Id.*

4

*See* U.S. Census data, 2010 Map of Percent Change in Total Population (Exhibit 2); U.S. Census data, 2010 Map of Percent Change in Black Population (Exhibit 3).

Thus, the Board of Apportionment was tasked with redrawing the boundaries of Arkansas State House and Senate districts to account for significant population changes and demographic shifts.  The difficulty of this task is underscored by a map depicting the extent to which the old Senate district boundaries deviated from the "ideal" district size of 83,311.  *See* 2010 Senate Variance Map (Exhibit 4).  For example, if the boundaries of old Senate District 5 and old Senate District 16 were to remain the same after the 2010 census, they would each fall short of the ideal population size by over 14,000 people, thereby giving voters in those districts a disproportionate share voting power under the principle of one person, one vote.

After receiving numerous comments and holding several public meetings, the Board of Apportionment voted 2 to 1 to approve a final plan for both legislative chambers.  *See* BOA 2011 Senate Map (Exhibit 5) (adopted July 29, 2011).  Governor Mike Beebe and Attorney General Dustin McDaniel voted in favor of the plan; Secretary of State Mark Martin voted against it.

Like the 2001 plan, the 2011 Senate Plan has four[4] majority-minority districts. The new majority-minority districts are as follows:

- **Senate District 24**, which is the only district that Plaintiffs challenge, has a total African American population of 57.05% and a BVAP of 52.88%.[5]  District 24

---

[4] *Compare Jeffers v. Clinton*, 756 F. Supp. 1195, 1200 (E.D. Ark. 1990) (upholding the Arkansas Board of Apportionment's proposed plan for two majority-minority Senate districts but modifying the borders).

includes Crittenden County and the eastern parts of St. Francis, Lee, and Phillips Counties. This district includes West Memphis, Helena-West Helena, and part of Forrest City.[6]   Senator Jack Crumbly,[7] an African American and plaintiff, is the incumbent senator of old District 16 and resides in new District 24.

- **Senate District 25** has a total African American population 58.37% and a BVAP of 55.85%. District 25 includes parts of Phillips, Desha, Lincoln, Arkansas, and Jefferson Counties. The City of Pine Bluff is in District 25. Senator Stephanie Flowers,[8] an African American, is the incumbent senator of old District 5 and resides in new District 25.

- **Senate District 30** has a total African American population of 56.33% and a BVAP of 53.19%. District 30 is in Pulaski County and includes part of Little

---

[5] Plaintiffs are apparently under the mistaken impression that the 52.88% BVAP does not accurately represent the percentage of adult African Americans in the district who are eligible to vote because new Senate District 24 includes a prison. *See* Am. Compl., ¶ 52. Plaintiffs fail to understand this mathematical reality: If the black-to-nonblack ratio of the prison population is smaller than the black-to-nonblack ratio of the adult population in the legislative district without the prison, excluding the prison population when calculating the BVAP would actually result in a *larger* BVAP calculation. *See* 2010 Census Block Information for East Arkansas Regional Unit, Exhibit 6 (showing a black prisoner population of 849 and a non-black population of 833). These data show that the BVAP of the prison was 50.5% on census day; therefore, excluding the prison from the tabulation of the district's BVAP would increase the BVAP to something slightly (albeit insignificantly) above 52.88%.

[6] *See* interactive map of Senate Districts, *available at* http://geocommons.com/users/AR-Apportionment/maps?page=1.

[7] *See* http://www.arkleg.state.ar.us/assembly/2011/2011R/Pages/MemberProfile. aspx?member=Crumbly

[8] *See* http://www.arkleg.state.ar.us/assembly/2011/2011R/Pages/ MemberProfile.aspx?member=S. Flowers

Rock.  Linda Chesterfield,[9] an African American, is the incumbent senator of old District 34 and resides in new District 30.

- **Senate District 31** has a total African population of 61.53% and a BVAP of 58.26%.  District 31 is in Pulaski County and includes part of Little Rock.  Joyce Elliot,[10] an African American, is the incumbent senator of old District 33 and resides in new District 31.

**B.      Plaintiffs' Lawsuit**

Plaintiffs' lawsuit is the latest in a series of cases spanning over three decades regarding the Arkansas Board of Apportionment.  In the first round of litigation, the plaintiffs prevailed in their efforts to establish court-ordered districts that had a BVAP of 60%.  In the second round, however, the plaintiffs switched positions and argued that those very districts diluted their voting strength by packing African-Americans into too few districts.  *See Jeffers v. Tucker*, 839 F. Supp. 612, 613 (E.D. Ark. 1993).  The *Jeffers* plaintiffs urged this Court to draw districts in the Delta that would give them a bare majority and thereby disperse their voting influence more broadly.  *Id.*

Nineteen years later, a new set of *Jeffers* plaintiffs has filed this lawsuit in which they argue that Section 2 compelled the Board of Apportionment to pack the new Senate District 24 with more African Americans in order to better ensure a "safe" seat for their preferred candidate.  Plaintiffs waited until January 23, 2012, to file their lawsuit— approximately 6 months after the Board of Apportionment enacted the new redistricting

---

[9] *See* http://www.arkleg.state.ar.us/assembly/2011/2011R/Pages/MemberProfile.aspx ?member=L. Chesterfield

[10] *See* http://www.arkleg.state.ar.us/assembly/2011/2011R/Pages/MemberProfile. aspx?member=Elliott

plan, only four months before the primary elections on May 22, 2012, and only one month before the February 23, 2012, start of the candidate filing period.

## II.    ARGUMENT

### A.    The Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  The nonmoving party may not rest on merely denying the moving party's statement of facts, but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Id*. at 587 (quoting Fed. R. Civ. P. 56(e) and adding emphasis); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (same).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id*. (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id*.  Pursuant to these standards, this Court should enter summary judgment against Plaintiffs.

**B.**     **The Court Should Enter Summary Judgment On Plaintiffs' Voting Rights Act Claim (Count I).**

     **1.**     **The *Gingles* Framework For Section 2 Liability**

Under Section 2 of the Voting Rights Act, states may not use voting practices and procedures that "result[] in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color . . . ." 42 U.S.C. § 1973(a). Following the 1982 amendments to the statute, a violation of Section 2 is established if, "based on the totality of circumstances, it is shown that the political processes leading to the nomination or election in the State . . . are not equally open to participation by members of a class of citizens protected by subsection (a) . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). The statute closes with this proviso:  "[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.*

The Supreme Court first construed the amended version of Section 2 in *Thornburg v. Gingles*, 478 U.S. 30 (1986). Under the *Gingles* framework, a Section 2 plaintiff must first establish three "necessary preconditions" for a claim of vote dilution: (1) the minority group must be "sufficiently and geographically compact to constitute a majority in a single-member district," (2) the minority group must be "politically cohesive," and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 50-51. Under the *Gingles* preconditions, courts do "not assume the existence of racial bloc voting; plaintiffs must prove it." *Gingles,* 478 US. at 46; *see also Growe*, 507 U.S. at 41 (holding that courts "may not presume bloc[] voting").

If the plaintiff meets the burden of establishing the threshold preconditions, the plaintiff must then also prove vote dilution under the totality of the circumstances. *Bartlett v. Strickland*, 556 U.S. 1, 11-12 (2009) ("[O]nly when a party has established the *Gingles* requirements does a court proceed to analyze whether a violation has occurred based on the totality of the circumstances."). The Senate Committee report that accompanied the 1982 amendments to the Voting Rights Act contains a list of factors— often called the "Senate Report" factors—for courts to consider. S.R. No. 97-417, at 28-29 (1982); *Gingles*, 478 U.S. at 44-45 (referring to Senate Report factors such as the history of official discrimination, the extent to which minority group members have been elected to public office, and the unresponsiveness of elected officials).

### 2.    Because New Senate District 24 Is A Majority-Minority District, It Does Not Violate Section 2 As A Matter Of Law.

The U.S. Supreme Court's decisions have consistently presumed that a Section 2 plaintiff's "submergence" theory of vote dilution (also called "fragmenting" or "cracking") requires a redistricting body's complete failure to create a majority-minority district. *See, e.g.*, *Gingles*, 478 U.S. at 51 ("[T]he minority must be able to demonstrate that *the white majority* votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate") (emphasis added) (citations omitted); *id.* at 68 ("The essence of a submergence claim is that minority group members prefer certain candidates whom they could elect were it not for the interaction of the challenged electoral law or structure *with a white majority* that votes as a significant bloc for different candidates.") (emphasis added); *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993) (stating that, if a cohesive minority group is large enough to constitute a "majority" in a single-member

district, the minority group "has a good chance of electing its candidate of choice, if the group is placed in a district where it constitutes a majority").  Thus, in *Gingles* and *Voinovich*, the Court's analytical framework for determining Section 2 liability under a submergence theory presumed a threshold showing that the redistricting body has drawn a white-majority district when, in fact, a compact black-majority district could have been created.

More recently, in *Bartlett v. Strickland*, the Supreme Court addressed the extent to which Section 2 requires "crossover" districts in which minority voters, who make up less than a majority of a district's population, could theoretically combine with white voters to elect the minority's preferred representatives.  Although the issue in *Bartlett* was different than the issue in this case, the Court's language and reasoning is highly instructive.

The *Bartlett* Court adopted a "majority-minority rule" for analyzing Section 2 liability under the first *Gingles* precondition.  The majority-minority rule "relies on an objective, numerical test:  Do minorities make up more than 50 percent of the voting age population in the relevant geographic area."  *Bartlett*, 556 U.S. at 18.  The majority-minority rule "has its foundation in the principles of democratic governance."  *Id.*  The Court elaborated:  "The special significance, in a democratic process, of a majority means it is a special wrong when a minority group has 50 percent or more of the voting population and could constitute a compact voting majority but, despite racially polarized bloc voting, that group is not put into a district."  *Id.*

The Supreme Court's majority-minority rule has the virtue of allowing for "workable standards and sound judicial and legislative administration."  *Id.* at 17.  Every

11

decision by a redistricting body should not result in litigation and its inevitable upheaval of the electoral process, but that is the unfortunate result of amorphous and "suspect" liability standards that defy predictability and invite courts to "make inquiries based on racial classifications and race-based predictions." *Id*. at 18. District courts should not be placed in the "untenable position of predicting many political variables and tying them to race-based assumptions," which would be involved in answering questions such as "What are the historical turnout rates among white and minority voters and will they stay the same?" *Id*. at 17. Those types of questions, the Court concluded, "are speculative, and the answers (if they could be supposed) would prove elusive." *Id*. At bottom, "[a] requirement to draw election districts on answers to these and like inquiries ought not to be inferred from the text or purpose of § 2." *Id*.

