**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**EASTERN DIVISION**

FUTURE MAE JEFFERS, et al.                                      PLAINTIFFS

v.                              Case No. 2:12-cv-00016
                  Three-Judge Court:  Hon. Holmes, Smith, and Wright

MIKE BEEBE, in his official capacity as
Governor of Arkansas and Chairman of
the Arkansas Board of Apportionment;
MARK MARTIN, in his official capacity as Secretary
of State of Arkansas and as a member of
the Arkansas Board of Apportionment;
DUSTIN McDANIEL, in his official capacity as Attorney
General of Arkansas and a member of the
Arkansas Board of Apportionment; and
THE ARKANSAS BOARD OF APPORTIONMENT                DEFENDANTS

**SEPARATE DEFENDANTS' LOCAL RULE 56.1**
**STATEMENT OF UNDISPUTED FACTS**

Governor Mike Beebe, Attorney General Dustin McDaniel, and the Arkansas

Board of Apportionment ("Separate Defendants") contend that, with regard to the

following material facts, there is no genuine dispute to be tried:

1.      The 2010 U.S. Census data showed that Arkansas's 2010 population was

2,915,918.  *See* U.S. Census data, 2010 Map of Total Population (Exhibit 30).

2.      Arkansas's 2010 population of 2,915,918 represented a 9.1% increase over

the state's 2000 population.  *See* U.S. Census data, 2010 Map of Percent Change in Total

Population (Exhibit 2).

3.      The 2010 U.S. Census data showed that the black population comprised

15.4% of Arkansas's total population.  *See* U.S. Census data, Map of Black Population by

County 2010 (Exhibit 20).

4.      The total population of Benton County increased by 44.3%.  *See* U.S. Census data, 2010 Map of Percent Change in Total Population (Exhibit 2).

5.      The total population of Washington County increased by 28.8%.  *See* U.S. Census data, 2010 Map of Percent Change in Total Population (Exhibit 2).

6.      The total population of Faulkner County increased by 31.6%.  *See* U.S. Census data, 2010 Map of Percent Change in Total Population (Exhibit 2).

7.      The black population of Faulkner County increased by 58.5%.  U.S. Census data, 2010 Map of Percent Change in Black Population (Exhibit 3).

8.      The total population of Pulaski County increased by 5.9%.  *See* U.S. Census data, 2010 Map of Percent Change in Total Population (Exhibit 2).

9.      The black population of Pulaski County increased by 16.2%.  U.S. Census data, 2010 Map of Percent Change in Black Population (Exhibit 3).

10.      The total population of Lonoke County increased by 29.4%.  *See* U.S. Census data, 2010 Map of Percent Change in Total Population (Exhibit 2).

11.      The black population of Lonoke County increased by 19.7%.  *See* U.S. Census data, 2010 Map of Percent Change in Black Population (Exhibit 3).

12.      The total population of Lee County decreased by 17.1%.  *See* U.S. Census data, 2010 Map of Percent Change in Total Population (Exhibit 2).

13.      The black population of Lee County decreased by 20%.  U.S. Census data, 2010 Map of Percent Change in Black Population (Exhibit 3).

14.      The total population of Phillips County decreased by 17.7%.  *See* U.S. Census data, 2010 Map of Percent Change in Total Population (Exhibit 2).

15.     The black population of Phillips County decreased by 12.1%.  U.S. Census data, 2010 Map of Percent Change in Black Population (Exhibit 3).

16.     The 2010 Senate Variance Map (Exhibit 4) accurately shows Arkansas's population under the 2010 census data in relation to the borders of the previous Senate districts.

17.     The 2010 Senate Variance Map (Exhibit 4) correctly shows the extent of the deviation if the Senate district boundaries were left unchanged.

18.     If the boundaries of old Senate District 5 and old Senate District 16 were to remain the same after the 2010 census, they would each fall short of the ideal population size by over 14,000 people.

19.     In July 2011, the Board of Apportionment voted 2 to 1 to approve a final plan for both legislative chambers.

20.     Governor Mike Beebe and Attorney General Dustin McDaniel voted in favor of the plan; Secretary of State Mark Martin voted against it.

21.     New Senate District 24 has a black population of 57.05%.  *See* BOA 2011 Senate Matrix (Exhibit 1).

22.      New Senate District 24 has a black voting-age population ("BVAP") of 52.88%.  *See* BOA 2011 Senate Matrix (Exhibit 1).

