## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF ARKANSAS
## EASTERN DIVISION

FUTURE MAE JEFFERS, et al.                                  PLAINTIFFS

v.                             Case No. 2:12-cv-00016-JLH

MIKE BEEBE, in his official capacity as
Governor of Arkansas and Chairman of the
Arkansas Board of Apportionment;
MARK MARTIN, in his capacity as Secretary of
State of Arkansas and as a member of
the Arkansas Board of Apportionment;
DUSTIN McDANIEL, in his capacity as Attorney
General of Arkansas and a member of the Arkansas
Board of Apportionment; and
THE ARKANSAS BOARD OF APPORTIONMENT                     DEFENDANTS

## PLAINTIFFS BRIEF IN SUPPORT OF RESPONSE TO
## SEPARATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, on January 23, 2012, filed this lawsuit requesting that the new Senate District 24 be declared to violate the Voting Rights Act of 1965, as amended, by diluting the voting strength of the African-American citizens in the newly formed district. The Voting Rights Act (VRA) is not intended to guarantee any particular outcome for the Plaintiffs. 42 U.S.C. §1973. The act and the cases interpreting the act require fairness. *Johnson vs. DeGrandy* 512 U. S. 997 114 S. Ct. 2647, 129 L.Ed.2d 775 (1994). Proportionality is linked, in the fairness context, to number of minority voting districts to the minority members' share of the relevant population. *Id.* at 1014 n. 11. The State of Arkansas has consistently failed to meet the proportionality number.

Proportionality of districts is a distinct concept from proportionality of representation. The former deals primarily with the districts being drawn. The latter deals with the results of elections held within the various districts. The whole concept merely confirms that the thrust of § 2 is to guarantee equal opportunity rather than electoral success.

According to the most recent census, Black people comprise roughly 15.4% of the population of the State of Arkansas. The Arkansas Senate has 35 seats. Fifteen percent of those seats would roughly equal 5.25 seats or 5.25 Senate Districts in a proportional situation. The documents filed by the Defendants along with their Motion for Summary Judgment indicate that there are only four attempted majority-minority districts in the State of Arkansas. Those districts are Districts 24, 25, 30 & 31. See Exhibit (1). Were this case a mere academic exercise, we could debate the state's ability to draw a fifth district by drawing two in Pulaski County, one in Jefferson County and two along the Mississippi River in Eastern Arkansas.

The Defendants question this case because they apparently feel that the district that they have drawn is sufficient. First, they posit the question as based on the "failure to create a large super-majority of minority residents" in a senate district. After setting that up as the polestar, the Defendants then argue that the Plaintiffs ought to be satisfied with the district because the Board of Apportionment is entitled to broad discretion in creating these districts. The gaping hole in the state's argument is that they have no proof and cannot provide any proof that Senate District 24 is a majority-minority district in the sense intended by the VRA. The State of Arkansas has no proof other than the sheer census numbers that the challenged district, Senate District 24, is in fact an "equal opportunity district." The totality of the circumstances analysis does not reveal that the district is an equal opportunity district.

Courts have found it "telling" when a jurisdiction has drawn less than a proportional number of districts. *Black Political Task Force v. Galvin* 300 F. Supp. 2d 291 (2004),  The flip side of the proportionality equation is how many majority-white districts are there in the State of Arkansas as compared to the relevant population? The number of districts is 31. The proportional number of districts would only be 27 districts or 77% of the total number of districts. Is it,

therefore, fair that white people have a disproportionately high number of senate seats? Additionally, as we talk about equal opportunity districts, the majority-majority or majority-white districts have substantially high white voting age populations. The minimum WVAP, outside of districts 24, 25, 30 & 31, is 66.50% in district 27.

The Defendants make reference to "super-majority" districts. The Supreme Court in *Growe vs. Emison*, 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) said "[o]ur precedent requires that, to establish a vote dilution claim with respect to a . . . districting plan (and hence to justify a super-majority districting remedy), a plaintiff must prove three threshold conditions." *Id. (citing Thornburg v. Gingles*, 478 U.S. 30 (1986)*)*. The court concludes that section of the discussion by saying "[u]nless these points are established, there neither has been a wrong or can be a remedy." *Id.* Therefore, super majority-minority districts are not prohibited.  However, super majority-minority districts are defined as having 60% black voting-age population ("BVAP").  See *Jeffers vs. Tucker*, 847 F. Supp. 655, 660 (E. D. Ark. 1994). (Footnote 4 references Senate District 22 as being 61.91% BVAP).