The *Bartlett* Court also emphasized the importance of legislative choice and discretion in redistricting. "Assuming a majority-minority district with a substantial minority population," the Court held, "a legislative determination, based on proper factors, to create two crossover districts may serve to diminish the significance and influence of race by encouraging minority and majority voters to work together toward a common goal." *Id*. at 23. As the Supreme Court has explained elsewhere, "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground." *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994). Thus, "[t]he option to draw [cross-over and influence] districts gives legislatures a choice that can lead to less racial isolation, not more." *Bartlett*, 556 U.S. at 23; *see also Voinovich*, 507 U.S. at 154 ("[C]reating majority-black districts necessarily leaves fewer black voters and therefore diminishes black-voter influence in predominately white districts."); *Page v.*

*Bartles*, 144 F. Supp. 2d 346 (D.N.J. 2001) (holding that a state's decision to reduce the African-American voting age population in a district from 53% to 27% would not prevent minorities from electing their preferred candidate and, instead, would help ensure minority influence in an additional district).

In summary, *Bartlett* stands for the propositions that Section 2 does not guarantee minority voters an electoral advantage; that deference is owed to legislative decisions that may lead to more coalition building and less racial isolation; and that judicial decisionmaking under the Voting Rights Act should be based on clear and predictable rules rather than speculative, race-based assumptions. The import of these principles is that there is no liability under Section 2 if the minority-race voters constitute a majority in the district at issue.

The majority-minority rule is ultimately grounded in the text of Section 2, which is concerned about situations in which minority groups have "*less* opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973 (emphasis added). When a district's black voting-age population exceeds 50% (or, as here, 52.88%), it is implausible that members of the minority group have less of an opportunity to participate in the political process than the white voters in the district. To demand more misses the point of Section 2. *See Bartlett*, 556 U.S. at 20 ("Section 2 does not guarantee minority voters an electoral advantage."); *see also De Grandy,* 512 U.S. at 1016 ("Failure to maximize cannot be the measure of § 2.").

3.      **Plaintiffs Cannot Establish The Third *Gingles* Precondition Under The Undisputed Facts.**

The third *Gingles* precondition requires Plaintiffs to show that "whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles*, 478 U.S. at 56.  "[A] white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Id.*  As always, Section 2 requires a jurisdiction-specific analysis. *Gingles*, 478 U.S. at 55-56 ("[T]he degree of bloc voting which constitutes the threshold of legal significance will vary from district to district.").  Thus, Plaintiffs must show that bloc voting by whites *in the relevant district* has "usually" or "normally" defeated the minority-preferred candidate.

Dr. Handley's Racial Bloc Voting Analysis in this case, as set forth in Part III of her report, required five steps:  (1) selecting a geographic region on which to focus her analysis; (2) selecting the electoral contests on which to focus her analysis; (3) gathering election and demographic data for each of the chosen contests; and (4) applying statistical techniques, such as regression analyses, to determine relative turnout and the extent to which white and black voters in the defined region supported the various candidates in each of the selected contests; and (5) summarizing the statistical information in an accurate and informative manner and drawing appropriate conclusions.

Under the undisputed facts, the first, second, third, and fifth steps in Dr. Handley's analysis are fatally flawed.  Moreover, the undisputed election data shows that bloc voting by whites has not "usually" or "normally" defeated black-preferred candidates in the relevant geographic area.  To the contrary, the black-preferred candidates have almost always received more votes than white-preferred candidates in

14

the relevant counties of eastern Arkansas.  Thus, a "usual" pattern of defeat is not present in the relevant counties, and this Court should enter summary judgment against Plaintiffs.

### a. Dr. Handley Improperly Defined The Relevant Geographic Area Of Inquiry (Step One).

With regard to the first step, Dr. Handley defined the geographic region of Arkansas that would be the focus of her analysis as "the Delta."  Dr. Handley defined "the Delta" as seven counties in Eastern Arkansas:  Crittenden, Cross, Lee, St. Francis, Phillips, Monroe, and Woodruff counties.  Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 1 n.1; Handley Dep. (Exhibit 7), at 13.  Dr. Handley's definition of "the Delta" came entirely from Plaintiffs' lawyers, and she exercised no independent judgment regarding the geographic scope of her analysis.  Handley Dep. (Exhibit 7), at 13, 16 (testifying that Mr. Valley, Plaintiffs' attorney, defined "the Delta").  Notably, the so-called Delta that Dr. Handley analyzed includes two predominately white counties (Monroe and Woodruff) that are not along the Mississippi River and, more importantly, do not comprise any part of the challenged district (*i.e.*, new Senate District 24).  Handley Dep. (Exhibit 7), at 72 (testifying that she was either uncertain or unaware of the fact that Woodruff and Monroe counties are not part of new Senate District 24 and were never part of old Senate District 16).  Dr. Handley can give no explanation for why Monroe and Woodruff counties are relevant or why voting behavior in counties along the Mississippi River that have larger black populations, such as Mississippi and Desha counties, are irrelevant.  Handley Dep. (Exhibit 7), at 73 (testifying that she does not know whether Arkansas residents consider these other counties as part of the Delta and that the seven-county definition "is the definition I was given").

**b.   Dr. Handley Used An Unnecessarily Small Set Of Election Contests, And Her Selection Criteria Do Not Comport With *Gingles* Or *Cottier* (Step Two).**

With regard to the second step, Dr. Handley focused exclusively on election contests that included African American candidates.   *See* Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7) at 2; Handley Dep. (Exhibit 7), at 78.[11]  In Dr. Handley's view, there is no quantity of unpolarized election contests involving only white candidates that would be relevant.   Handley Dep. (Exhibit 7), at 149-50 ("Q:  If there are, say, 15 elections within that category that are polarized, how many all-white elections that are not polarized would need to be examined before you reached the ultimate conclusion that the district was not polarized?  A:  So if every contest that included black was polarized, I would say it doesn't matter how many white-versus-white contests there are.").   Dr. Handley's race-based criterion flies in the face of Supreme Court and Eighth Circuit precedent.  *See Gingles*, 478 U.S. at 68 ("Clearly, only the race of the voter, not the race of the candidate, is relevant to vote dilution analysis."); *see also id.* at 67 ("[B]oth the language of § 2 and a functional understanding of the phenomenon of vote dilution mandate the conclusion that the race of the candidate *per se* is irrelevant to racial bloc voting analysis."); *id.* at 68 ("[T]he fact that race of voter and race of candidate is often correlated is not directly pertinent to a § 2 inquiry."); *Cottier v. City of Martin*, 604 F.3d 553 (8th Cir. 210) (en banc) (holding that several all-white contests revealed victories by the minority-preferred candidate or a lack of polarization and, therefore, the district court properly declined to impose Section 2 liability notwithstanding the results of some

---

[11] Dr. Handley exclusively relied on Plaintiffs and their lawyers to select the contests that met her racial criterion.  Handley Dep. (Exhibit 7), at 12; *id.* at 87; *id.* 90; *id.* at 92.

interracial contests, which showed polarization and defeats of the minority-preferred candidate).[12]

In addition, Dr. Handley further limited the scope of her analysis by generally considering only election contests featuring a black candidate and a white candidate, but excluding elections where two black candidates vied for office; the lone exceptions are three election contests in old Senate District 16, which have featured only black candidates in recent years.  *See* Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 4; Handley Dep. (Exhibit 7), at 78-79 ("What happened was, I prioritized and looked only at biracial, then went to Senate District 16 . . . ."").  Dr. Handley thus failed to analyze polarization (or lack thereof) in five of the contests set forth in Table 1 of her report, which featured only black candidates.[13]  Dr. Handley's explanation for not analyzing these contests is that "time constraints" got in the way.  Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 4; Handley Dep. (Exhibit 7), at 85-86; *id.* at 79

---

[12] Specifically, the Eighth Circuit held that, even though three out of four interracial contests at the county level showed polarized voting, "there were twenty-five state and federal races with white-only candidates, and the [minority]-preferred candidate won fifteen of those contests in the city."  *Cottier*, 604 F.3d at 560.  In addition, a few white-only countywide races showed lack of polarization or victories by the minority-preferred candidate.  The court concluded:  "These results, taken as a whole[,] show almost equal numbers of victories for Indian-preferred candidates and non-Indian preferred candidates. They do not compel a finding that a white majority in Martin votes sufficiently as a bloc usually to defeat the Indian-preferred candidate."  *Id.*  Thus, the lack of polarization in all-white contests so overwhelmed the presence of polarization in contests that involved minority candidates that the district court properly concluded that the jurisdiction's electorate was not polarized.

[13] The five contests are as follows:  (1) State Report Dist. 52 -- May 2004 Primary (Murdock v. Blount); (2) State Report Dist. 54 -- May 2004 Primary (Carter v. Davis. v. Robertson); (3) State Report Dist. 52 – May 2010 Primary (Murdoch v. Johnson); (4) State Report Dist. 54 – May 2010 Primary (Smith v. Tobar v. Rogers v. Pulliaum); and (5) State Report Dist. 54 – June 2010 Primary (Smith v. Pulliaum).

(testifying that "we ran out of time" to analyze several contests featuring only black candidates).[14]  Dr. Handley justifies this omission with the statement, unsupported by any Supreme Court precedent, that "biracial [contests] were more important than [contests in which the] candidates . . . just included minority candidates."  Handley Dep. (Exhibit 7), at 85-86.[15]  With the limited set of all-black contests in her data set, Dr. Handley admits that she is unable to draw broad, important conclusions about polarization in such contests.  Handley Dep. (Exhibit 7), at 85 ("Q:  So in the Arkansas litigation, is it your belief that elections involving all-black candidates are less polarized than the biracial elections?  Q (later):  I'm asking you to draw a broader conclusion about Arkansas.  A:  I can't.  I didn't look at enough black-versus-black contests.").

Dr. Handley also failed to analyze municipal elections.  *See* Handley Dep., (Exhibit 7), at 14 (testifying that she did not analyze such elections because she "didn't have any time for one thing"); *id*. at 14-15 (testifying that she does not know "if there's a municipality that encompasses about 70, 80 percent of Senate District 16").  The latter

---

[14] The Board of Apportionment adopted its final Senate map in July 2011, and Plaintiffs waited approximately six months to file suit.  Plaintiffs then urged, during the Rule 26(f) Conference, for a prompt trial date that could potentially result in a ruling before the primary elections on May 22, 2012.  Plaintiffs also agreed to the schedule for expert discovery, although Plaintiffs subsequently got a court-approved extension of the deadline to submit a "final" report and then submitted yet another "final" report on the night before Dr. Handley's deposition.  In this regard, Dr. Handley's limited window of time for conducting a thorough analysis is of Plaintiffs' own making, and the Board of Apportionment's duly enacted Senate map should not be thrown out on the basis of "time constraints" that prevented Dr. Handley from undertaking a more thorough analysis.  Good science—not a truncated expert analysis in the face of a deadline—should be the only basis for a federal court's intervention in the redistricting process.

[15] This explanation is important because, as will be discussed later, the interracial contests, which Dr. Handley deems to be the most relevant, do not support the presence of legally significant white bloc voting or a prediction that the 52.88% BVAP in new District 24 will be insufficient to provide equal opportunity.

rationale makes no sense because the challenged district is Senate District 24 (not old District 16) and, moreover, there are no state legislative contests—including those in old Senate District 16—that meet the criteria of encompassing 70-80% of the challenged district.[16]  The notion that election results in Woodruff and Monroe counties are relevant whereas municipal election results within the challenged jurisdiction are irrelevant defies common sense.