23.     New Senate District 24 has a minority voting-age population of 55.72%.  *See* BOA 2011 Senate Matrix (Exhibit 1).

24.     East Arkansas Regional Unit is a prison that exists within new Senate District 24.  *See* Am. Compl., ¶ 52.

25.     The 2010 Census Block Information for East Arkansas Regional Unit (Exhibit 6) shows a black adult prisoner population of 849.

26.     The 2010 Census Block Information for East Arkansas Regional Unit (Exhibit 6) shows a non-black adult prisoner population of 833.

27.     Rounding to the nearest tenth of a percent, the census data shows that the BVAP of the prison was 50.5% on census day.

28.     Excluding the prison from the tabulation of new Senate District 24's BVAP would increase the district's BVAP to above 52.88%.

29.     The Board of Apportionment's 2001 Senate plan had four majority-minority districts.

30.     The Board of Apportionment's 2011 Senate plan has four majority-minority districts.

31.     New Senate District 24 includes all of Crittenden County.

32.     New Senate District 24 includes part of Cross County.

33.     New Senate District 24 includes part of St. Francis County.

34.     New Senate District 24 includes part of Lee County.

35.     New Senate District 24 includes part of Phillips County.

36.     Plaintiff Jack Crumbly is a member of the Arkansas State Senate.

37.     Senator Crumbly is an African American.

38.     Senator Crumbly was elected to the State Senate from old Senate District 16.

39.     Senator Crumbly resides in new Senate District 24.

4

40.     New Senate District 25 has a total African American population 58.37%. *See* BOA 2011 Senate Matrix (Exhibit 1).

41.     New Senate District 25 has a BVAP of 55.85%.  *See* BOA 2011 Senate Matrix (Exhibit 1).

42.     New Senate District 25 includes part of Phillips County.

43.     New Senate District 25 includes part of Desha County.

44.     New Senate District 25 includes part of Lincoln County.

45.     New Senate District 25 includes part of Arkansas County.

46.     New Senate District 25 includes parts of Jefferson County and Monroe County.

47.     Stephanie Flowers is a member of the Arkansas State Senate.

48.     Senator Flowers is an African American.

49.     Senator Flowers was elected to the State Senate from old Senate District 5.

50.     Senator Flowers resides in new Senate District 25.

51.     New Senate District 30 has a total African American population of 56.33%.  *See* BOA 2011 Senate Matrix (Exhibit 1).

52.     New Senate District 30 has a BVAP of 53.19%.  *See* BOA 2011 Senate Matrix (Exhibit 1).

53.     New Senate District 30 is in Pulaski County.

54.     New Senate District 30 includes part of Little Rock.

55.     Linda Chesterfield is a member of the Arkansas State Senate.

56.     Senator Chesterfield is an African American.

57.     Senator Chesterfield was elected to the State Senate from old Senate District 34.

58.     Senator Chesterfield resides in new Senate District 30.

59.     New Senate District 31 has a total African population of 61.53%.  *See* BOA 2011 Senate Matrix (Exhibit 1).

60.     New Senate District 31 has a BVAP of 58.26%.  *See* BOA 2011 Senate Matrix (Exhibit 1).

61.     New Senate District 31 is in Pulaski County.

62.     New Senate District 31 includes part of Little Rock.

63.     Joyce Elliot is a member of the Arkansas State Senate.

64.     Senator Elliot is an African American.

65.     Senator Elliot was elected to the State Senate from old Senate District 33.

66.     Senator Elliot resides in new Senate District 31.

67.     In Dr. Lisa Handley's racial bloc-voting analysis, Dr. Handley defined the geographic region of Arkansas that would be the focus of her analysis as "the Delta." Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 1 n.1; Handley Dep. (Exhibit 7), at 13.

68.     Dr. Handley defined "the Delta" as the following Arkansas counties: Crittenden, Cross, Lee, St. Francis, Phillips, Monroe, and Woodruff.  Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 1 n.1; Handley Dep. (Exhibit 7), at 13.