The Plaintiffs have offered to the Defendants a very simple and straight-forward alternative map which cures the deficiencies complained of by the Plaintiffs and, while not being a safe or super-majority minority district, creates a more nearly equal opportunity for the Plaintiffs to elect a candidate of their choice. That map is called Jeffers 03 and has a deviation of only 867 people (less than 5%) while having a BVAP of 58.41%. Jeffers 03 alters Senate Districts 23 and 24, and no other district. To address the concerns raised by Governor Beebe in his deposition, Plaintiffs produced another map, Jeffers 04, which alters districts 22, 23 and 24. District 24 remains precisely as it is drawn in Jeffers 03. Districts 22 and 23 swap territories and end up with deviations of 312 and -1,633 people respectively (less than + or – 5%).

Plaintiffs are fully apprised that the Board of Apportionment has the discretion to draw new maps if so ordered by this Court. These maps are submitted to make the best of a bad situation. Attorney General Dustin McDaniel said in his deposition ". . . because one thing that we discovered in this process is that a rock in the pond sent ripples to every edge." *Depostion of Attorney General Dustin McDaniel*, Page 64 Lines 3-5. Ideally, had the Board of Apportionment drawn the minority districts first, the "rock in the pond" scenario would have had less impact upon the African-American populace and perhaps five (5) senate districts could have been drawn.

I.     **Background**

    A.     **The Board of Apportionment's Return to *Pre-Jeffers* District**

The Board of Apportionment is required to convene and determine the legislative district boundaries. Pursuant to Article 8 of the Arkansas Constitution, the Board of Apportionment is comprised of the Governor, Attorney General and Secretary of State.  The Governor is the chair of the board.  The board met an unusually meager number of times during this redistricting cycle and kept very few records of actions between the meetings.

Secretary of State Mark Martin testified by deposition that "[u]ltimately the Board of Apportionment met three times. There was two informational meetings and then the final meeting where the - - if I recall correctly, the meeting where the --- the maps were adopted." *Deposition of Mark Martin*, Page 11, Lines 1-5.

The Board of Apportionment had three sets of maps at its final meeting. Each member had a set of maps for the house and senate. At the meeting on July 29, 2011, Governor Beebe and Attorney General Dustin McDaniel voted to adopt the Governor's maps in a single motion. Secretary Mark Martin testified "[a]nd I think the entire package was adopted in one vote. They

4

were not separated out, it was one vote to adopt the maps." *Deposition of Mark Martin*, Page 39,

lines 23-25 and Page 40 Line 1.

Secretary Martin voted against adoption of the maps. He explained his basis for opposing

the maps as followings:

> "One of the first things was is I had not had a chance to actually review the final maps, even though I had submitted memos requesting that there be a freeze period and 48 hours to -- prior to that meeting for review of the maps. Another reason is . . . the map that had come out shortly before that - - - had some serious concerns that it would not meet the legal requirements that we had been striving to meet, especially after attending - - I attended, just as an observer, one of the final public comment meetings, and the feedback from members of the Black Caucus and the African-American community were quite clear that both the House maps and the Senate maps did not seem to  meet what they believed was the standards of the Jeffers decisions."

*Deposition of Mark Martin*, Page 40 Line 18 through Page 41 Line 8.

The Board of Apportionment in the prior decade is said to have met 16 times in various

parts of the State with the membership receiving live testimony on the proposed maps. The

contrast here is that this board did all that it could behind closed doors and left no trail by which

the public could determine its decision making scent. The tenor of Secretary Martin's deposition

is that even his office was generally kept in the dark by the other two offices.

Most interestingly, when queried about the ability to pull draft maps from the computers

used by the staffs of the Governor and Attorney General, Secretary Martin said that the

information had all been "erased off" and "deleted." See *Deposition of Mark Martin*, Page 67,

Line 17 and Page 68 Line 4.