Dr. Handley also failed to analyze county contests.  She relied on Plaintiffs' lawyers to get the election returns and was "unable" to get the returns for reasons that she does not know.  Handley Dep. (Exhibit 7), at 15.

Thus, by ignoring *Gingles* and *Cottier* and focusing on a few (mostly interracial) contests that featured black candidates, Dr. Handley is able to draw conclusions from a limited sample set that allows her to advocate in favor of Section 2 liability under truly remarkable circumstances.[17]  Dr. Handley's limited, result-oriented analysis does not conform to scientific or legal principles, and this Court should disregard it.

---

[16] *See, e.g.*, Overlap Map of 2000 Senate District 16 with 2010 Adopted Senate District 24 (Exhibit 8) (showing that new Senate District 24, with a total population of 87,147, includes 34,554 persons who were not in old Senate District 16 and that 16,149 persons who were in old Senate District 16 are not in new Senate District 24).  Dr. Handley's 70-80% threshold could be met, however, by considering contests for national and statewide office in which votes were cast in each of the four core counties that contribute territory to new Senate District 24.  Separate Defendants will discuss such contests *infra.*

[17] An expert's consideration of all-white contests might show that the black-preferred (white) candidates always win.  And consideration of all-black contests might show that, even though minority candidates regularly get elected to office, they are often the candidates who can best cross racial divides and get elected with the help of white cross-over votes.  Under Dr. Handley's reasoning, all-white contests do not matter, and the election of the least polarizing black candidate in an all-black contest counts as a strike against the state if the black candidate is not "black preferred."  As explained above, *Gingles* and *Cottier* support the contention that all-white contests *do* matter.  To the extent that Dr. Handley is concerned with ensuring that minority candidates get elected to

      **c.**      **Dr. Handley Used Suspect And Unverifiable Data That She Received From Plaintiffs' Attorneys, And She Did Not Check It (Step Three).**

With regard to the third step, Dr. Handley relied entirely on Peter Wattson (counsel of record for Plaintiffs) to supply her with spreadsheets containing election results alongside demographic racial data from the U.S. Census Bureau.[18]  Dr. Handley did not do any independent work to obtain election results or census data.  Handley Dep. (Exhibit 7), at 27-28 ("A:  Well, I did not do this.  This was done by someone else.  But the description of how it was done appears in my report.  Q:  All right.  Who did this?  A:  Mr. Wattson, with some assistance from county clerks, I believe.  Q:  [C]ould you describe how he went about the process of determining which precincts go with which polling place?  A:  Well, you – not really; no, I don't."); *id.* at 90 (Q:  And this is the type of information that has election results alongside demographic results; is that right?  A:  Yes.  Q:  So all of that type of information you looked at in this case was prepared by the lawyers; is that right?  A:  Yes.").

The process of determining how the racial demographic data reported by the U.S. Census Bureau should be paired with election results is technically complex and apparently entailed Mr. Wattson's use of Google Maps, special software called "Maptitude for Redistricting," and the creation of various databases.  *See* Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 4-5 & n.6; Handley Dep. (Exhibit 7),

---

office, Section 2 deals with that concern as the seventh Senate Factor.  *Gingles*, 478 U.S. at 37.  There is no need to build a requirement of minority representation into the bloc-voting analysis in an effort to further emphasize the issue.  Indeed, the race of the candidate "*per se* is irrelevant to racial bloc voting analysis."  *Gingles*, 478 U.S. at 67.

[18] *See, e.g.*, Exemplar Wattson Spreadsheet, Exhibit 9 to Handley Dep. (Exhibit 7).

at 30.  The problem stems from the fact that the U.S. Census Bureau's geographic unit for reporting demographic data does not coincide with how election results in Arkansas are tabulated.  The U.S. Census Bureau reports racial demographic information by Voter Tabulation District ("VTD"),[19] whereas election results in Arkansas have typically been reported by "polling place."   Handley Dep., (Exhibit 7), at 26-27; Secretary of State Election Results (Willis v. Hall) (Exhibit 9).

A polling place is a location, such as a church or fire station, where citizens cast their votes.  Handley Dep. (Exhibit 7), at 27 (agreeing that a "polling place" is a "spot where people go vote [that] encompasses at least one precinct").  A polling place might exist within a single precinct and draw voters from only that precinct, in which case the correlation between election results and demographic census data is straightforward.  In this scenario, the polling place election results are the same thing as precinct results and, therefore, can be readily matched with the appropriate demographic data.  In other cases, however, there is no polling place within a precinct; voters who live there must travel to a *different* precinct to cast their votes.  In this scenario, the polling place draws voters from more than one precinct.  Plaintiffs have coined the term "Polling Place Area" to describe the set of precincts from which a polling place draws its voters.  Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 4.  The important point, for purposes of this motion, is that there is no error-free methodology for accurately determining which precincts belong in a Polling Place Area other than to gather the official proclamations from each county

---

[19] In Arkansas, VTDs are known as "wards" or "precincts."  Handley Dep. (Exhibit 7), at 26-27.

board of election commissioners *for each county in each election.*[20]   This time-consuming, technical process would presumably require the creation of correlation tables that show which precincts should be aggregated to form a Polling Place Area.  But Dr. Handley has never seen a document from Mr. Wattson showing which precincts go with which polling areas or the definitive supporting documents (*i.e.*, official proclamations).  Nor has Dr. Handley checked the accuracy of the lawyer's work.   The following exchange is illustrative:

> Q:   You didn't call any County Clerk?
>
> A:   I didn't.
>
> Q:   So there are presumably notes or records from County Clerk conversations or documents obtained from a County Clerk somewhere?
>
> A:   I don't know.
>
> Q:   You didn't attempt to verify any of that information?
>
> A:   I did not.

---

[20] For an example of polling sites and precincts in Phillips County, see Map of 2000 VTDs in Phillips County and Polling Sites (Exhibit 10).  The stars denote polling sites. In this example, some precincts have polling sites, but there is no polling site in several precincts.   For example, Hicksville, Cypress, Searcy 1, Searcy 2, Searcy 3, Marion, Cleburne, Cleburne 2, Spring Creek 2, Upper Big Creek 2, Bush, Lake, St. Francis 1, St. Francis 2, St. Francis 4, Languille, and Lake do not have polling sites.  It is, however, clear that voters in the Cleveland precinct cast their votes at Watkins Corner Volunteer Fire Department.  If the U.S. Census data shows how many of the residents of the Cleveland VTD are black, that information could be used along with the election results from the Watkins Corner Volunteer Fire Department to study voting behavior.  But where did the voters in the Searcy 1 VTD cast their ballots?  The only acceptable answer must be derived from the official proclamation for each county with respect to each election (because polling site assignments can change from election to election).  An example of a proclamation from the Phillips County Election Commission is attached to Separate Defendants' motion for summary judgment as Exhibit 11.  The fact that Plaintiffs have not produced any such proclamations or that Dr. Handley has not checked to see that such proclamations have been gathered for each election (or *any* election) is troubling, to say the least.

Handley Dep. (Exhibit 7), at 30-31; *id.* at 28.

This point is important because the election results by polling place must be accurately paired with census information in order for Dr. Handley to analyze voting behavior in the Delta.  If Dr. Handley's election results have been mistakenly paired with demographic information from a precinct that was not officially assigned to the polling place, the mistake will produce critical errors in Dr. Handley's racial analysis of voting behavior.

In summary, the identity of the precincts that Plaintiffs contend comprise each Polling Place Area—which is essential information in the pairing of election results with demographic information so that voting behavior can be analyzed—is a mystery to both Dr. Handley and Separate Defendants.  Dr. Handley has no reason to believe that the information upon which she relied is accurate; she has only blind trust that a non-expert has performed this complicated and technical task correctly.[21]

> ### d.  Dr. Handley Applied Statistical Techniques To The Election And Demographic Data (Step Four).

The next step in Dr. Handley's analysis was to apply three statistical techniques to the eighteen election contests that met her race-based criteria.  The first technique, homogenous precinct analysis, "involves comparing the voting behavior of precincts that are racially homogenous."  Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 5. A homogeneous precinct is "one in which 90 percent or more of the voting age population is one race—in this case, either black or white."  *Id.*

---

[21] The data that Mr. Wattson provided to Dr. Handley is also defective because it ignores tens of thousands of votes cast in each election—mostly early and absentee votes.

The second technique is a regression technique known as "ecological" or "bivariate" regression. *Id.* This technique "involves applying ordinary least squared regression to determine if a pattern exists across precincts between the percentage black within the precincts and the percentage of votes cast for each of the candidates." *Id.*

The third technique, developed more recently by Professor Gary King, "incorporates the method of bounds and maximum likelihood statistics to produce estimates of voting pattern by race." *Id.*; Handley Dep. (Exhibit 7), at 47-48.

As Dr. Handley's report demonstrates, the different statistical techniques often yield wildly different results. *See*, *e.g.*, Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 8 (showing that 26.1% of whites voted for Simes in the May 2000 primary election for Senate District 22 under the ecological inference estimate, but only 2.7% of whites voted for Simes under the bivariate regression estimate). Dr. Handley testified that ecological inference is an improvement over bivariate regression and, if she needs to choose just one result, she usually selects the ecological inference estimate. Handley Dep. (Exhibit 7), at 52 ("I tend to favor ecological inference estimates, but there might be some evidence to suggest that I wanted to look at the other estimates and rely on them more."); *id.* at 56 ("The EI tends to be slightly more reliable."); *id.* at 53 (explaining that, in some cases, the homogenous precinct estimates are the most reliable). Even so, Dr. Handley describes the three techniques as "complementary." Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 5. For example, Dr. Handley uses the different techniques as cross-checks and throws out inconsistent results. Consider the following testimony:

Q:     [Are there] some sort of cross-checks you use to determine [when,] using all three, whether one of them is whacky, so to speak?

24

> A:      If I got estimates that – say, for example, I got bivariate regression estimates that showed one thing and ecological inference estimates that showed something dramatically different, then I would actually not make any assumptions about that particular contest rather than rely on one estimate or the other.

Handley Dep. (Exhibit 7), at 49.   Dr. Handley clarified that her use of the phrase "dramatic difference" does not refer to the magnitude of variation between the different estimates but, instead, refers to situations in which the identity of the preferred candidate is in question due to the estimates' pointing in different directions.  *See* Handley Dep. (Exhibit 7), at 51 (testifying that, even if there are approximately 20-point differences between the various estimates, she is still "pretty confident of who the candidate of choice was" because "they are all showing that the candidate of choice was whatever candidate we're talking about"); *id.* at 52 (agreeing that "we can feel fairly confident we know who the candidate of choice is" so long as the three statistical techniques point in the same direction).

> ### e.      Even Under Dr. Handley's Improperly Limited Universe Of Contests, The Undisputed Facts Show The Absence Of White Bloc Voting In the Relevant Area That Usually Defeats Black-Preferred Candidates (Step Five).