69.     Dr. Handley's definition of "the Delta" came from Plaintiffs' lawyers. Handley Dep. (Exhibit 7), at 13, 16.

70.     The so-called Delta that Dr. Handley analyzed includes Monroe County.

71.     Monroe County is not adjacent to the Mississippi River.

72.     Monroe County does not comprise any part of New Senate District 24.

73.     The BVAP of Monroe County is 37.4%.  *See* U.S. Census data, Map of 2010 BVAP (Exhibit 19).

74.     The so-called Delta that Dr. Handley analyzed includes Woodruff County.

75.     Woodruff County is not adjacent to the Mississippi River.

76.     Woodruff County does not comprise any part of New Senate District 24.

77.     The BVAP of Woodruff County is 26%.  *See* U.S. Census data, Map of 2010 BVAP (Exhibit 19).

78.     Dr. Handley's bloc-voting analysis included only election contests that featured one or more African American candidates.   In other words, Dr. Handley did not consider contests in which the only candidates were white.  *See* Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7) at 2; Handley Dep. (Exhibit 7), at 78.

79.     With the exception of three election contests in old Senate District 16 that featured only black candidates, Dr. Handley analyzed polarization only in contests featuring a black candidate and a white candidate.  *See* Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 4; Handley Dep. (Exhibit 7), at 78-79.

80.     Dr. Handley did not report on the polarization (or lack thereof) in five of the contests set forth in Table 1 of her report, which featured only black candidates. Those five contests are as follows:  (1) State Report Dist. 52 – May 2004 Primary (Murdock v. Blount); (2) State Report Dist. 54 – May 2004 Primary (Carter v. Davis. v. Robertson); (3) State Report Dist. 52 – May 2010 Primary (Murdoch v. Johnson); (4)

State Report Dist. 54 – May 2010 Primary (Smith v. Tobar v. Rogers v. Pulliaum); and (5) State Report Dist. 54 – June 2010 Primary (Smith v. Pulliaum).

81.     Dr. Handley cannot determine whether contests featuring only black candidates are more polarized than interracial contests because she did not analyze enough contests featuring only black candidates.  Handley Dep. (Exhibit 7), at 85.

82.     Dr. Handley did not analyze polarization in any municipal elections.  *See* Handley Dep., (Exhibit 7), at 14-15.

83.     Dr. Handley did not analyze polarization in any county elections.

84.     Dr. Handley relied on Plaintiffs' lawyers to get the election returns for county contests and was "unable" to get the returns.

85.     Dr. Handley relied on Peter Wattson (counsel of record for Plaintiffs) to supply her with information containing election results alongside demographic racial data from the U.S. Census Bureau.  Handley Dep. (Exhibit 7), at 27-28; *id.* at 90.

86.     The U.S. Census Bureau's geographic unit for reporting demographic data does not coincide with how election results in Arkansas have usually been tabulated from 2000-2010.  The U.S. Census Bureau reports racial demographic information by Voter Tabulation District ("VTD"), whereas election results in Arkansas have typically been reported by "polling place."   Handley Dep., (Exhibit 7), at 26-27; Secretary of State Election Results (Willis v. Hall) (Exhibit 9).

87.     A polling place is a location, such as a church or fire station, where citizens cast their votes.  Handley Dep. (Exhibit 7), at 27.

88.     In some cases, there is no polling place within a precinct; voters who live there must travel to a different precinct to cast their votes.

89.     Official proclamations from county boards of election commissioners show which precincts are assigned to a polling place for a given election.

90.     Plaintiffs have not produced any official proclamations from a county board of election commissioners in this case.

91.     In the course of preparing her expert report, Dr. Handley did not review any documents showing which precincts are assigned to a polling place for a given election.

92.     In the course of preparing her expert report, Dr. Handley did not review any official proclamations from a county board of election commissioners.

93.     Dr. Handley did not check the accuracy of Peter Wattson's work with regard to determining which precincts are assigned to a polling place for a given election. Handley Dep. (Exhibit 7), at 30-31; *id.* at 28.

94.     If Dr. Handley's election results have been mistakenly paired with demographic information from a precinct that was not officially assigned to the polling place, the mistake will produce errors.

95.     Dr. Handley applied three statistical techniques to the eighteen election contests that met her race-based criteria:  homogenous precinct analysis, bivariate regression, and ecological inference.

96.     Dr. Handley describes the three techniques as "complementary."  Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 5.