Adding insult to injury, the transcripts of the public meetings were not even read by the

Governor or Attorney General. Governor Mike Beebe testified that "I don't recall reviewing the

transcripts. I recall getting reports of the salient issues of those – of many of those public

meetings." *Deposition of Governor Mike Beebe* Page 76 Lines 11-2. Governor Beebe goes on to say that he did not recall either reviewing the transcript or getting reports about the July 25, 2011 public meeting where several presenters addressed vote dilution in eastern Arkansas. Attorney General Dustin McDaniel essentially said the same thing. He explained that his staff attended the meetings and "advised him in detail of the goings on at the meetings." *Deposition of Attorney General Dustin McDaniel* Page 9, lines 24-25

The Board of Apportionment met on July 29, 2011 and adopted maps for the Arkansas General Assembly including 100 single member districts for the House of Representative and 35 single member districts for the Senate. The Adopted map reduced the number of majority-minority House Districts to 11 from 13 and sustained the four districts labeled "majority-minority" on the senate side of the chamber.

Senate District 24 resembles the senate districts from the Crittenden County area before the *Jeffers vs. Clinton* litigation. This Board of Apportionment made a conscientious choice to "take this district back pre-Jeffers."  The Board's actions bear out this fact.

Prior to *Jeffers vs. Clinton*, and from as far back as 1950, Crittenden County was a solid county within a senate district and basically controlled the selection of the senator. According to Secretary Martin, in 1952 and 1966, District 25 was comprised of Crittenden, St. Francis and Cross Counties.  Those were multimember, two senator, districts. In the 1981 map, Crittenden County was in District 19, which included all of Crittenden County and small portions of Poinsett, Cross and St. Francis Counties. In 1986, other changes were made, however, Crittenden County remained in single member district 19.

Then in 1989, there is a court ordered map put into place which split Crittenden County and several other counties in the eastern part of the state. District 19 then runs west across from

the Hernando Desoto Bridge over the Mississippi River in Crittenden County through Poinsett, Cross and Woodruff Counties to the White River. State Senate Districts 18 and 30 begin in Crittenden County and run south through parts of St. Francis, Lee and Phillips Counties. Districts 18, 19 and 30 cover the entirety of Crittenden, Cross, Lee, St. Francis and Phillips Counties in this 1989 map.

State Senate District 22 eventually was developed out of the *Jeffers vs. Clinton* litigation and became the predecessor district to our current State Senate District 24. *Jeffers vs Clinton* was a clearly the line in the sand on redistricting in Eastern Arkansas.

Keith Ingram's father and his brother served as State Senators in the *pre-Jeffers* State Senate Districts. Therefore, taking the district back to a *pre-Jeffers* status is also taking the district back to a favorable Ingram situation.

B.     **Plaintiff's Lawsuit**

Plaintiffs have alleged that State Senate District 24 dilutes their voting strength. The contour of the district differs in significant ways from the predecessor district 16. As a preliminary matter, State Senate District 16 as composed at the time the Board of Apportionment began its redistricting in 2011, was over 61% BVAP. Because of the Board of Apportionment's desire to return the district to a "*pre-Jeffers*" status, rather than merely adding 11,000 or so people to the boundaries of Senate District 16, the Board of Apportionment removed about 10,000 people (majority black voting age population) from within the boundaries of State Senate District 16 and placed them into the new State Senate District 23. That move, made State Senate District 16, which became State Senate District 24, short on population.

The target or ideal population for a State Senate District, following the increased state population as reflected in the 2010 census, is 83,312. The population for the State of Arkansas is

roughly equal to 83,312 times 35 or 2,915,920 people. Under current law, the Board of Apportionment must satisfy the one-person, one-vote principle by creating nearly equal districts in terms of population numbers. The accepted practice is deviation from the ideal or target population is good as long as it does not exceed plus or minus five percent from the ideal number. Therefore, Arkansas's Senate Districts could lawful range in population size from 87,478 on the high side and 79,146 on the low side.