In Tables III and IV of her report, Dr. Handley sets forth her statistical analysis of 18 election contests—fifteen interracial contests, in addition to three contests in old Senate District 16 that featured only black candidates.  Notably, Dr. Handley did not identify a white-preferred or black-preferred candidate in any contest; she did not report any outcomes of the national and statewide elections in a manner that reflects the voting behavior of voters in new Senate District 24 or eastern Arkansas; and she did not identify which contests involved bloc voting by whites.  It is not surprising, then, that Dr.

Handley never stated in her report that white bloc voting in the relevant region has usually defeated black-preferred candidates.   Under the undisputed facts, such a conclusion cannot be reached in this case.

### i).   Election Contests In The Counties That Approximate The Challenged District

The behavior of voters in Bentonville, Fayetteville, and Texarkana has no relevance to this case.  The relevant issue is how voters have behaved (and will behave) in the challenged district.  Thus, a reasonable approach would be to focus on a geographic area that approximates the electorate that will comprise new Senate District 24.  In *Cottier*, for example, the Eighth Circuit held that the district court properly considered the votes in contests for national and statewide office that were cast in the relevant geography (*i.e.*, the City of Martin).  *Cottier*, 604 F.3d at 560.

To predict electoral outcomes in new Senate District 24, one method of analysis, which Dr. Handley describes as "typical," is to examine contests for national and statewide office over the past decade and determine whether the black-preferred candidate would have been elected within the precise boundaries of the new district.  Dr. Handley did not undertake this mode of analysis in this case.  *See* Handley Dep. (Exhibit 7), at 31 (testifying that she "played around" with this concept but did not use it in her analysis); *id.* at 67 (testifying that "reconstituted election results" from contests for national and statewide office were not done, as is "typical" in a case like this, because the election results were not available at the block level); *id.* at 64 ("Q:  Was there any attempt by you to determine with regard to the statewide electoral outcomes solely [within] the new Senate District 24? A:  Well, I made an initial attempt.  It's not included in my report.").

With the aim of approximating the relevant geography, one possibility is to focus on election results in contests for national and statewide office that arise out of the five counties that contribute territory to new Senate District 24:  Crittenden, Cross, St. Francis, Lee, and Phillips.  Another contest, the 2004 primary election for State Senate District 17, also occurred within the five counties that contribute territory to new Senate District 24.   Under this approach, the black-preferred candidate received the most votes in four of the seven contests that Dr. Handley analyzed.  *See* Zax. Dec. (Exhibit 13), at ¶ 14.

A better approach is to focus on national and statewide election results in those county configurations that best approximate the electorate of new Senate District 24.  In this case, the core counties of new Senate District 24 are Crittenden, St. Francis, Lee, and Phillips counties.  This 4-county configuration eliminates approximately 16,000 residents of Cross County who are not included in new Senate District 24.  The cost of taking this step is the omission of approximately 1,300 Cross County voters who may be included in new Senate District 24.  Despite this cost, the correct omission of the large bulk of Cross County likely renders the approximation of the 4-county region to the true new Senate District 24 more accurate than the 5-county region.  *See* Zax Dec. (Exhibit 13), at ¶ 11. The 4-county region certainly meets Dr. Handley's criterion of having 70-80% of the voters in the challenged district.  In the 4-county region, the black-preferred candidate *always* received the most votes (*i.e.*, seven out of seven contests).

The results of the 5-county and 4-county contests, which are based on undisputed election results from the Secretary of State's Office, are stated in Professor Zax's Declaration (Exhibit 13 at ¶ 14) and are reproduced here: [22]

| CONTEST | REGION | BVAP | OUTCOME IN REGION |
|---|---|---|---|
| **1. Sheffield** v. Dilday (2002) | 5-County | 42.3% | Black-preferred candidate **won** |
| **2. Sheffield v**. Rockefeller (2002) | 5-County | 42.3% | Black-preferred candidate **won** |
| **3. Griffen** v. Hannah (2004) | 5-County | 42.3% | Black-preferred candidate lost |
| **4. Griffen** v. Danielson (2006) | 5-County | 46% | Black-preferred candidate **won** |
| **5. Obama** v. Clinton (2008) | 5-County | 46% | Black-preferred candidate lost |
| **6. Obama** v. McCain (2008) | 5-County | 46% | Black-preferred candidate **won** |
| **7. Jones** v. Luker (2004) | 5-County | 26.2%[23] | Black-preferred candidate lost |
| **8. Sheffield** v. Dilday (2002) | 4-County | 45.9% | Black-preferred candidate **won** |
| **9. Sheffield v**. Rockefeller (2002) | 4-County | 45.9% | Black-preferred candidate **won** |
| **10. Griffen** v. Hannah (2004) | 4-County | 45.9% | Black-preferred candidate **won** |
| **11.  Griffen** v. Danielson (2006) | 4-County | 50.1% | Black-preferred candidate **won** |
| **12. Obama** v. Clinton (2008) | 4-County | 50.1% | Black-preferred candidate **won** |
| **13.  Obama** v. McCain (2008) | 4-County | 50.1% | Black-preferred candidate **won** |

[22] Bold typeface in the first column indicates a person designated in Dr. Handley's Report as an African American.  According to Dr. Handley's statistical analyses, the African American candidates were always the black-preferred candidates.

[23] This BVAP calculation is based on the Polling Place Areas shown in Dr. Handley's data as reporting votes in this election.

| **14. Jones** v. Luker (2004) | 4-County | 28.9%[24] | Black-preferred candidate **won** |
|---|---|---|---|

ii).    **Election Contests In Old Senate Districts 16 And 22**

The contests in old Senate Districts 16 and 22 could also be considered, although though they omit a large portion of the relevant geography.  *See* Overlap Map of 2000 Senate District 16 with 2010 Adopted Senate District 24 (Exhibit 8).  The black-preferred candidate, Alvin Simes, defeated the white-preferred candidate, Steve Higginbothom, in the 2000 primary election for Senate District 22 by a margin of 52.8% to 47.2%.  *See* Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 8.  Two years later, Higginbothom narrowly won in a contest that featured Simes and another African American candidate, McCoy.[25]  *See* Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 8.  Although Plaintiffs attribute Higginbothom's victory to a redistricting decision by the Board of Apportionment, Dr. Handley's ecological inference estimates show a nearly eleven-point reduction in black support for Simes (64.9% compared to 76% in the first contest); a six-point increase in black support for Higginbothom (25.2% compared to 18.7% in the first contest); and a nearly 6% reduction in turnout among black voters (16.3% compared to 22% in the first contest).  *See* Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 8.  Despite the usual advantages of incumbency, Simes lost support among black voters after two years on the job.

---

[24] The BVAP calculation is based on the Polling Place areas shown in Dr. Handley's data as reporting votes in this election.

[25] Footnote 9 of Dr. Handley's report implies that Higginbothom won by a large margin based on the votes cast for Higginbothom and Simes.  Dr. Handley admitted in her deposition that the footnote omitted the votes cast for McCoy.  Handley Dep. (Exhibit 7), at 103.

The other contests in old District 16 featured only black candidates.   In the ultimate irony, Plaintiffs may contend that Senator Jack Crumbly—a plaintiff in this lawsuit—is a "white preferred candidate" and not a "black preferred candidate."   Under this argument, each victory by Senator Crumbly should count as a strike against the State of Arkansas and weigh in favor of Section 2 liability.   But the record evidence does not support the notion that Senator Crumbly is a white-preferred, rather than a black-preferred, candidate.   *First*, Dr. Handley excluded all-white contests from her analysis, in defiance of *Gingles* and *Cottier*, under the implicit assumption that black candidates can best represent back voters.   *Second*, Senator Crumbly testified that increasing the BVAP in new Senate District 24 would improve his electoral prospects— a statement that could only be true if he were the black-preferred candidate.   Crumbly Dep., (Exhibit 15), at 97 (testifying that a higher BVAP would "enhance my chances"). *Third*, Dr. Handley's statistical evidence underscores the ambiguous status of Senator Crumbly and his black opponents.   For example, Willis won a small plurality of the votes in the 2006 contest for Senate District 16 (34.6% of the total vote), but it is not clear who the white-preferred candidate was.   Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 8.   Dr. Handley's ecological inference estimate shows that white voters narrowly preferred Willis over Crumbly (43.7% to 40.0%), but her homogeneous precinct analysis shows that white voters preferred Crumbly (44.6% to 33.7%) and her bivariate regression estimate likewise shows a white preference for Crumbly over Willis (40.2% to 38.1%).   *Id.*   Dr. Handley cannot determine a white-preferred candidate in the face of such inconsistency.   Handley Dep. (Exhibit 7), at 49-52.   Whites split their votes

between black candidates, and no reasonable factfinder could conclude that whites voted as a bloc in this contest.

In the 2006 primary runoff election for Senate District 16, Senator Crumbly won by approximately 68 votes.[26] Dr. Handley's ecological inference estimate shows that blacks preferred Willis over Crumbly (53.9% to 45.3%).  *See* Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 8.  But her homogenous precinct analysis shows the opposite result:  black voters preferred Crumbly over Willis (57.1% to 42.9%).  *Id.* In other words, the homogenous precinct analysis shows that Senator Crumbly was the black-preferred candidate.  Dr. Handley testified that homogenous precinct analysis uses the "actual data" and that its results can be more accurate than ecological inference estimates.  Handley Dep. (Exhibit 7), at 34-35; *id.* at 53.  When the results of the statistical techniques are inconsistent, Dr. Handley disregards the contest as a reliable data point.  Handley Dep. (Exhibit 7), at 49.  A reasonable factfinder could not conclude that white bloc voting prevented the election of a black-preferred candidate in this contest because there was no obvious black-preferred candidate.

Finally, in the 2010 primary election for State Senate District 16, Dr. Handley's ecological inference estimates show that blacks slightly preferred Simes over the winner, Crumbly (51.1% to 48.6%).  Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 9.  However, ecological inference estimates are not exact, and Dr. Handley did not calculate a margin of error for any of her estimates.  Handley Dep. (Exhibit 7), at 58-59 (testifying that, with some approaches to ecological inference, a margin of error can be

---

[26] *See* Secretary of State Election Results (2006 Senate Dist. 16 Runoff) (Exhibit 14).

produced, but Dr. Handley did not consider margins of error in her Arkansas analysis). Here, again, there was no clear black-preferred candidate.

### iii).    Election Contests In Districts That Have Minimal Overlap With New Senate District 24

Another possibility is to consider various contests for state legislative office that have minimal overlap with new Senate District 24.   Consideration of these contests is suspect under Dr. Handley's own testimony.   *See* Handley Dep. (Exhibit 7), at 14 (testifying that municipal elections within a challenged district are not useful to analyze if they do not comprise 70-80% of the challenged district).   If these contests are considered, however, Dr. Handley's report shows that two of the six contests were won by black-preferred candidates.   *See* Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7),  at 6-9.   Davis, the black-preferred candidate, defeated Nassar by a wide margin in the 2004 general election for House District 54 (65.7%).   *Id.* at 6-7.   In addition, Willis, the black-preferred candidate, defeated Hall in the 2004 primary election for House District 13.   *Id*. at 8.   Two years earlier, Willis lost to the white-preferred candidate, King, in a contest that King won by less than 100 votes (50.9%). Black-preferred candidates also lost three other House contests analyzed by Dr. Handley, two of which occurred in districts with BVAPs less than 32%.   *See* Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 8-9; BOA 2001 House Matrix (Exhibit 16).[27]

---

[27] The BVAP in the 2001 House Matrix is the seventh column from the left.  The number can be confirmed by dividing the last column ("VABlack") with the next-to-last column ("VApersons").  A chart summarizing the various contests analyzed by Dr. Handley is attached to Separate Defendants' motion for summary judgment as Exhibit 18.