97.     Dr. Handley does not make assumptions about a particular contest if one technique shows one thing and another technique shows something dramatically different.  Handley Dep. (Exhibit 7), at 49.

98.     In her analysis, Dr. Handley did not consider reconstituted election results with regard to national and statewide elections that took place within the precise geography of new Senate District 24.  *See* Handley Dep. (Exhibit 7), at 31; *id.* at 67; *id.* at 64.

99.     In the 5-county region of Cross, Crittenden, St. Francis, Phillips, and Lee counties, the black-preferred candidate (Sheffield) received the most votes in the 2002 Democratic primary election for Lt. Governor.   The BVAP of this region was approximately 42.3%.

100.    In the 5-county region of Cross, Crittenden, St. Francis, Phillips, and Lee counties, the black-preferred candidate (Sheffield) received the most votes in the 2002 general election for Lt. Governor.  The BVAP of this region was approximately 42.3%.

101.    In the 5-county region of Cross, Crittenden, St. Francis, Phillips, and Lee counties, the black-preferred candidate (Griffen) received the most votes in the 2006 election for Associate Justice.  The BVAP of this region was approximately 46%.

102.     In the 5-county region of Cross, Crittenden, St. Francis, Phillips, and Lee counties, the black-preferred candidate (Obama) received the most votes in the 2008 general election for President.  The BVAP of this region was approximately 46%.

103.    In the 4-county region of Crittenden, St. Francis, Phillips, and Lee counties, the black-preferred candidate (Sheffield) received the most votes in the 2002 Democratic primary election for Lt. Governor.   The BVAP of this region was approximately 45.9%.

104.     In the 4-county region of Crittenden, St. Francis, Phillips, and Lee counties, the black-preferred candidate (Sheffield) received the most votes in the 2002 general election for Lt. Governor.  The BVAP of this region was approximately 45.9%.

105.     In the 4-county region of Crittenden, St. Francis, Phillips, and Lee counties, the black-preferred candidate (Griffen) received the most votes in the 2004 election for Chief Justice.  The BVAP of this region was approximately 45.9%.

106.     In the 4-county region of Crittenden, St. Francis, Phillips, and Lee counties, the black-preferred candidate (Griffen) received the most votes in the 2006 election for Associate Justice.  The BVAP of this region was approximately 50.1%.

107.     In the 4-county region of Crittenden, St. Francis, Phillips, and Lee counties, the black-preferred candidate (Obama) received the most votes in the 2008 Democratic primary election for president.  The BVAP of this region was approximately 50.1%.

108.     In the 4-county region of Crittenden, St. Francis, Phillips, and Lee counties, the black-preferred candidate (Obama) received the most votes in the 2008 general election for President.  The BVAP of this region was approximately 50.1%.

109.     In the 4-county region of Crittenden, St. Francis, Phillips, and Lee counties, the black-preferred candidate (Jones) received the most votes in the 2004 Democratic primary election for Senate District 17.   The BVAP of this region, considering only the polling areas shown in Dr. Handley's data, was approximately 28.9%.

110.     African Americans have recently been elected to county-wide offices in St. Francis and Lee counties.  *See* Original Compl. (Doc. 1), at ¶ 42.

111.    The 2010 BVAP of St. Francis County was 48.2%.  *See* U.S. Census data, Map of 2010 BVAP (Exhibit 19).

112.    The 2010 BVAP of Lee County was 52.9%.  *See* U.S. Census data, Map of 2010 BVAP (Exhibit 19).

113.    The black-preferred candidate, Alvin Simes, defeated the white-preferred candidate, Steve Higginbothom, in the 2000 primary election for Senate District 22 by a margin of 52.8% to 47.2%.  *See* Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 8.

114.    Willis won a plurality of the votes in the 2006 contest for Senate District 16 (34.6% of the total vote).  Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 8.  Dr. Handley's ecological inference estimate shows that white voters preferred Willis over Crumbly (43.7% to 40.0%), but her homogeneous precinct analysis shows that white voters preferred Crumbly (44.6% to 33.7%) and her bivariate regression estimate likewise shows a white preference for Crumbly over Willis (40.2% to 38.1%).  *Id.*

115.    In the 2006 primary runoff election for Senate District 16, Senator Crumbly won by approximately 68 votes.  Dr. Handley's ecological inference estimate shows that blacks preferred Willis over Crumbly (53.9% to 45.3%).  *See* Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 8.  But her homogenous precinct analysis shows the opposite result:  black voters preferred Crumbly over Willis (57.1% to 42.9%).  *Id.*

116.    In the 2010 primary election for State Senate District 16, Dr. Handley's ecological inference estimates show that blacks preferred Simes over the winner,

Crumbly (51.1% to 48.6%).  Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 9.