Senate District 16, which had a 2010 census population count of 68,732, was only 10,414 people short of being within the acceptable population range under the one-person, one-vote principle. Therefore, the Board of Apportionment could have merely added 10,414 people to State Senate District 16 and created a lawful district in terms of population size.  Instead, the Board of Apportionment, for the purpose making a Crittenden County whole, enabling Keith Ingram's candidacy and returning the district to a *pre-Jeffers* district, removed about 10,000 more people from district 16 and added approximately 30,000 people to the district from Crittenden County.

The Defendants refer to this litigation as a series. That characterization is unfortunate. First, the plaintiffs are generally not the same people. They are related to those former plaintiffs, many of whom are now dead. There was no litigation following the 2001 census and redistricting when Senate District 16 was diluted from Senate District 22. Black people in Eastern Arkansas became victims of their own success in the Jeffers case. Most of the lawyers involved in the *Jeffers vs Clinton* case had become judges or otherwise unavailable to file suit. In essence, no warriors were left to fight the battle.

Nineteen years later, as the Defendants have characterized this case, the state is returning to its old methods. This is still Arkansas home, of Orval Faubus and the Little Rock Nine. This is

still Arkansas, home of many active desegregation cases including Helena (until 2003 or so), Forrest City (currently) and Little Rock (and Central Arkansas districts). This is still the State of Arkansas, which fought the tiny Lakeview School District for more than a decade in school districts effort to get adequate funding for poor public school students. After the district prevailed and the state was ordered to provide adequate funding, the state closed the Lakeview School District altogether. The people who take on the State of Arkansas do so at great personal cost.

Perhaps more importantly, the series of cases would not be necessary if the State would follow settled law rather than trying to appease a few well connected friends of high office holders. Much more difficult would the case have been for Plaintiffs to challenge a map containing 15 house districts and 5 senate districts. No. That did not happen  Instead, the State decreased the House Districts from 13 to 11 and decreased the BVAP in Senate District 24 from 61% to 52.88%.

The Defendants make issue of the Plaintiffs' filing suit on January 23, 2012. First the date is really of no consequence because the harm is a continuing harm. Second, the Plaintiffs and Defendants have agreed to a truncated schedule for getting this matter to trial. This placed extreme pressure on the Plaintiffs, who do not have the luxury of making payments for expenses from the public treasury. Plaintiffs have had to scrape, scrub and sacrifice in order to fund this case to this point. This has been a huge effort by the Plaintiffs. This is particularly true where Plaintiffs, many of them, are poor people with friends who are equally poor and are living through one of the poorest economies since the Great Depression.

The Defendants know very well the conditions with which the Plaintiffs deal on a daily basis. The proper course for the Defendants to have taken in light of all of these factors would

have been to burden the Plaintiffs less and not more; to remove barriers rather than build walls.

## II.    Argument

### A.    Summary Judgment Standard

Summary judgment law is very settled. Fed. R. Civ. P. 56(c); see also *Celotex Corp v.*

*Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In that case, which has been cited

over 60,000 times since being handed down, the court declared:

> Under Rule 56(c), summary judgment is proper "if the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any, show that there is no
> genuine issue as to any material fact and that the moving party is
> entitled to a judgment as a matter of law." In our view, the plain
> language of Rule 56(c) mandates the entry of summary judgment,
> after adequate time for discovery and upon motion, against a party
> who fails to make a showing sufficient to establish the existence of
> an element essential to that party's case, and on which that party
> will bear the burden of proof at trial.

*Id*. 477 U. S. at 322.

## B. The Court should NOT Enter Summary Judgment on Plaintffs' Voting Rights Act Claim.

### 1.    The *Gingles* Framework for Section 2 Liability

This case should be decided after all material things have been considered. The Voting

Rights Act of 1965, as amended in 1982, states in relevant portion:

> (a) No voting qualification or prerequisite to voting or
> standard, practice, or procedure shall be imposed or applied by any
> State or political subdivision in a manner which results in a denial
> or abridgement of the right of any citizen of the United States to
> vote on account of race or color, or in contravention of the
> guarantees set forth in section 1973b (f)(2) of this title, as provided
> in subsection (b) of this section.
> (b) A violation of subsection (a) of this section is
> established if, based on the totality of circumstances, it is shown
> that the political processes leading to nomination or election in the
> State or political subdivision are not equally open to participation
> by members of a class of citizens protected by subsection (a) of

this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U. S. C. 1973.