### iv).  The Tally

In the 4-county region that most closely approximates new Senate District 24, black-preferred candidates received the most votes in all six of the contests for national and statewide office.  In the two Senate contests between Simes and Higginbothom, the black-preferred candidate won one contest and lost the other.  In the various House contests that Dr. Handley analyzed, the black-preferred candidate won two contests and lost four.  The subtotal is nine contests in favor of the black-preferred candidate and five against.

In the 2004 primary election for Senate District 17, the black-preferred candidate (Jones) lost.  However, old Senate District 17 consisted almost entirely of areas that are not included in new Senate District 24.  *See* BOA 2001 Senate Map (Exhibit 17); BOA 2011 Senate Map (Exhibit 5).  Old Senate District 17 included all of Monroe County, all Woodruff County, all of Cross County, parts of Crittenden and Phillips counties, and the western portions of St. Francis and Lee counties (*i.e.*, the portions that are largely excluded from new Senate District 24).  When the election results are tabulated within the four counties that comprise the core of new Senate District 24, the black-preferred candidate received the most votes.  *See* Zax Dec. (Exhibit 13), ¶¶ 14-15.

The remaining contests are the three Senate primary contests that featured plaintiff Senator Crumbly.  In the first contest (2006 primary), Dr. Handley's statistical techniques were contradictory on the issue of which candidate was preferred by white voters.  But this much is clear:  whites did not vote as a "bloc" under any reasonable definition of that term.  In the second contest (2006 primary runoff), Dr. Handley's statistical techniques were contradictory on the issue of which candidate was preferred

by black voters, and whites narrowly preferred Crumbly.   Again, no reasonable factfinder could conclude that white bloc voting prevented the election of a black-preferred candidate in this contest.   In the third contest (2010 primary), black voters slightly preferred Simes according to Dr. Handley's ecological inference estimate (51.1%), although Dr. Handley did not provide a margin of error for this calculation. Once again, it is impossible to decipher a clear "black-preferred" candidate among the different black candidates.

In summary, a tally of the 18 contests analyzed by Dr. Handley shows that the black-preferred candidate received the most votes in the relevant area in ten contests and lost five.   In the other three contests, there was no obvious white-preferred or black-preferred candidate.

These facts do not show that white bloc voting has *usually* defeated the black-preferred candidates in the relevant region.   To the contrary, the black-preferred candidate has almost always received the most votes.   Plaintiffs cannot establish this essential element of their claim, and the Court should enter summary judgment in favor of Defendants. *Anderson*, 477 U.S. at 250 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

### 4. Under The Undisputed Facts, New Senate District 24 Can Be Predicted To Provide Black Voters With An Equal Opportunity To Elect Their Preferred Candidates.

Plaintiffs may argue that they do not have to establish that bloc voting by whites within the vicinity of new Senate District 24 has usually caused the defeat of black-preferred candidates.   Plaintiffs may contend that Arkansas lives in a state of perpetual

Section 2 liability and, therefore, the essential elements of a Section 2 claim should not stand in their way.  Under this view, the Court would skip immediately to a remedial phase in which the primary inquiry is what BVAP is needed to give black voters an equal opportunity to elect candidates of their choice.

Plaintiffs have no legal basis for such a position.  But even if Plaintiffs were relieved of their obligation to establish the third *Gingles* precondition, the undisputed evidence shows that the challenged district, with a BVAP of 52.88%, will be more than sufficient to provide black voters with an equal opportunity to elect their preferred candidates.

> ### a.   The Parties Agree That A Jurisdiction-Specific, Functional Analysis Of Election Data And Voting Behavior—Rather Than A Predetermined "Rule Of Thumb"—Is Required.

If there is one point of agreement between Plaintiffs and Separate Defendants, it is the following statement from Dr. Handley:  "The percentage minority population needed to create an 'effective minority district' (that is, a district that provides minority voters with the ability to elect candidates of their choice to office) varies depending on the locality—there is no single target (for example, 65 percent) that can be applied universally."  Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 9.[28]  In other

---

[28] *Compare Smith v. Clinton*, 687 F. Supp. 1361, 1362-63 (E.D. Ark. 1988) (citing *Ketchum v. Byrne*, 740 F. 2d 1398 (7th Cir. 1984)).  The *Smith* court, following the Seventh Circuit's decision in *Ketchum* and other lower-court decisions of that era, reasoned that a "guideline" of 65% of the total black population was appropriate for remedying a proven Section 2 violation under the following calculation:  start with a bare majority of 50%; then add 5% to offset the fact that the minority population tends to be younger than the white population, which means that a greater percentage of minority residents are below the legal voting age; then add 5% for historically lower voter registration rates among blacks; then add 5% for historically lower voter turnout among blacks.  The second step—an increase of 5% to account for a younger population—does not need to be performed if voting age population, rather than total population, is the

words, a jurisdiction-specific analysis of election data—not a preconceived guideline or rule of thumb—is required under the Supreme Court's Section 2 jurisprudence. *See Gingles*, 478 U.S. at 55-56 (discussing the importance of jurisdiction-specific analyses); Br. in Support of Sep. Def. Mot. to Dismiss (Doc. 13), at 13-20 (seeking dismissal of Plaintiffs' original complaint, which appeared to be based on the discredited notion that a 60% BVAP or 65% total black population is always required);[29] *see also* Ancheta & Imahara, *Multi-Ethnic Voting Rights: Redefining Vote Dilution in Communities of Color*, 27 U.S.F. L. Rev. 815, 867 (1993) ("[T]he 65% benchmark is an artificial one because it does not necessarily reflect a minority group's true potential to control a district."); Brace, Groffman, Handley, & Niemi, *Minority Voting Equality: The 65 Percent Rule in Theory and Practice*, 10 Law & Policy 1 (Jan. 1988), Exhibit 3 to Handley Dep. (Exhibit 7).

In the latter article, Dr. Handley and her co-authors noted that the 65-percent rule formerly advanced by the Justice Department in the 1970s "rested on shaky empirical grounds"; that lower courts' adoption of the 65-percent rule was attributable to a "misreading of the early cases"; that Justice Department officials "do not regard the 65

---

starting point. *Smith*, 687 F. Supp. at 1363. The *Smith* court's mathematical formula was not based upon any citations to historical texts or social science literature, much less evidence in the record regarding the particular district at issue. Rather, the court's reasoning was based entirely upon the *ipse dixit* that the "the extent to which minorities must outnumber whites in the relevant jurisdiction is a matter of 'general acceptance.'" *Id*. at 1362-63. As Dr. Handley has repeatedly emphasized, this issue is hardly matter of "general acceptance," and *Gingles* requires a jurisdiction-specific analysis in each case.

[29] Separate Defendants incorporate their motion to dismiss the original complaint and supporting brief (Doc. 12 & 13) by reference under Fed. R. Civ. P. 10(c). Separate Defendants also incorporate their motion to dismiss the amended complaint and supporting brief (Doc. 31 & 32).

percent figure as having any special significance"; that there is not "anything special about the 65 percent figure"; and that it is "sometimes too high and . . . sometimes too low." *Id.* at 45-46.  Dr. Handley affirmed these statements in her deposition, although she believes that the rule of thumb is no longer "engraved in concrete" in the lower courts.  Handley Dep. (Exhibit 7), at 109-115.

To the extent that lower court decisions regarding the 60-percent or 65-percent rule had persuasive value at one time, the Supreme Court's recent decision in *Bartlett* has put an end to the matter.  *See* Br. In Support of Sep. Def. Mot. to Dismiss (Doc. 13), at 17-20; *Cottier*, 604 F.3d at 565-72 (Smith, J., dissenting) (stating that a 60-percent rule "finds no reasoned basis in case law" and, moreover, is questionable after the Supreme Court's decision in *Bartlett*). [30]  With the parties in agreement, there is no need to belabor the point.

> **b.    Dr. Handley Does Not Have An Opinion About What BVAP Is Necessary To Provide Equal Opportunity To Black Voters In New Senate District 24.**

In the introductory section of her expert report, Dr. Handley states that she was asked by her clients "to ascertain the level of black population required in this region of

---

[30]  In *Cottier*, a majority of the Eighth Circuit, sitting *en banc*, held that the plaintiff failed to meet the third *Gingles* precondition (significant block voting by white voters) and, therefore, reversed the district court's judgment of liability under Section 2.  Given the absence of liability, the majority never reached the issue of whether, at the remedial phase, a 60% or 65% guideline was appropriate.  In dissent, Judge Smith, joined by Judges Murphy, Bye, and Melloy, concluded that the *en banc* court should not have disturbed the district court's judgment of liability for procedural reasons.  The dissenting judges believed, however, that the district court's decision regarding an appropriate remedy should have been remanded for reconsideration in light of *Bartlett* because the Supreme Court's decision was inconsistent with the district court's use of a 65% or 60% rule for determining what constitutes an effective majority.  Thus, four Eighth Circuit judges believe that *Bartlett* is inconsistent with a 60% rule, and the other judges have not opined on the issue.

the state to provide African American voters with the ability to elect candidates of their choice to legislative office, particularly in the general area of 2011 Senate District 24." Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 1.  This expression of Dr. Handley's fundamental task captures the heart of Plaintiffs' claim.  But, remarkably, Dr. Handley has no opinion on the matter.  Consider the following colloquy:

> Q: In the first paragraph of your report, you say that you were asked to "ascertain the level of black population required in this region of the state to provide African-Americans with the ability to elect candidates of their choice to legislative office, particularly in the general area of 2011 Senate District 24"; right?
>
> A: Yes.
>
> Q: Did you answer that question?
>
> A: No, not – not fully, no.  That's before I realized that – that's what my contract said, but again, we've got a problem with Senate District 16, in that it's currently not electing.  So this is a difficult question to answer like that.

Handley Dep. (Exhibit 7), at 160-61.  In essence, Dr. Handley testified that, because plaintiff Senator Crumbly won some close election in old District 16 featuring only black candidates, she is incapable of telling the Court what BVAP is needed to have an effective district as requested by her clients in their contract.

Dr. Handley had other opportunities to testify in her deposition about the conspicuous omission in her expert report, but she did not further illuminate the issue. Consider the following exchange:

> Q: Did you actually run a calculation [to determine future effectiveness] in this Arkansas case?
>
> A: I think I tried to do it for Senate District 16, yeah, possibly, but it doesn't - --because the minority preferred candidate is other than you would – it didn't work.

Q:    Why didn't it work?