117.    Ecological inference estimates are not necessarily exact, and Dr. Handley did not calculate a margin of error for any of her estimates.  Handley Dep. (Exhibit 7), at 58-59.

118.    Senator Crumbly believes that a higher BVAP will likely enhance his chances for re-election to the Senate.  Crumbly Dep., (Exhibit 15), at 97.

119.    Davis, the black-preferred candidate, defeated Nassar in the 2004 general election for House District 54.

120.    Willis, the black-preferred candidate, defeated Hall in the 2004 primary election for House District 13.

121.    Two years earlier, Willis lost to the white-preferred candidate, King, in a contest that King won by less than 100 votes.

122.    The percentage minority population needed to create an "effective minority district" (that is, a district that provides minority voters with the ability to elect candidates of their choice to office) varies depending on the locality—there is no single target (for example, 65 percent) that can be applied universally.   Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 9.

122.    Dr. Handley says that her clients asked her to "ascertain the level of black population required in this region of the state to provide African Americans with the ability to elect candidates of their choice to legislative office, particularly in the general area of 2011 Senate District 24."   However, Dr. Handley did not "fully" answer this question.  Handley Dep. (Exhibit 7), at 160-61.

123.    Dr. Handley did a "tentative try" at applying her model for Senate District 16, but she did not generate any calculations that she will "comment on."  Handley Dep. (Exhibit 7), at 190-91.

124.    90% or more of the people who live within the boundaries of new Senate District 24 reside within the 4-county region of Crittenden, St. Francis, Lee, and Phillips counties.

125.    Part IV of Dr. Handley's expert report is titled "Providing Minority Voters with the Ability to Elect Their Preferred Candidates."  *See* Handley Report, Exhibit 1a to Handley Dep. (Exhibit 7), at 9.  The only information that Dr. Handley provides in this section is Table 4, which shows the BVAP percentage needed to equalize turnout on election day.

126.    In Dr. Handley's earlier writings, she wrote that "[o]ne cannot adhere slavishly to the most easily quantifiable part of minority vote calculations, namely, to the equalization percentage."  Brace, Groffman, Handley & Niemi, *Minority Voting Equality: The 65 Percent Rule in Theory and Practice*, 10 Law & Policy 1 (Jan. 1988), Exhibit 3 to Handley Dep. (Exhibit 7), at 57.  In Chicago, for example, Dr. Handley and her co-authors noted that "for blacks, incumbency, polarization, and other factors may now be as significant as differences in [turnout factors such as] registration rates, voting, and even VAP [Voting Age Population]."  *Id.*

127.    More recently, Dr. Handley and her co-authors advanced a formal model for determining "the percentage minority necessary to provide minority voters with an equal opportunity to elect their candidates of choice."  Groffman, Handley & Lublin, *Drawing Effective Minority Districts: A Conceptual Framework And Some Empirical*

*Evidence*, 79 U.N.C. L. Rev. 1383 (2001), Exhibit 4 to Handley Dep. (Exhibit 7).  The purpose of the model is to "estimate[] future minority voting strength."  *Id.* at 1387.  On page 1404 of the article, Dr. Handley discusses the first component of the model— namely, the equalization of black and white turnout.  On page 1407 of the article, Dr. Handley discusses additional critical variables: cohesion and cross-over voting.  Dr. Handley wrote:  "Equalizing turnout is not the best indicator of whether minority voters will have an equal opportunity to elect minority candidates.  We also need to incorporate the level of minority cohesion and the degree of white crossover voting that can be expected when a minority-preferred candidate competes for office."  *Id.* at 1407 (emphasis added).  "If, for example, white voters regularly cross over to vote for black candidates, the percentage black necessary to create an effective black district decreases."  *Id*.

128.    Dr. Handley noted that, after majority-minority districts were redrawn in the wake of the Supreme Court's anti-gerrymandering decisions, the black population in eight districts fell to a level below 50 percent, and the African American candidates won in every contest in which they sought re-election.  Handley Dep. (Exhibit 7), at 120.