Congress amended the Voting Rights Act in 1982 to address and overrule the decision of the U. S. Supreme Court made in *City of Mobile vs. Bolden*, 446 U. S. 55, 100 S. Ct. 1490, 64 L.Ed.2d 47 (1980). The court there found that Section 2 as written "added nothing to the Fifteenth Amendment claim." *Id*. at 61. Of course, under the Fifteenth Amendment, "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color or previous condition of servitude." *Id*. at n. 9. The essence of the *Bolden* decision was that it found that "disproportionate impact alone cannot be decisive, and courts must look to other evidence to support a finding of discriminatory purpose." *Id*. at 70.

"This case requires that we construe for the first time §2 of the Voting Rights Act of 1965, as amended June 29, 1982. 42 U.S.C. § 1973." *Thornburg vs. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). "Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the "results test," applied by this Court in *White v. Regester*, 412 U. S. 755, 93. S.Ct. 2332, 37 L.Ed.2d 314 (1973), and by other federal courts before *Bolden, supra,*. S. Rep. No. 97-417, 9th Cong. 2nd Sess. 28 (1982), (U.S. Code Cong.& Admin. News 1982, pp. 177, 205" Id. at 35.

For Plaintiffs to prevail in this case they do not need to establish that the Arkansas Board of Apportionment acted with a discriminatory purpose; it is sufficient to prove that the rendition

of Senate District 24 has a discriminatory effect. *Bush vs. Vera*, 517 U. S. 952, 976 (1996); *Gingles*, 478 U.S. at 35-36. Prevailing in this case will not guarantee the Plaintiffs success at the ballot box. *Johnson v. De Grandy*, 512 U.S. 997, 1014 n. 11 (1994). There is a guarantee of a level playing field which includes equal opportunity for victory at the polls as enjoyed by others. *Vecinos de Barrio Uno v. City of Holyoke*, 72. F.3d 973, 979 (1st Cir. 1995).

In proving their case, the Plaintiffs face substantial hurdles as are present in all Voting Rights Cases. In *Gingles, supra*, the Supreme Court limned three threshold conditions, also called preconditions, elements, factors and prongs, which must be fulfilled in order to successfully show vote dilution. First the Plaintiffs must show that they are a part of a minority group that is "sufficiently large and geographically compact to constitute a majority in a single-member district." 478 U.S. 50. Second, the Plaintiffs must show that the Plaintiffs are "politically cohesive." *Id*. at 51. Third, Plaintiffs must show that the "white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, such as the minority's preferred candidate running unopposed  -- usually to defeat the minority's preferred candidate." Id. (citation omitted).

Completing the Gingles three-step pavane does not guarantee victory for the Plaintiffs. This court must look to the totality of the circumstances to determine whether the Plaintiffs prevail. In reviewing the totality of the circumstances assessment, this Court should be guided by the litany of factors listed in the Senate report which accompanied the amended Voting Rights Act. *Gingles*, 478 U.S. 43-46.

One factor for this Court to consider is proportionality. By proportionality we mean the relationship between the number of majority minority voting districts and the minority group's share of the relevant population. *De Grandy*, 512 U.S. at 1000, 1014 n. 11. Key in this Court's

assessment of the factors, is whether the challenged district, Senate District 24, deprives minority voters of an equal opportunity to participate in the electoral process and to elect candidates of their choice.

>    **2.   Senate District 24 is not an Effective District and Dilutes the Voting Strength of Black Voters**

The Defendants have argued that because they have drawn a majority-minority district they have met their lawful burden. This approach is probably what caused this litigation in the first place.