A:    Because—well, again, this is something I want to revisit, but it's  -- the – I wouldn't say – I did a tentative try at it, but nothing that I would comment on.

Handley Dep. (Exhibit 7), at 190-91.  Thus, Dr. Handley will not "comment" on a matter that, from Plaintiffs' perspective, is the key issue in this case.[31]

      **c.**      **Dr. Handley's Usual Model Shows That A 52.88% BVAP Exceeds The BVAP Required To Provide Black Voters With Equal Opportunity.**

            **i).**      **Dr. Handley's Usual Model:  Incorporating Turnout, Cohesiveness, And Cross-Over Voting**

Part IV of Dr. Handley's expert report is titled "Providing Minority Voters with the Ability to Elect Their Preferred Candidates."  S*ee* Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 9.  The only information that Dr. Handley provides in this section is Table 4, which shows the BVAP percentage needed to equalize turnout on election day.   Table 4 is only marginally relevant and certainly does not tell the whole story.   In Dr. Handley's earlier writings, for example, she wrote that "[o]ne cannot adhere slavishly to the most easily quantifiable part of minority vote calculations, namely, to the equalization percentage."  Brace et al., *supra*, Exhibit 3 to Handley Dep. (Exhibit 7), at 57.  In Chicago, for example, Dr. Handley and her co-authors noted that "for blacks, incumbency, polarization, and other factors may now be as significant as differences in [turnout factors such as] registration rates, voting, and even VAP [Voting Age Population]."  *Id.*

---

[31] Dr. Handley also will not establish useable parameters for determining when a district is "effective."  *See* Handley Dep. (Exhibit 7), at 23 ("Q:  When is a district effective?  A: I mean, there are varying degrees of effectiveness, just as there are varying degrees of polarization.")

More recently, Dr. Handley and her co-authors advanced a formal model for determining "the percentage minority necessary to provide minority voters with an equal opportunity to elect their candidates of choice."  Groffman, Handley & Lublin, *Drawing Effective Minority Districts: A Conceptual Framework And Some Empirical Evidence*, 79 U.N.C. L. Rev. 1383 (2001), Exhibit 4 to Handley Dep. (Exhibit 7).  The purpose of the model is to "estimate[] future minority voting strength."  *Id.* at 1387.  On page 1404 of the article, Dr. Handley discusses the first component of the model—namely, the equalization of black and white turnout.  On page 1407 of the article, Dr. Handley discusses additional critical variables: cohesion and cross-over voting.  Dr. Handley wrote:  "*Equalizing turnout is not the best indicator of whether minority voters will have an equal opportunity to elect minority candidates.  We also need to incorporate the level of minority cohesion and the degree of white crossover voting that can be expected when a minority-preferred candidate competes for office*."  *Id.* at 1407 (emphasis added).  "If, for example, white voters regularly cross over to vote for black candidates, the percentage black necessary to create an effective black district decreases."  *Id.*

The incorporation of cross-over voting and cohesion can have profound implications.  Dr. Handley noted that, after majority-minority districts were redrawn in the wake of the Supreme Court's anti-gerrymandering decisions, the black population in eight districts fell to a level below 50 percent, and the African American candidates won in every contest in which they sought re-election.  Handley Dep. (Exhibit 7), at 120.  In her article, Dr. Handley considered 20 congressional races in the South.  In every case, the "% black needed to equalize turnout" exceeded 50%, and it was as high as 58% in the contest for Georgia's second congressional district.  *Drawing Effective Minority*

*Districts*, Exhibit 4 to Handley Dep. (Exhibit 7), at 1406.   But when crossover and cohesion numbers were introduced into the model, the "effectiveness" number was substantially smaller than the "turnout equalization" number in every instance.   For example, in Georgia's second congressional district, Dr. Handley calculated that the "% black needed to win, incorporating cohesion and crossover," was only 37.1%.   *Id.* at 1408.    In most cases, the effectiveness number was "in the range of 33%-39%.   *Id.* "This is because, even though blacks are typically turning out to vote at lower rates than whites, blacks are voting very cohesively—over 95% of the black voters consistently voted for the black Democrat in the general election—and approximately one-third of the white voters supported the black Democrat in the general election." *Id.*  Thus, even if an election is polarized, if black voters are more cohesive than white voters, the black voters improve their chances of electing the black-preferred candidate.   Handley Dep. (Exhibit 7), at 126 (agreeing that, if blacks engage in bloc voting or cohesion more intensely than whites in a given election, that fact tends to lower the percentage of black population needed to have effective districts).[32]

Dr. Handley's model is represented in the relatively simple equation in footnotes 68 and 72 of her *North Carolina Law* Review article.   Dr. Handley recently applied this equation when she served as a consultant for the Alaska Redistricting Board.   *See* Handley, *A Voting Rights Analysis of the Proposed Alaska State Legislative Plans: Measuring the Degree of Racial Bloc Voting and Determining the Effectiveness of Proposed Minority Districts* (2011) (hereinafter "Alaska Report"), Exhibit  5 to Handley Dep. (Exhibit 7); Handley Dep. (Exhibit 7), at 135-144.   In Part 3 of that document, Dr.

---

[32] In her deposition, Dr. Handley affirmed all of the relevant statements in her *North Carolina Law Review* article.   *See* Handley Dep. (Exhibit 7), at 115-135.

Handley calculated the minority VAP percentage needed to have the ability to elect a minority-preferred candidate.   Dr. Handley considered numerous elections and applied the model as set forth in her *North Carolina Law Review* article.  *See* Alaska Report, Exhibit 5 to Handley Dep. (Exhibit 7), at 19 & n.14.  Dr. Handley calculated a "target percentage of 41.8" and concluded that, on average, any district with an Alaska Native VAP greater than 41.8% should be able to elect an Alaska Native-preferred candidate to office."   *Id.*   "This percentage is lower than 50% Alaska Native," Dr. Handley explained," because of the turnout rates and cross-over votes that minority-preferred candidates "can usually expect."  *Id.*  Of course, as in the examples in her law review article, a high level of cohesion by the minority voters can also cause the effectiveness number to fall below 50% of the minority voting-age population.

### ii).  Dr. Handley's Model Shows That A BVAP Of 49.9% Will Provide Equal Opportunity.

Dr. Handley admitted in her deposition that Table 4 in her report is not very relevant, because it considers only one variable.  Handley Dep. (Exhibit 7), at 147 ("Q: Do you have an opinion about the specific number needed in the new District 24 to be effective for minority voters?  A:  I have only gone through the first stage of that, and you can see the results of that in Table 4.") (emphasis added); *see also* Handley Dep. (Exhibit 7), at 106 ("Q:  Are you aware of any U.S. Supreme Court case that says that Section 2 requires the creation of majority-minority districts for turnout on election day that is equal?  A:  Not in those words, no.").

To fill the void, Separate Defendants asked their testifying expert, Professor Zax, to apply Dr. Handley's model by using Dr. Handley's data, including cohesion and cross-over voting calculations.  Based on Plaintiffs' data for the 18 contests that Dr.

Handley considered in her bloc voting analysis, Professor Zax calculated that a BVAP of 49.9% in the new Senate District 24 is the threshold above which the black-preferred candidate would expect to receive more than 50% of the vote.  Zax Dec. (Exhibit 13), at ¶ 6.

It is also noteworthy that Dr. Handley has repeatedly emphasized the importance of black incumbency in her writings.  *See Drawing Effective Minority Districts*, Exhibit 4 to Handley Dep. (Exhibit 7), at 1423; *see also* Handley Dep. (Exhibit 7), at 113 (agreeing that "the presence of minority incumbents should be taken into account.").  Professor Zax has not performed any downward adjustments to the effectiveness calculation, even though such an adjustment may be justified in this case given Senator Crumbly's status as an incumbent.  Crumbly Dep. (Exhibit 15), at 15.

### iii). Dr. Handley's Explanation For Having "No Comment" Does Not Make Sense.

After being confronted with her prior writings, Dr. Handley explained that she jettisoned her usual model in this case because voters in old Senate District 16 were not electing black-preferred candidates.  Handley Dep. (Exhibit 7), at 145.  This explanation makes no sense.  For one thing, the premise that Senator Crumbly was not a black-preferred candidate in any of the three all-black contests for state Senate is highly doubtful for the reasons discussed above.  But, in any event, Senator Crumbly's level of favor or disfavor within the African American community is no reason for Dr. Handley to abandon the model she has proposed in her own published work.[33]  A virtue of her model

---

[33] A *good* reason for jettisoning the model would be if the election data were tainted by thousands of missing votes or unverifiable technical processes undertaken by a non-expert, such as Mr. Wattson, which may render the resulting expert analysis unreliable or violate the principle of replicability.

is that it relies on numerous election contests in an effort to understand how the electorate behaves over a series of election cycles involving a variety of candidates.  *Cf. Gingles*, 478 U.S. at 57 (noting that a bloc voting analysis that considers elections "over a period of time" is more probative "than are the results of a single election").  It is apparent from Dr. Handley's statistical analysis that white voters do not prefer Alvin Simes, who appeared in four of the five election contests that occurred in the predecessor senate districts.  But how much weight should be placed on a small set of contests that feature one particularly polarizing individual when a broader sample set shows overwhelming success by black-preferred candidates against white opponents in the region?  Like any good social scientist, Dr. Handley recognizes that numerous data points are needed to draw reasonable conclusions.   Handley Dep. (Exhibit 7), at 85 (declining to opine on the level of polarization in contests featuring only black candidates because she "didn't look at enough black-versus-black contests").  Dr. Handley has shown by her own work that incorporating numerous contests into her model is important, and her stated reasons for disavowing her own model in this case are unpersuasive.

> c.  **The Elections That Dr. Handley Analyzed Over The Past Decade Confirm That Black-Preferred Candidates Can Be Elected To Office With A BVAP Of Less Than 52.88%.**

Election data from the relevant region in eastern Arkansas show that the figure of 49.9% BVAP needed for blacks to be able to elect a candidate of their choice (as calculated by Professor Zax using Dr. Handley's model and Dr. Handley's data) coincides very closely with historical election results from that same region.  Attached to Separate Defendants' motion for summary judgment as Exhibit 18 is a chart showing the

results of election contests that Dr. Handley mentioned in her report, organized by BVAP ranges.  The following conclusions are beyond dispute:

- **Zone 1 (BVAP under 32%):**  In this range, black-preferred candidates, each of whom was black, received the most votes in **2 out of 11** election scenarios. Therefore, African American black-preferred candidates have difficulty winning within this range.

- **Zone 2 (BVAP between 42% and 45%):**  In this range, black-preferred candidates, each of whom was black, received the most votes in **2 out of 3** election scenarios in the relevant region.