129.    In her article, Dr. Handley considered 20 congressional races in the South. In every case, the "% black needed to equalize turnout" exceeded 50%, and it was as high as 58% in the contest for Georgia's second congressional district.  *Drawing Effective Minority Districts*, Exhibit 4 to Handley Dep. (Exhibit 7), at 1406.  But when crossover and cohesion numbers were introduced into the model, the "effectiveness" number was substantially smaller than the "turnout equalization" number in every instance.  For example, in Georgia's second congressional district, Dr. Handley calculated that the "%

black needed to win, incorporating cohesion and crossover," was only 37.1%.  *Id.* at 1408.  In most cases, the effectiveness number was "in the range of 33%-39%.  *Id.*  "This is because, even though blacks are typically turning out to vote at lower rates than whites, blacks are voting very cohesively—over 95% of the black voters consistently voted for the black Democrat in the general election—and approximately one-third of the white voters supported the black Democrat in the general election."  *Id.*

130.    If blacks engage in bloc voting or cohesion more intensely than whites in a given election, that fact tends to lower the percentage of black population needed to have effective districts.  Handley Dep. (Exhibit 7), at 126

131.    Dr. Handley's model is represented in the equation in footnotes 68 and 72 of her *North Carolina Law* Review article.

132.    Dr. Handley recently applied this equation when she served as a consultant for the Alaska Redistricting Board.  *See* Handley, *A Voting Rights Analysis of the Proposed Alaska State Legislative Plans:  Measuring the Degree of Racial Bloc Voting and Determining the Effectiveness of Proposed Minority Districts* (2011) (hereinafter "Alaska Report"), Exhibit 5 to Handley Dep. (Exhibit 7); Handley Dep. (Exhibit 7), at 135-144.

133.    In Part 3 of the Alaska Report, Dr. Handley calculated the minority VAP percentage needed to have the ability to elect a minority-preferred candidate.    Dr. Handley considered numerous elections and applied the model as set forth in her *North Carolina Law Review* article.  *See* Alaska Report, Exhibit 5 to Handley Dep. (Exhibit 7), at 19 & n.14.

134.    Dr. Handley calculated a "target percentage of 41.8" and concluded that, on average, any district with an Alaska Native VAP greater than 41.8% should be able to elect an Alaska Native-preferred candidate to office." *Id.* "This percentage is lower than 50% Alaska Native," Dr. Handley explained," because of the turnout rates and cross-over votes that minority-preferred candidates "can usually expect." *Id.*

135.    In this case, Dr. Handley has only "gone through the first stage" of her model.   Handley Dep. (Exhibit 7), at 147.  Dr. Handley considered turnout equalization, but she did not incorporate cohesion or cross-over voting.

136.    Professor Zax calculated that Dr. Handley's model would show that a BVAP of 49.9% in the new Senate District 24 is the threshold above which the black-preferred candidate would expect to receive more than 50% of the vote.  Zax Dec. (Exhibit 13), at ¶ 6.

137.    According to Dr. Handley, the presence of a minority incumbent should be taken into account.  *See Drawing Effective Minority Districts*, Exhibit 4 to Handley Dep. (Exhibit 7), at 1423; *see also* Handley Dep. (Exhibit 7), at 113.

138.    Table 1 of Dr. Handley's report is a list of 24 contests in the Delta since 2000 that have included at least one African American candidate.

139.    Dr. Handley could not analyze polarization in one of the interracial contests (Mitchell v. Brandon v. Hall – State Rep. Dist. 13 May Primary 2006) because Phillips County did not report election returns by precinct or polling area for this election.

140.    In the contests in Dr. Handley's Table 1 within geographical regions in which the BVAP was less than 32%, the black-preferred candidate received the most votes in two election scenarios presented in MSJ Exhibit 18.

141.    In the contests in Dr. Handley's Table 1 within geographical regions in which the BVAP was between 42% and 45%, the black-preferred candidate received the most votes in two election scenarios presented in MSJ Exhibit 18.

142.    In the contests in Dr. Handley's Table 1 within geographical regions in which the BVAP was between 46% and 53%, the black-preferred candidate received the most votes in 9 election scenarios presented in MSJ Exhibit 18.