The State has a burden that goes beyond merely grouping enough black people into a district and calling it majority-minority. Various factors impact the effectiveness of a district. For example, in Helena-West Helena, a creative cartographer could draw a majority-minority district which included Stonebrook, Waverly Woods, Oak Forest and North Helena. That district would probably be around 55% BVAP. However, the residents of North Helena are 99% Black and 50% live in housing provided by the Helena Housing Authority. The others are very poor and suffer from the crippling disadvantages of poverty. While, by contrast, the neighborhoods of Stonebrook, Waverly Woods and Oak Forest are the wealthiest concentrations of home owners in all of Phillips County, Arkansas. The manner in which the majority-minority district is accomplished is as probative as the result of having a majority-minority district.

Furthermore, the state is now aware, because Plaintiffs engaged the expert services of Dr. Lisa Handley, who is quoted as co-author on many writings in the redistricting area, that Senate District 16 was not an effective district. By effective district, the Plaintiffs contend that more times than not, the minority group will be able to elect its preferred-candidate.

Dr. Handley's well presented report clearly shows that in Senate District 16 the minority group has not been able to elect its preferred candidate for the last ten years. Her report shows

that Steve Higginbotham won in 2002 and was not the preferred candidate. Jack Crumbly won in 2006 and 2010 and was not the preferred candidate.

This evidence leads to the question, what happened between *Jeffers v. Clinton* which produced Senate District 22 at 61.91% BVAP (see Jeffers v. Tucker footnote) and the elections in 2002, 2006 and 2010? The answer, simply put, is redistricting by the Board of Apportionment which reduced the BVAP from 61.91% to 55% or so in 2001. Just to be clear, Senate District 22 was the predecessor to Senate District 16 which is the predecessor to Senate District 24.

Therefore, merely clicking on the computer mouse until it creates a district containing 50 plus percent BVAP is not the end of the inquiry. Actually, around the country, progressive redistricting bodies, whether commissions, boards or legislatures, have engaged experts as a part of the redistricting effort and made assessments regarding the current districts *before* attempting to create new districts. In this instance, however, the Board of Apportionment deemed its own staff members experts. Interestingly, the principals (Governor Beebe, et al.) had difficulty remembering the names of the staff persons.

As part of Dr. Handley's report presented at her deposition and attached to the Defendants Motion for Summary Judgment, she made several findings which will assist the Court in carrying out its duties in this case.  Dr. Handley found that "[v]oting in the Delta Counties area of Arkansas is consistently racially polarized: In nearly every contest examined, African American and white voters preferred different candidates." Handley Report, Page 5, Exhibit 31to Motion for Summary Judgment. On page nine of that report, she states "all but one of the 18 contests analyzed was racially polarized (2002 Democratic Primary for Lieutenant Governor was the only contest in which black and white voters supported the same candidate, African American Sheffield). The black-preferred candidate was defeated in every polarized

contest that did not occur in the majority black legislative district --- and sometimes lost contests in majority black districts as well."

Dr. Handley concluded her findings by saying:

> African American voters satisfy all three prongs of the Gingles test in the Delta Counties region of Eastern Arkansas: voting is racially polarized, with black voters cohesive in support for their candidates of choice and whites bloc voting to defeat the minority-preferred candidate. Because voting is racially polarized and the minority-preferred candidates usually lose, districts that offer minority voters the ability to elect candidates of their choice must be created. African American turnout rates are depressed relative to white turnout in this area of the state, hence only districts with black populations substantially higher than 50% black in voting age population will produce an equivalent number of African-American and white voters on election day."

Handley Report, Page 11 (Document number 55-31).

The Defendants have a very precarious defense being offered in this case. As the Plaintiffs and their counsel understand the defense, it is "we do not know what we did but you cannot prove that we violated any law." This is buttressed by the Governor and Attorney General having little ability to recall salient facts about this case during their depositions. They responded "I don't recall" to several questions during their depositions. Additionally, the Defendants' chosen expert, Dr. Jeffrey Zax has done no analysis of racial polarization.  In his deposition on page 9 he was asked:

> Q. So I understand you correctly, you've not been engaged to actually compile a report of your own that would assess racial polarization, for example?
> **A. I do not understand that to be outside the scope of my potential responsibilities**.
> Q. All right. With that being as it is, have you compiled a report that would reflect on whether the voting patterns in the Delta Counties of Eastern Arkansas is racially polarized?
> **A. Yes. My report speaks to that issue.**
> Q.  Your report that was produced on yesterday speak to you doing an analysis of racial polarization?
> **A. No.**

15

Zax Deposition, Page 9-10 Lines 18-9.