- **Zone 3 (BVAP between 46% and 53%):**   In this range, black-preferred candidates, all of whom were black, received the most votes in **9 out of 11** election scenarios in the relevant region.[34]   However, the BVAP was not so high that whites were usually dissuaded from running for elected office, and whites sometimes (though rarely) received the most votes.   Thus, this zone reflects something more than equal opportunity for black candidates, but something less than a "guarantee" or "safe" seat.   In addition, the center of this range happens to coincide with Professor Zax's application of Dr. Handley's model, which generated an effectiveness calculation of 49.9% BVAP.   Finally, Plaintiffs' own

---

[34] There were only two instances in which a white-preferred candidate received more votes than the black-preferred candidate.  *First*, Clinton—a presidential candidate with strong Arkansas ties—narrowly defeated Obama in the 5-county region with a 46% BVAP.  However, Obama received the most votes in the 4-county region with a 50.1% BVAP.  *Second*, King (white) defeated Willis (black) by only 91 votes in the House District 13 contest with a 52.88% BVAP.  However, Willis (black) won the next election for the same seat by a comfortable margin in a contest against Hall (white).  The black-preferred candidate received the most votes in all other contests within this range.

admissions regarding county-wide contests further support the proposition that Zone 3 provides equal opportunity to black voters.[35]  New Senate District 24 has a BVAP of 52.88% and is at the top end of Zone 3.

- **Zone 4 (BVAP over 55%):**  In this range, whites almost never run for office.  In the **12** contests that fall within this range, only **4** involved white candidates.  The other **8** featured only black candidates.  Thus, to the extent that 55% BVAP can be considered to be any sort of "threshold" in this case, it appears to be threshold beyond which whites will almost never become candidates for office.

In summary, the undisputed electoral evidence shows that, when the BVAP is in a range of 46% to 53%, the black-preferred candidate almost always receives more votes than white-preferred candidates.  This electoral reality comports with Professor Zax's application of Dr. Handley's theoretical model, which generated an effectiveness calculation of 49.9% BVAP—almost in the middle of the 46-53% range.

In the face of this overwhelming evidence, Plaintiffs are left with the thin argument that the BVAP must fall within Zone 4 and, in particular, at a level sufficient to (1) dissuade white candidates from seeking office and (2) result in the election of the most "black-preferred" candidate in contests that will inevitably feature only black candidates.  In more concrete terms, the test for Plaintiffs is apparently this:  What BVAP would have allowed even the most polarizing black candidate in the contests within the

---

[35] In Plaintiffs' original complaint, Plaintiffs alleged that African Americans have recently been elected to county-wide offices in St. Francis and Lee counties.  *See* Original Compl. (Doc. 1), at ¶ 42.  The 2010 BVAP of St. Francis County was 48.2%, and the 2010 BVAP of Lee County was 52.9%.  *See* U.S. Census data, Map of 2010 BVAP (Exhibit 19).  These undisputed facts are not reflected in the information reported above or in the underlying chart (Exhibit 18).  Thus, these facts further show that black candidates regularly succeed when the BVAP is within Zone 3.

predecessor districts always to defeat his opponents?   But this position is directly contrary to the Supreme Court's emphasis that redistricting bodies may draw districts that reduce "the significance and influence of race by encouraging minority and majority voters to work together toward a common goal."  *Bartlett*, 556 U.S. at 23.

In addition to the deficient sample size, Plaintiffs' anticipated argument has no legal support because Section 2 does not require the maximization of minority voting strength, safe seats for minority candidates, or guaranteed outcomes for minority-preferred candidates.  *Bartlett*, 556 U.S. at 20 ("Section 2 does not guarantee minority voters an electoral advantage."); *see also De Grandy,* 512 U.S. at 1016 ("Reading § 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose [of equal opportunity].  One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast.").  Like the maximization of minority voting strength, the electability of Alvin Simes is not the measure of Section 2.

Even under Dr. Handley's consideration of only 18 contests, the undisputed facts show that a BVAP of 52.88% will be more than sufficient to provide equal opportunity to black and white voters.  Section 2 requires no more.  *Bartlett*, 556 U.S. at 17 (stating that the focus of the bloc-voting analysis is to determine whether minority voters' ability to elect their chosen representatives is *inferior* to that of white voters); *DeGrandy*, 512 U.S. at 1020 ("[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground"); *id.* at 1014 n.11 ("[Section 2's] proviso also confirms what is otherwise clear from the text of the statute, namely, that the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred

47

candidates of whatever race."); *Little Rock School Dist. v. Pulaski Co. Special School District No. 1*, 831 F. Supp. 1453, 1462 (E.D. Ark. 1993) (Wright, J.) ("The [Voting Rights Act] is not an affirmative action statute, and it is not violated by a state legislature simply because that legislature does not enact a districting plan that maximizes black political power and influence.") (citations omitted).

**C.    The Court Should Enter Summary Judgment On Plaintiffs' Claim Of Intentional Discrimination Under The U.S. Constitution (Count II).**

**1.    The Fourteenth Amendment**

Plaintiffs contend that Separate Defendants violated the Equal Protection Clause of the Fourteenth Amendment, which provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Am. XIV, § 1.  A claim under the Fourteenth Amendment is more onerous than a statutory claim under the Voting Rights Act.  A redistricting plan violates the Fourteenth Amendment only if it was "conceived or operated as [a] purposeful devic[e] to further racial . . . discrimination" and has the intended effect.  *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971); *see also City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980); *Roberts v. Wamser*, 883 F.3d 617, 623 (8th Cir. 1989) (noting that a voting rights plaintiff proceeding under 42 U.S.C. § 1983 for constitutional violations must prove purposeful discrimination). The plaintiff's burden is to show that "race was the predominant factor motivating the . . . decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995).  In addition, "[the term] 'discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker[s] . . . selected or reaffirmed a particular course of

conduct at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeny*, 442 U.S. 256, 279 (1979).

Plaintiffs' primary focus seems to be that the Board of Apportionment kept Crittenden County whole and included it in the district where Senator Crumbly resides. Am. Compl., ¶¶ 58-61.   But Plaintiffs do not dispute that Crittenden County has a majority-black population of 51.2% according to the 2010 census data. *See* U.S. Census data, Map of Black Population by County (Exhibit 20).   Nor can Plaintiffs dispute that keeping counties whole is a race-neutral practice that follows the traditional redistricting principle set forth in the Arkansas Constitution.   Ark. Const., Art. 8, § 3.

Plaintiffs have no evidence that the inclusion of Crittenden County (or any other geographic area) in new Senate District 24 is the result of purposeful discrimination against African Americans.   Rather, the new district's boundaries are the result of Separate Defendants' application of several traditional redistricting principles.   The first of these principles is compliance with the law, including the principle of one-person, one-vote.   Governor Beebe testified that he "wanted to make sure that the respective districts contained the appropriate number of people within the parameters of what the law provided."   Beebe Dep. (Exhibit 21), at 11.   Likewise, General McDaniel "made it a very clear priority to [his] counsel that throughout the process" they must "be ever vigilant and . . . vocal . . . if they ever had a concern that [the Board was] not in compliance with the law."   McDaniel Dep. (Exhibit 22), at 12.   "All of the law was important to [Separate Defendants]." *Id.*

In addition to following the law, Separate Defendants "wanted to keep communities of interest together where possible[;]" "wanted to take into consideration

the wants and desires of the people in the state that expressed those desires, including, but not limited to incumbents[;]" and "wanted to maintain minority districts as much as possible."  Beebe Dep. (Exhibit 21), at 11-12.  The goal of Separate Defendants was to get the BVAP "as high as possible in consideration of all of the other factors in drawing a statewide map."  McDaniel Dep. (Exhibit 22), at 54.  These factors—none of which suggest discrimination against African Americans—"were present in all the districts[,]" and "the additional factor of trying to maximize minority districts was the only factor that was different" when majority-minority districts, including new Senate District 24, were drawn.  Beebe Dep. (Exhibit 21), at 64-65.

Like Governor Beebe, General McDaniel testified that "the courts have not declared a hard-and-fast number, so you take into account the totality of the circumstances in each district."  McDaniel Dep. (Exhibit 22), at 25.  General McDaniel agreed with Governor Beebe that "there are a number of considerations that have to be considered, vis-à-vis all of the districts[.]"  McDaniel Dep. (Exhibit 22), at 25-26.  While taking the totality of the circumstances into account, Separate Defendants sought to "ensur[e] that minority voters have the opportunity to elect the candidate of their choice [in new Senate District 24]" by including within its boundaries a "56-plus percent minority population, 52.8 or 9 percent voting-age African-American population, not counting voting age other minorities[.]"  McDaniel Dep. (Exhibit 22), at 26.  Separate Defendants' decisionmaking does not give rise to an inference of intentional discrimination against African Americans—especially where, as here, there is "an incumbent African-American senator and a district that was not likely to have a Republican opponent at all."  McDaniel Dep. (Exhibit 22), at 26.

Senator Crumbly, however, was not satisfied with the way that the new district was to be drawn.  He lobbied for an even larger BVAP in the district by proposing various alternative maps.  Beebe Dep. (Exhibit 22), at 20.  But Plaintiffs can cite no case for the proposition that failing to maximize the BVAP in a particular district amounts to a Section 2 violation, much less a violation of the more rigorous constitutional standard. Governor Beebe found fault with Senator Crumbly's maps, but none of the Governor's reasons were discriminatory.  Governor Beebe disliked Senator Crumbly's maps because, if adopted, they would have "impacted another African-American incumbent senator's district[,]" to the South and resulted in a noncompact senate district to the North that stretched from the Mississippi River into Jackson and White County.  Beebe Dep. (Exhibit 21), at 20.  That district, if adopted, would have been "too elongated[,]" and— based on geography, economics, and history—had "very little community of interest[.]" Beebe Dep. (Exhibit 21), at 21.  In contrast, Lee, Crittenden, and St. Francis counties in the new Senate District 24 "all have heavy farming interest[s,]" a tradition of having some representation together in the past," tend to gravitate more toward Memphis with regard to the journalism and television markets[,]" and "have a history together with even . . . high school sports[.]"   Beebe Dep. (Exhibit 21), at 23-24.  It is these factors—not purposeful discrimination against African Americans—that are the reason why the new district's BVAP is not higher than 53%.  Beebe Dep. (Exhibit 21), at 14-15.

Like the Governor, General McDaniel described how during "the final weeks of the redistricting process," Senator Crumbly "demanded that [Separate Defendants] seek and add additional precincts to his district[.]"  McDaniel Dep. (Exhibit 22), at 34-35. Senator Crumbly asked that the new district "take in a number of African-American

voters from Senator Flowers' district."  McDaniel Dep. (Exhibit 22), at 42.   General McDaniel "discussed that with Senator Flowers, and she, as you might imagine, did not want to lose any of the voters from her district; and, ultimately, Senator Crumbly's demands were not met."  McDaniel Dep. (Exhibit 22), at 42.

Rather than submit to Senator Crumbly's demands that black voters be transferred to his district from Senator Flowers' district, Separate Defendants "struggle[d] to find African-American-dominant precincts in order to add them to Senator Crumbly's district."  McDaniel Dep. (Exhibit 22), at 34.  "[T]he rural areas of Lee and St. Francis and even Phillips Counties were overwhelmingly white, so [Separate Defendants] struggled to get [the district's] numbers up as high as they are."  McDaniel Dep. (Exhibit 22), at 34.  General McDaniel testified that Separate Defendants

> tried to find as much African-American population centers as we could to add to the district.  But as you got out into areas of rural St. Francis and Lee and even Phillips County and Monroe County, you would find precincts that were 99 percent white.  So traveling westerly actually didn't help him in terms -- you know, if the goal was to maximize his voting-age African-American population, which we certainly sought to do.