143.    Willis, the black-preferred candidate, defeated Hall in the 2004 Democratic primary election for House District 13. The BVAP for this district was approximately 52.88%.

144.    In the contests in Dr. Handley's Table 1 within geographical areas in which the BVAP was 55% or higher, white candidates ran for office in 4 out of 12 elections.

145.    The black-preferred candidate, Davis, defeated Nassar in the 2004 general election for House District 54.

146.    The black-preferred candidate, Simes, defeated Higginbothom in the 2000 Democratic primary election for Senate District 22.

147.    The 2006 Democratic primary election for Senate Dist. 16 featured only black candidates.   The winner did not face a Republican opponent.   The BVAP of this district was higher than 55%.

148.     The 2006 Democratic primary runoff election for Senate District 16 featured only black candidates.  The winner did not face a Republican opponent.   The BVAP of this district was higher than 55%.

149.     The 2010 Democratic primary election for Senate District 16 featured only black candidates. The winner did not face a Republican opponent.  The BVAP in this district was higher than 55%.

150.     The 2004 Democratic primary election for House District 52 featured only black candidates. The winner did not face a Republican opponent.  The BVAP of this district was higher than 55%.

151.     The 2004 Democratic primary election for House District 54 featured only black candidates.  The winner prevailed in the general election against a Republican opponent.  The BVAP of this district was higher than 55%.

152.     The 2010 Democratic primary election for House District 52 featured only black candidates.  The winner did not face a Republican opponent.  The BVAP of this district was higher than 55%.

153.     The 2010 Democratic primary election for House District 54 featured only black candidates. The winner did not face a Republican opponent.  The BVAP of this district was higher than 55%.

154.     The 2010 Democratic primary runoff election for House District 54 featured only black candidates.  The winner did not face a Republican opponent. The BVAP of this district was higher than 55%.

155.     Since 2000, there have been five elections in old Senate District 16 and its predecessor, Senate District 22.  Alvin Simes was a candidate in four of those contests.

156.    Crittenden County has a black population of 51.2% according to the 2010 census data.  *See* U.S. Census data, Map of Black Population by County (Exhibit 20).

157.    Governor Beebe wanted to make sure that the respective districts contained the appropriate number of people within the parameters of what the law provided.  Beebe Dep. (Exhibit 21), at 11.

158.    General McDaniel made it a clear priority to his staff that throughout the redistricting process they must be ever vigilant and vocal if they ever had a concern that the Board was not in compliance with the law.  McDaniel Dep. (Exhibit 22), at 12.

159.    The Separate Defendants wanted to keep communities of interest together where possible.  Beebe Dep. (Exhibit 21), at 11.

160.    The Separate Defendants wanted to take into consideration the wants and desires of the people in the state that expressed those desires, including, but not limited to incumbents.  Beebe Dep. (Exhibit 21), at 11.

161.    The Separate Defendants wanted to maintain minority districts as much as possible.  Beebe Dep. (Exhibit 21), at 11-12.

162.    The goal of the Separate Defendants was to get the BVAP as high as possible in consideration of all of the other factors in drawing a statewide map.  McDaniel Dep. (Exhibit 22), at 54.

163.    While taking the totality of the circumstances into account, the Separate Defendants sought to ensure that minority voters have the opportunity to elect the candidate of their choice in new Senate District 24.  McDaniel Dep. (Exhibit 22), at 25-26.

164.     Plaintiff Jack Crumbly is a State Senator whose residence is in Senate District 24 under the plan adopted by the Board of Apportionment in 2011.  Am. Compl., ¶ 27.

165.     Before the Board of Apportionment adopted Senate District 24 in 2011, Senator Crumbly proposed that the district have boundaries that are different from those that the Board actually adopted.  Beebe Dep. (Exhibit 21), at 20-21; McDaniel Dep. (Exhibit 22), at 34-35, 42.

166.     The Separate Defendants did not approve of Senator Crumbly's proposed boundaries for the district because, if adopted, they believed that those boundaries would have impacted another African-American incumbent senator's district.  Beebe Dep. (Exhibit 21), at 20-21; McDaniel Dep. (Exhibit 22), at 42.