This fact alone deprives this Court of a comparison of the experts or their work, which is apples to apples. See. *U. S. v. City of Euclid*, 580 F.Supp.2d 584 (N. D. Ohio 2008)(declining to accept Zax's strained analysis of the case). Dr. Zax has said that this work is "far too simpleminded to be dignified as a method. It's simple multiplication. I took Dr. Handley's number and said what do (sic) these numbers predict about voters outcome in precincts. Voila." Zax Deposition Page 65 Lines 20-24.

The Defendants are also, in some way, relying on *Bartlett v. Strickland*, 556 U.S. 1, 129 S.Ct. 1231,173 L.Ed.2d 173 (2009). Plaintiffs believe that the Defendants, in error, relied on this case as a remedy case as opposed to a threshold case. *Bartlett* stands for the premise that unless the minority group is sufficient in number to make a majority of the voting age population in an district, then the minority group has failed to state a claim under the Voting Rights Act and the case law interpreting it. *Id. at 16.* "To the extent there is any doubt whether §2 calls for the majority-minority rule, we resolve that doubt by avoiding serious constitutional concerns under the Equal Protection Clause." *Id.* (citing *Clark* v. *Martinez,* 543 U. S. 371, 381-382 (2005) (citations omitted).

The confusion may be the Defendants desire to create districts with lower black voting age populations. However, *Bartlett* did not alter the *Gingles* analysis or the burdens under that analysis. *Bartlett* clarified the fact that so-called cross-over districts, while permissible creations, cannot be forced into existence under the Voting Rights Act.  The court said, "[d]isregarding the majority-minority rule and relying on a combination of race and party to presume an effective majority would involve the law and courts in a perilous enterprise." Id. at 18.  The Supreme Court was concerned that race was being injected too deeply into the fabric of redistricting.

"Given the consequences of extending racial considerations even further into the districting process, we must not interpret §2 to require crossover districts." *Id.* In short, the Bartlett case, if it has any application in Arkansas would be to give the Board of Apportionment authority to draw a "potential" cross-over senate district in southeast. The case did not authorize the dilution of Senate District 24.

### 3.   The Third Gingles Prong

#### a.   Bloc Voting by Whites Usually Defeats the Minority's Preferred Candidate

The Defendants are essentially arguing that we no longer have racial polarization in Eastern Arkansas voting. Certainly, that fact, if it were true, would be breaking news to everybody in the state except perhaps, the Defendants. This part of the state is divided along many lines. The easiest and most obvious is racial. By and large all volunteer associations are still racially distinct. This distinction runs through organizations like the Rotary, Lions, Kiwanis, NAACP, Delta Sigma Theta, Zeta Phi Beta, Kappa Alpha Psi, Boards of Directors for Various institutions, and Chambers of Commerce to name a few. Many of these are voluntarily choices; not controlled by the state. But they are facts of life in the "Delta."

Neighborhoods are segregated. Schools are segregated. Black students are in public schools. White students are in private schools. Churches are segregated. In Phillips County, the staff in the county clerk's office is all black. The staff in the circuit clerk's office is all white. The race of the office holder is discernable from those facts. Also telling is the fact that this practice has lasted 10 – 15 years and through two different circuit clerks.

School boards in the area that are majority-black, once gained additional black or minority membership after lawsuits or other changes in the law. Black candidates have not prevailed in Eastern Arkansas elections save and except where there is a super-majority of

17

African-American voters.

The Defendants, as state actors, are certainly aware that there are no currently elected African-Americans in Crittenden County to any county-wide office. There is only one county-wide elected official in St. Francis County who is African-American. Phillips County has two African-American county-wide elected officials: County Clerk and County Coroner. The County Clerk was elected in the early 1990's to an open seat with the support of the then current incumbent who was moving to Northwest Arkansas. The First African American Phillips County Coroner, it is believed, won an open seat in the early 1990's as well. He died in office and was replaced by an African American appointee who was succeeded by the third African-American Coroner unopposed. Lee County has an African-American Coroner and has so had for many years.