McDaniel Dep. (Exhibit 22), at 35.  And, even though Separate Defendants wanted to minimize population variances among the new districts, new Senate District 24 was given the highest total population of any senate district in the state "[t]o increase the African-American population[.]"  Beebe Dep. (Exhibit 21), at 11, 60.

To be sure, Governor Beebe and General McDaniel attempted to maximize the BVAP in new Senate District 24 within the framework of other redistricting principles, such as keeping Crittenden County whole for the reasons discussed above.  In the end, Separate Defendants' reasons for placing Crittenden County in its entirety in new District

24 were "[a]ll of the factors that [the Governor] previously talked about."  Beebe Dep.

(Exhibit 21), at 60.  You had to get the numbers, the pure census numbers, to make up a

senate district."  *Id.*  "And you're trying not to go so far west, as I indicated."  *Id.*  "A

district that goes from the Mississippi River to the Ozarks is what we were trying to

avoid.   That necessitated Crittenden County being more together.   The additional

numbers were necessitated by trying to increase the African-American population."

Beebe Dep. (Exhibit 21), at 61.  General McDaniel agreed

> with the Governor's descriptions about the geographic
> differences and economic differences and, etc., from a
> district that divides Crittenden County in order to put
> northern Crittenden County in with northern White County
> when the existing District 24 map maintains Crittenden
> County and -- and assures a greater degree of economic
> homogeneity and -- homogeneity and compactness in all of
> the districts, including District 24.

McDaniel Dep. (Exhibit 22), at 63.  As General McDaniel succinctly concluded, "I would

think that the downsides of . . . lumping northern White County all the way over to the

Hernando-Desoto bridge going into Memphis would not be a proper way to draw the

map.  There are a lot of considerations that go into that."  McDaniel Dep. (Exhibit 22), at

64.

Finally, Secretary Martin's early drafts of Senate Maps, which were circulated by

his Office for discussion purposes, did not divide Crittenden County.   Martin Dep.,

(Exhibit 23), at 141-42 & Exhibits 16-17 (draft maps).   Secretary Martin testified that

keeping Crittenden County whole was not inherently discriminatory.   Martin Dep.

(Exhibit 23), at 141-42.  Plaintiffs have no evidence that Crittenden County was kept

whole "because of, not merely in spite of, its adverse effects upon [African Americans]."

*Feeny*, 442 U.S. at 279.

Plaintiffs also allege that three white state representatives—Jerry Brown, Clark Hall, and Keith Ingram—were "likely to consider running for Senate in 2012 if given a favorable district." Am. Compl., ¶ 80. Plaintiffs properly admit that only Brown and Hall (not Ingram) were "term-limited from running for the House again in 2012" and that Ingram was serving in his second term as state representative and, therefore, a possible candidate for another term as representative. Am. Compl., ¶¶ 77, 79. Plaintiffs allege that the Board of Apportionment placed two white representatives (Hall and Ingram) as *possible* challengers for Crumbly's senate seat, thus potentially pitting two white candidates and a black candidate against each other according to Plaintiffs' theory. Am. Compl., ¶¶ 82. But one of those white candidates (Ingram) might have sought reelection to a state House seat, while the other (Hall) is running for U.S. Congress. Am. Compl., ¶ 85. The amended complaint thus alleges three possibilities at the time of the Board of Apportionment's decision in July 2011: (1) a three-way race for state Senate involving a black incumbent and two white challengers, (2) a race between one black incumbent and one white challenger, or (3) a contest involving no white challengers at all.

With the benefit of hindsight, of course, Plaintiffs now know that Ingram has decided to run for the state Senate seat and that Hall has decided to run for Congress, which explains why Plaintiffs have carved out the Ingram residence from each of their alternative proposals. *See* Close-Up View of Plaintiffs' Alternative Maps (northern boundary of Jeffers_01 and Jeffers_03, with star designating Ingram residence) (Exhibit 24). Plaintiffs' allegations regarding Separate Defendants' alleged pre-decision conspiracy, however, are inconsistent and implausible on their face.

Turning to the record evidence, Governor Beebe testified that these allegations are "absolutely false."   Beebe Dep. (Exhibit 21), at 54-55.   It was the Governor's understanding that Representative Ingram "was not term limited and there was a strong indication he was running for speaker of the house -- or he's had plans to run for speaker of the house, which would indicate he was running for reelection."   Beebe Dep. (Exhibit 21), at 68.   Accordingly, the Governor "was shocked when Keith Ingram announced he was running for the senate."   Beebe Dep. (Exhibit 21), at 55.   General McDaniel testified that he did not recall having any discussions with Representative Hall regarding redistricting and did not have any such discussions with either Representative Brown or Representative Ingram.   McDaniel Dep. (Exhibit 22), at 40-41.

Plaintiffs have no evidence to support their conspiracy theory.   Senator Crumbly himself testified that

> [I]t may just be coincidence that -- that Clark Hall and Keith Ingram got placed in the new proposed District 24. It's also -- may be just coincidence that the northern part of Crittenden County got added to Senate District 24.   And – but that's quite a coincidence that all of that happens just coincidentally, that both Clark Hall and Keith Ingram are put into the new Senate District 24 and somehow Jerry Brown got left over in 23 all by himself.   I just think that's coincidence.

Crumbly Dep. (Exhibit 15), at 116.   Even though the Complaint alleges that the Governor and Attorney General's decision to vote in favor of a new Senate map, including new Senate District 24, was based on racial discrimination, Senator Crumbly also says he "is sure" that Governor Beebe had other reasons for rejecting the boundaries that Senator Crumbly himself proposed for the new district.   Crumbly Dep. (Exhibit 15), at 104-105. Senator Crumbly also concedes that General McDaniel might have had some other reason

to propose and vote for the new Senate districts.  Crumbly Dep. (Exhibit 15), at 108.

Senator Crumbly recognizes that the purpose of adopting the new Senate districts is a

question that one would "have to ask General McDaniel and the Governor."  Crumbly

Dep. (Exhibit 15), at 108.  And Senator Crumbly concedes "that only" the Governor and

Attorney General can answer whether they voted for the new Senate districts for the

purpose of discriminating based on race.  Crumbly Dep. (Exhibit 15), at 110-11.

In summary, Plaintiffs have no proof to support Count II of their Amended

Complaint.  Plaintiffs' conclusory assertions can neither satisfy their burden of proof nor

overcome Separate Defendants' motion for summary judgment.  The Supreme Court has

left no doubt that "the plain language of Rule 56(c) mandates the entry of summary

judgment . . . against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear

the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  "In such a situation, there can be

'no genuine issue as to any material fact,' since a complete failure of proof concerning an

essential element of the nonmoving party's case necessarily renders all other facts

immaterial.  *Id.* at 322-23.  "The moving party is 'entitled to a judgment as a matter of

law' because the nonmoving party has failed to make a sufficient showing on an essential

element of her case with respect to which she has the burden of proof."  *Id.* at 323.

Pursuant to these well-established standards, Separate Defendants are entitled to

summary judgment on the Plaintiffs' claim of intentional discrimination in violation of

the Fourteenth Amendment.

### 2.  The Fifteenth Amendment

The Fifteenth Amendment states:  "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."  U.S. Const., Amend. XV, § 1.  The Supreme Court has "never held any legislative apportionment inconsistent with the Fifteenth Amendment."  *Voinovich*, 507 U.S. at 146*; see also Reno v. Bossier Parish School Board*, 528 U.S. 320, 334 n.3 (2000) ("[W]e have never held that vote dilution violates the Fifteenth Amendment.");  *Bolden*, 446 U.S. at 84, n.3 (Stevens, J., concurring) (characterizing the plurality opinion as concluding that the Fifteenth Amendment applies only to practices that directly affect access to the ballot).

Even if the Fifteenth Amendment were applicable to Plaintiffs' claim (and it is not), Plaintiffs would have to demonstrate that there was a discriminatory purpose behind the 2011 Senate Plan.  *See Bolden*, 446 U.S. at 63 ("While other of the Court's Fifteenth Amendment decisions have dealt with different issues, none has questioned the necessity of showing purposeful discrimination in order to show a Fifteenth Amendment violation.").  As explained above, Plaintiffs have not come close to alleging facts giving rise to an inference of purposeful race discrimination.

### III.   CONCLUSION

In the final analysis, Plaintiffs contend that Separate Defendants should have made race a more predominate factor in their decisionmaking by focusing on the goal of placing an even larger number of African Americans within Senate District 24.  Anything less, Plaintiffs contend, is unlawful dilution and invidious racial discrimination against African Americans.  *See* Am. Compl., ¶ 42 (alleging that the BVAP must exceed 55%);

*but see Miller*, 515 U.S. at 904 (stating that the Equal Protection Clause's "central mandate is racial neutrality in governmental decisionmaking," and this imperative "obtains with equal force regardless of the race of those burdened or benefited by a particular classification").  Plaintiffs have cited no legal authority for the position that a redistricting body's failure to draw a super-majority district for a minority group violates Section 2 or the U.S. Constitution.  In addition, Plaintiffs fail to acknowledge that their super-majority, race-centered approach to redistricting "engages in the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls." *Miller*, 515 U.S. at 911-12 (citations and quotations omitted).

This Court must be mindful that redistricting "is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court."  *Growe v. Emison*, 507 U.S. 25, 34 (1993).  "[T]he underlying districting decision is one that ordinarily falls within a legislature's sphere of competence.  Hence, the legislature must have discretion to exercise the political judgment necessary to balance competing interests, and courts must exercise *extraordinary caution* in adjudicating claims that a State has drawn district lines on the basis of race."  *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (emphasis in original) (internal citations and quotations omitted).  Plaintiffs do not have evidence of a Section 2 or constitutional violation sufficient for this Court to displace the Board of Apportionment's political judgments.  This Court should enter summary judgment against Plaintiffs.

DUSTIN MCDANIEL
Attorney General of Arkansas

By: /s/ *David A. Curran*
David A. Curran, Ark. Bar No. 2003031
Assistant Attorney General
C. Joseph Cordi Jr., Ark. Bar No. 91225
Assistant Attorney General
Warren T. Readnour, Ark. Bar No. 93224
Senior Assistant Attorney General
Office of the Arkansas Attorney General
323 Center St., Suite 500
Little Rock, AR 72201
Phone: (501) 682-1681
Fax: (501) 682-2591
Email: david.curran@arkansasag.gov

*Attorneys for Separate Defendants Governor Mike Beebe, Attorney General Dustin McDaniel, and the Arkansas Board of Apportionment*

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following:

James F. Valley
james@jamesfvalley.com

Peter S. Wattson
peterwattson@gmail.com

W. Asa Hutchinson,
asa@ahlawgroup.com

W. Asa Hutchinson, III
ahutchinson@ahlawgroup.com

/s/ David A. Curran