167.     The Separate Defendants did not approve of Senator Crumbly's proposed boundaries for the new district because, if adopted, they believed that those boundaries would have resulted in another district being "too elongated."  Beebe Dep. (Exhibit 21), at 20-21; McDaniel Dep. (Exhibit 22), at 63-64.

168.     The Separate Defendants did not approve of Senator Crumbly's proposed boundaries for the new district because, if adopted, they believed that those boundaries would have resulted in another district having insufficient community of interest.  Beebe Dep. (Exhibit 21), at 20-21; McDaniel Dep. (Exhibit 22), at 63-64.

169.     The Separate Defendants struggled to find African-American-dominant precincts in order to add them to Senator Crumbly's district.  McDaniel Dep. (Exhibit 22), at 34.

170.   Even though the Separate Defendants wanted to minimize population variances among the new districts, new Senate District 24 was given the highest total population of any senate district in the state to increase the African-American population. Beebe Dep. (Exhibit 21), at 11, 60.

171.   The Separate Defendants did not adopt Senate District 24 to avoid an election contest between white incumbent legislators.  Beebe Dep. (Exhibit 21), at 54-55.

172.   Representatives Jerry Brown and Clark Hall are serving their third term in the Arkansas House of Representatives, and thus are term-limited from running for the House again in 2012.  Am. Compl., ¶ 77.

173.   Representative Keith Ingram is currently serving his second term in the Arkansas House of Representatives, and is thus not term-limited from running for the House again in 2012.  Am. Compl., ¶ 79.

174.   Governor Beebe was surprised when Keith Ingram announced he was running for the senate.  Beebe Dep. (Exhibit 21), at 55.

175.   General McDaniel does not recall having any discussions with Representative Hall regarding redistricting.  McDaniel Dep. (Exhibit 22), at 40-41.

176.   General McDaniel did not have any discussions with either Representative Brown or Representative Ingram regarding redistricting.  McDaniel Dep. (Exhibit 22), at 40-41.

177.   During his deposition, Senator Crumbly testified that

> it may just be coincidence that – that Clark Hall and Keith Ingram got placed in the new proposed District 24.  It's also – may be just coincidence that the northern part of Crittenden County got added to Senate District 24.  And – but that's quite a coincidence that all of that happens just coincidentally, that both Clark Hall and Keith Ingram are

> put into the new Senate District 24 and somehow Jerry
> Brown got left over in 23 all by himself.  I just think that's
> coincidence.

Crumbly Dep. (Exhibit 15), at 116.

178.    During his deposition, Senator Crumbly testified that he "is sure" that Governor Beebe had reasons other than purposeful discrimination for rejecting the boundaries that Senator Crumbly proposed for the new district.  Crumbly Dep. (Exhibit 15), at 104-105.

179.    During his deposition, Senator Crumbly testified that General McDaniel might have had some reason other than purposeful discrimination to propose and vote for the new Senate districts.  Crumbly Dep. (Exhibit 15), at 108.

180.    During his deposition, Senator Crumbly testified that the purpose of adopting the new Senate districts is a question that one would "have to ask General McDaniel and the Governor."  Crumbly Dep. (Exhibit 15), at 108.

181.    During his deposition, Senator Crumbly testified "that only" the Governor and Attorney General can answer whether they voted for the new Senate districts for the purpose of discriminating based on race.  Crumbly Dep. (Exhibit 15), at 110-11.

DUSTIN MCDANIEL
Attorney General of Arkansas

By: /s/ *David A. Curran*
David A. Curran, Ark. Bar No. 2003031
Assistant Attorney General
C. Joseph Cordi Jr., Ark. Bar No. 91225
Assistant Attorney General
Warren T. Readnour, Ark. Bar No. 93224
Senior Assistant Attorney General
Office of the Arkansas Attorney General
323 Center St., Suite 500
Little Rock, AR 72201
Phone: (501) 682-1681
Fax: (501) 682-2591
Email: david.curran@arkansasag.gov

*Attorneys for Separate Defendants Governor Mike Beebe, Attorney General Dustin McDaniel, and the Arkansas Board of Apportionment*

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following:

James F. Valley
james@jamesfvalley.com

Peter S. Wattson
peterwattson@gmail.com

W. Asa Hutchinson,
asa@ahlawgroup.com

W. Asa Hutchinson, III
ahutchinson@ahlawgroup.com

/s/ David A. Curran

24