The Office of Coroner is not the bellwether of Delta politics. Since Roller Funeral Homes entered into this area, the race for coroner has been less challenged. With Roller Funeral Homes in Phillips and Lee Counties, they have been the dominant, and at some point the only, white funeral home in the county.

In Eastern Arkansas, African-Americans are still celebrating black firsts, like the first Black superintendent of a particular school district. There are some black firsts that have yet to be celebrated in many eastern Arkansas jurisdictions:  mayor, county judge, sheriff, circuit clerk, tax assessor, and district court judge. African Americans are not without successes. There have been black people appointed Police Chief and Fire Chief, which are significant appointments. Black people have been elected mayor in Forrest City, Marianna, and Helena-West Helena for the last ten years or so. Those cities are super-majority black populations.

b. ***Gingles*** **and** ***Cottier***

Dr. Handley focused her inquiry on contests which were bi-racial. Those contests where a black person and a white person were opposing one another for elective office are the races she found most probative to her polarization analysis. The Defendant argues that Handley's approach flies in the face of precedent. What the Defendants mean is their expert has not analyzed any elections. So, the information that was available in *Cottier v. Martin*, 604 F.3d 553 (8th Cir. 2010), is not available here because only Dr. Handley has performed any analysis. This argument assumes information not available as evidence because their expert did not run the numbers. Dr. Handley's analysis and her testimony via deposition clearly show racial polarization and that the Plaintiffs can provide sufficient proof on all three of the *Gingles* preconditions. The Defendants do not meet proof with proof in this regard. The *Cottier* problem, if any, rests squarely on the shoulders of the Defendants.

The remaining arguments put forth in Defendants' Brief take issue with evidence presented by the Plaintiffs. For example, the Defendants have taken issue with Dr. Handley's report, which the Defendants have attached to their Motion for Summary Judgment documents. The Dr. Handley's Report should be juxtaposed to Dr. Zax's report in order to determine whether there is a material issue of fact remaining for decision by the court. However, Dr. Zax's report is not a separate analysis of the elections that took place in the relevant area but instead is a criticism of Dr. Handley's report. For that reason, his report offers very little probative information. Again, and we cannot overstress this point, Defendants' expert has performed no analysis of racial polarization, political cohesion or white bloc voting. Dr. Zax's entire presence can be nearly equated to the comedian who asked the question do you believe me or your . . . eyes? The implication that where your eyes and my story intersect, believe me over your own eyes because your eyes will betray you and, of course, I will not.

19

C. **Summary**

The Plaintiffs have, through several documents being filed together with this brief, outlined the material issues of fact that remain to be decided by the court. They have provided some anecdotal evidence of racial polarization, political cohesion and white bloc voting. They have provided more than enough information for the Court to deny the Motion for Summary Judgment and continue with a full-blown trial of this case.

Respectfully Submitted,

James F. Valley, Esq
J F VALLEY ESQ PA
P O BOX 451
423 RIGHTOR STREET, SUITE 3
HELENA-WEST HELENA, AR 72342-0451
(870)338-6487 X 7 Telephone
(866)786-9885 Phone and Fax
james@jamesfvalley.com Email

## CERTIFICATE OF SERVICE

I, James F. Valley, certify that on April 27, 2012, consistent with the requirements of FRCP 5, I served a complete copy of this document with any attachments to counsel as listed below:

Attorneys for Honorable Mike Beebe and
Honorable Dustin McDaniel:

Mr. David Curran, Esq.
david.curran@arkansasag.gov

C. Joseph Cordi, Jr
joe.cordi@arkansasag.gov

Mr. Warren Readour, Esq.
warrenr@arkansasag.gov

Attorneys for Honorable Mr. Martin:
Mr. W. Asa Hutchinson, Esq.
asa@ahlawgroup.com

Mr. W. Asa Hutchinson, III, Esq.
Ahutchinson@ahlawgroup.com

Ms. Kristi Hunter, Esq.
Khunter@Ahlawgroup.com

James F. Valley