**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
HELENA DIVISION**

FUTURE MAE JEFFERS; MARY JEFFERS; HENRY                    PLAINTIFFS
PEACOCK; SHIRLEY HARVELL; REV. RONALD
WILLIAMS; PEGGY R. WRIGHT; LAURA LOVE;
FRANK SHAW; C.W. CAMPBELL; LEO CHITMAN;
ETTA CAMPBELL; PLEZ LUCAS; VICKIE
ROBERTSON; JOSEPH PERRY; ELBERT SMITH;
SANDRA BAGLEY; NIKKI DISMUKE; ALICE W.
VALLEY; LAKETHA BROWN FLUKER; KATRINA
HARRELL; CHESTER HARRELL; EDDIE O'NEAL;
CHRISTOPHER FRANKLIN; and JACK BERNARD
CRUMBLY


v.                              No. 2:12CV00016 JLH

MIKE BEEBE, in his capacity as Governor of Arkansas and
Chairman of the Arkansas Board of Apportionment; MARK
MARTIN, in his capacity as Secretary of State of Arkansas
and as a member of the Arkansas Board of Apportionment;
DUSTIN MCDANIEL, in his capacity as Attorney General
of Arkansas and a member of the Arkansas Board of
Apportionment; and ARKANSAS BOARD OF
APPORTIONMENT                                              DEFENDANTS

**<u>PLAINTIFFS' TRIAL BRIEF</u>**


Plaintiffs Future Mae Jeffers, et al., challenge Senate District 24, as drawn by the Board

of Apportionment in 2011, and ask that the primary election for that district, now scheduled for

May 22, 2012, be enjoined.  They also ask that the Board of Apportionment be ordered to draw a

new district that complies with the requirements of § 2 of the Voting Rights Act of 1965.

Changes to the boundary of one district also affect the boundary of the adjacent district.

Plaintiffs have proposed an alternative map for Senate District 24 that impacts only one other

district, Senate District 23, whose primary election they likewise seek to enjoin.  That is all—unless the Board of Apportionment requests permission to alter other districts to accommodate the changes they must make to District 24.

The Board had to draw districts which accommodated a nine-percent (9%) state-wide population increase and many population shifts within the state. Two products were therefore necessary, larger districts in terms of population and an adjustment of district lines to accommodate population shifts.

The Black/African American population increased by about 30,000 people between the 2000 Census and the 2010 Census. However, as a part of the total state population, the Black/African-American number decreased as a percentage of the whole by approximately three-tenths of one percent (0.03%) from about 15.7% to about 15.4%. In other words, although the African-American population grew in this state, it grew at a slower rate than did the Hispanic population. The White population of the state, as a percentage was 80% following the 2000 Census and had shrunk to 77% following the 2010 Census. The Hispanic population doubled to 6.4% during this same time period.

The African American population in this state is concentrated, generally in three distinct areas. Pulaski County, Jefferson County and the "Delta" are the three areas which are home to most of the state's African-American population. Pulaski, Jefferson, Lee, Phillips St. Francis and Crittenden are the Home Counties to approximately 237,000 African-Americans which is approximately 53% of the total African-American population in Arkansas.

Since the early 1990s there have been four senate districts in our state. Two of those districts were in Pulaski County, one district was in Jefferson County and the remaining district

was in the "Delta." Statistically, it was not probable that an effective 5th State Senate District could be drawn in 1990 or 2000.

Historically and prior to the court-ordered districts from the early 1990s, senate district lines followed county lines and kept the counties intact. This methodology, which was authorized by the Arkansas Constitution, permitted Crittenden County to be the largest and most influential county in the various senate districts from 1950 until the court ordered redistricting in the late 1980s or early 1990s. Most of those districts were multi-member districts.

The Board of Apportionment will draw the new district according to the guidance given by this Court. To comply with Article 8, § 3 of the Arkansas Constitution, Plaintiffs seek an order that the new district be composed of convenient, contiguous territory, that it not divide more counties than necessary to meet equal-population requirements, and that its population not deviate from the ideal by more than five percent. To comply with § 2 of the Voting Rights Act, Plaintiffs seek an order that the redrawn District 24, while meeting state constitutional requirements, have a Black voting-age population of at least 58%.

Plaintiffs' proposed map, Jeffers_03, creates a new District 24 composed of convenient, contiguous territory that divides no more counties than District 24 as drawn by the Board, divides fewer precincts, deviates from the ideal population far less than the Board's district, and has a Black voting-age population of 58.41%.

Plaintiffs are confident that, if so ordered, the Board will be able to draw the new districts and have them approved by this Court in time for Secretary of State Martin to conduct the primary election for the affected districts either before or concurrently with the November general election.

## I.      HISTORY

### A.      The Voting Rights Act of 1965

The Voting Rights Act of 1965 ("VRA") may have been the most effective civil rights legislation in American history because it has given African Americans and other minorities real power:  the power to vote and have those votes counted in a way that makes a meaningful impact on the outcome of an election.

#### 1.      VRA Section 2

Section 2 of the Act (codified as amended at 42 U.S.C. § 1973), prohibits a state or political subdivision from imposing any "voting qualification or prerequisite to voting, or standard, practice or procedure [that] results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group.  "Language minority group"  is defined as "American Indian, Asian American, Alaskan Natives or of Spanish heritage."   42 U.S.C. § 1973l(c)(3).  The test is whether, "based on the totality of the circumstances," the members of a protected minority "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

Purity of intent will not save a law from attack under § 2 and proof of discriminatory intent is not necessary.  The question is whether the law "results in a denial or abridgment" of the right to vote, not whether it was enacted with an intent to discriminate.

Section 2 applies throughout the United States.  It has been used to reject redistricting plans on the ground that they discriminated against Blacks, Hispanics, or American Indians and abridged their right to vote by diluting their voting strength.

### 2.        Vote Dilution Techniques

The three most common techniques for diluting the voting power of a minority group, whether a racial minority or a partisan political minority, have been submerging, cracking, and packing.  The Arkansas Board of Apportionment has been accused of using each of the three to dilute the voting power of African Americans.

### a.        Multi-Member Districts

Submerging is accomplished by creating multi-member districts.

When a minority population lives in a relatively compact area, surrounded or adjoined by the majority population, a state or city may decide to create a district that includes both populations and provide that, whoever wins a majority in the combined area will win all the seats within it.  The minority population is submerged in the majority population and is unable to win any seats.

Section 2 of the Voting Rights Act has been used to dismantle multi-member districts designed to dilute the voting power of a racial or language minority where:

1) the minority is sufficiently large and geographically compact to constitute a majority in a single-member district;

2) the minority is politically cohesive; and

3) in the absence of special circumstances, bloc voting by the White majority usually defeats the minority's preferred candidate.

*Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).

If those three "preconditions" are met, the plaintiffs must then prove a history of discrimination against the minority in that jurisdiction based on "the totality of the circumstances."  If the plaintiffs are successful, the multi-member district must be broken into single-member districts that include some districts where the minority population has an equal opportunity to elect representatives of their choice.

In *Gingles* and other cases, minorities have been successful in their attacks on multi-member districts.  In *Smith v. Clinton*, 687 F. Supp. 1310 (E.D. Ark. 1988), this Court ordered the Arkansas Board of Apportionment to dismantle a 1981 multi-member state House district that had been used to submerge the votes of African Americans in Crittenden County.

### b.    Cracking

"Cracking" is drawing district lines so that the minority population is broken up.  If multimember districts are disallowed, the majority may prevent the minority from winning any seats by cracking them.  Members of the minority are spread among as many districts as possible, keeping them a minority in every district, rather than permitting them to concentrate their strength enough to elect representatives in some districts.  The classic technique has been the pie wedge:  a city surrounded by suburbs or farmland is divided into districts, each of which reaches out into the suburbs or farms.  The city residents are made a minority of the voting population in each district.  The city has many districts, but elects no representatives.

Cracking has been used against racial and language minorities, and § 2 of the Voting Rights Act has been used to stop it.  In *Jeffers v. Clinton*, 730 F. Supp. 196 (E.D. Ark. 1989), this Court ordered the Board of Apportionment to redraw its 1981 plans to increase the number of Black-majority Senate districts from one to about three, and increase the number of Black-majority House districts from four to about 13.  730 F. Supp. 196, 198, 217 (E.D. Ark. 1989).

In *Growe v. Emison*, 507 U.S. 25, 40-41 (1993), the Supreme Court held that the three preconditions required by *Gingles* to challenge multimember districts also applied to allegations that a single-member district had been drawn to fragment (or "crack") a minority population.

### c.      Packing

If multimember districts are not permitted, and the minority population can't be cracked to prevent them from winning any seats, the majority may decide to pack them.

"Packing" is drawing district boundary lines so that the members of the minority are concentrated, or "packed," into as few districts as possible.  They become a supermajority in the packed districts—60, 70, or 80 percent.  They can elect representatives from those districts, but their votes in excess of a simple majority are wasted.  They are not available to help elect representatives in other districts, so the minority cannot elect representatives in proportion to their numbers in the state as a whole.

In *Jeffers v. Tucker*, 847 F. Supp. 655 (E.D. Ark. 1994), this Court denied a packing challenge to Black-majority districts in the Delta drawn by the Board of Apportionment in 1991.

B.      **Previous Challenges to Arkansas Legislative Districts**

1.      *Smith v. Clinton*

In January 1988, Black residents of Crittenden County brought suit in this Court challenging the use by the 1981 Board of Apportionment of multimember House districts in Crittenden County to submerge the votes of Blacks, in violation of § 2 of the VRA.  At issue was a multimember district entirely within the county from which two representatives were elected. This Court found that the Black population within the district was sufficiently large and geographically compact to constitute a majority in one single-member district, that Blacks tended to vote cohesively for the same candidates, and that their preferred candidates were always defeated by Whites voting as a bloc for a White candidate.  *Smith v. Clinton*, 687 F. Supp. 1310 (E.D. Ark. 1988).

The plaintiffs' expert witness, Dr. Allan Lichtman, used both bivariate regression analysis and homogeneous precinct ("extreme case") analysis of nine election contests to determine that voting in elections in Crittenden County was racially polarized.  687 F. Supp. at 1315-16.  Those were the same two methods the Supreme Court had relied on in *Thornburg v. Gingles*, 478 U.S. at 52-53.  The Court found that, since the elections at issue were for the House of Representatives, the results of previous House elections were the most probative.  687 F. Supp. at 1317.  The Court had little interest in contests in which there were no Black candidates. It noted that the Supreme Court, in *Gingles*, 478 U.S. at 52-53, had relied heavily on elections between Black and White candidates.  It said that analyzing elections among Whites proves only that "candidates favored by blacks can win, but only if the candidates are white."  687 F. Supp. at 1317-18.  The Court took judicial notice that:

> (1) . . . [T]here is a history of racial discrimination in the electoral process in Arkansas. (Citations omitted.)   We do not believe that this history of discrimination, which affects the exercise of the right to vote in all elections under state law, must be proved anew in each case under the Voting Rights Act.

> (2)   We further find that the history of discrimination has adversely affected opportunities for black citizens in health, education, and employment.   The hangover from this history necessarily inhibits full participation in the political process.

687 F. Supp. at 1317.

After a two-day trial ending April 26, 1988, the three-judge court set aside the result of the March 8 primary and ordered the Board of Apportionment and plaintiffs to submit proposed plans for dividing the multimember district into two single-member districts.   The Board declined to do so, and objected to the defendants' plan as providing for a 60.55% "supermajority" of Black voting-age population.   The Court ordered the Board to implement the 60.55% plan, saying the number greater than a simple majority was necessary in order to compensate for lower voter registration and lower voter turnout among Blacks, whose lower rate of participation in the political process was due, in part, to the effects of the multimember district and, in part, to their lower levels of educational attainment and lower incomes.   687 F. Supp. at 1363.

### 2.      *Jeffers v. Clinton*

The lead plaintiff in *Jeffers v. Clinton*, M.C. Jeffers, was the husband of the lead plaintiff in this action, Future Mae Jeffers.   The *Jeffers* plaintiffs did not limit their challenge to Crittenden County House districts.   They challenged both House and Senate districts throughout the state, alleging that more Black-majority districts could have been drawn than were, because concentrations of Black population had been fragmented (what we now call "cracked") into

neighboring districts with a White majority.  Their expert, Dr. Richard Engstrom, used three methods:  single regression, double regression (bivariate regression), and homogeneous-precinct analysis to determine that Blacks voted cohesively and Whites voted sufficiently as a bloc to usually defeat the Black-preferred candidate, except in districts where Blacks were a majority of the voters.  The Court repeated its support of these analytical methods and disinterest in elections where there was no Black candidate.  730 F. Supp. 196, 208-09 (E.D. Ark. 1989).  With regard to the totality of the circumstances, in a twelve-day trial the Court developed a fuller record of continuing discrimination than it had in the two-day *Smith* trial.  Among other findings, it noted that Roy Lewellen, who had been a candidate for the state Senate in 1986, had been warned by the Sheriff not to run and then prosecuted unjustifiably for unrelated activity when he ignored the warning.  730 F. Supp. at 210-11.  The Court ordered the Board of Apportionment to redraw Senate and House districts in the eastern and southern parts of the state, but not in Pulaski County or the northwest.  Whereas the Board in 1981 had drawn only one Senate district and four House districts with a Black majority, the Court noted that three Senate and 13 House districts could have been drawn and presumed that the Board would draw that number, but did not require it.  730 F. Supp. at 198, 217.

When the Board submitted its remedial plans and plaintiffs objected, the Court held that the Board's plans, for a House district in Lee and St. Francis Counties with a BVAP of 58%, and a House district in Monroe and Phillips Counties with a BVAP of 56%, were legally insufficient to provide Black voters with an equal opportunity to elect candidates of their choice.  Rather, the Court ordered adoption of the Jeffers' plans for those districts, with a BVAP of 63% in the first and 64% in the second, because that could be accomplished with districts no less compact and contiguous than those proposed by the Board, and would compensate for Blacks' lower rates of

voter registration and turnout, and their economic and educational disadvantages.  756 F. Supp.

at 1198-1200.  As the Court explained:

> On a strictly numerical and quantitative view of equality, any district with a BVAP of 50% or higher would be *per se* lawful. We think the Voting Rights Act means something more than this. Suppose two people are in a race, and one of them has had to run the first three laps with a 100-pound weight on his back. Suddenly it occurs to the referee that this is unfair. Something must be done to correct the injustice. Is it corrected just by removing the weight from the disadvantaged runner for the last lap? Of course not. If no more than this is done, equality of opportunity is nothing but an empty promise, a form of words better left unsaid by honest people. Past injustice, especially centuries of it, cannot be ignored. In Justice Blackmun's elegant phrase, "in order to get beyond racism, we must first take account of race." *University of California Regents v. Bakke, 438 U.S. 265, 407, 57 L. Ed. 2d 750, 98 S. Ct. 2733 (1977)* (separate opinion).

756 F. Supp. 1198.

The Board's remedial plan for the Senate included a district in portions of Crittenden,

Cross, Lee, Phillips, and St. Francis Counties that had a BVAP of 55%.  The Court held the

district insufficient to remedy the wrong and ordered implementation of the Jeffers plan, which

had a BVAP of 60.5%.  The Board's objection that it paired two White incumbents in the same

district was denied.  The Court found that avoiding contests between White incumbents was not

a valid reason for rejecting the plaintiffs' district, which was no less compact and contiguous

than the district proposed by the Board and had a higher BVAP percentage.  756 F. Supp. at

1200 (Feb. 9, 1990).  When the Board submitted another plan, which eliminated the pairing of

the two incumbents but increased the BVAP to 62%, the Court approved it.  756 F. Supp. at

1202-03 (Mar. 5, 1990).

3.      *Jeffers v. Tucker*

In *Jeffers v. Tucker*, 847 F. Supp. 655 (E.D. Ark. 1994), plaintiffs alleged that the plan drawn by the Board of Apportionment in 1991 violated § 2 of the VRA because it had two fewer Black-majority districts in the Delta than could be drawn:  it packed Black voters into too many districts with a Black voting-age population over 60%.   The Board's plan provided for the following districts:

| District | BVAP% | Incumbent |
|----------|-------|-----------|
| HD 94 | 56.32 | Black |
| HD 95 | 63.06 | Black |
| HD 97 | 61.95 | White |
| HD 99 | 60.10 | Black |
|  |  |  |
| SD 22 | 61.91 | Black |

847 F. Supp. at 661.

Plaintiffs alleged that the 1990 Census showed that an additional House and Senate district could be drawn by lowering the Black voting-age population in two House districts and one Senate district below 60% and using those voters to provide for one additional House district and one additional Senate district with a Black voting-age population over 55%, as follows:

| District | BVAP% | Incumbent |
|----------|-------|-----------|
| HD 38 | 59.31 | None |
| HD 48 | 62.67 | None |
| HD 72 | 55.04 | None |
| HD 74 | 58.61 | None |
| HD 75 | 55.24 | Black |
|  |  |  |
| SD 7 | 58.05 | None |
| SD 22 | 60.18 | Black |

*Id.*

With respect to the House, plaintiffs argued that 60% supermajorities were no longer necessary where there was no White incumbent.  This Court rejected the challenge, saying that districts in excess of 60% were required in order to give Black voters an equal opportunity to elect representatives of their choice.  847 F. Supp. at 661.

With respect to the Senate, the Court did not object to the fact that the plaintiffs' Senate District 7 was slightly below 60%, because it had no incumbent.  847 F. Supp. at 661.  Rather, the Court rejected the challenge because, in order to create the District 7, plaintiffs had reduced the Black voting-age percentage in another Black-majority district, reducing its total population below tolerable limits, and had done so with districts that were not compact.  Senate District 7 extended "a series of long, slender fingers deeply to the west from the River [cutting] across numerous communities and political subdivisions."  The Court concluded plaintiffs had failed to prove the Black population was sufficiently large and geographically compact to constitute a majority in a single-member district, thus failing to establish the first *Gingles* precondition.  847 F. Supp. at 661-62.

## C.      Senate Elections in the Delta – 1962 to 2010

William K. "Bill" Ingram was a member of the Arkansas Senate, representing all of Crittenden County, from 1963 to 1981, when he died in office and was succeeded in a special election by his son, Ken Ingram, who continued to represent all of Crittenden County.   *See* Deposition of Mike Beebe (Exhibit 1) at 52.

In 1982 and 1986, Paul Benham was elected to represent Senate District 30, which consisted of Lee, Monroe, and Phillips Counties.  *See* 1982 Election Results (Exhibit 2); 1986 Election Results (Exhibit 3).

In 1990, this Court ordered that Crittenden County be divided, with the African-American-dominated South placed into a new Senate District 30 with portions of Cross, Lee, Phillips, and St. Francis Counties.  1990 Senate District 30 had a Black voting-age population ("BVAP") of 62%.  *See Jeffers v. Clinton*, 756 F. Supp. at 1202-03 (Mar. 5, 1990).

In the 1990 Democratic primary, African-American candidate Roy C. "Bill" Lewellen defeated the White incumbent, Paul Benham, and went on to become the first African-American state senator to be elected from Lee County since the 1870s.  *See* Arkansas Election Results 1990 (Exhibit 4) at 35.

In 1991, the Board of Apportionment redrew the boundaries of 1990 Senate District 30 so that it that still included portions of Crittenden, Lee, Phillips, and St. Francis Counties, but excluded Cross County.  The 1991 district was numbered Senate District 22.  *See* Map of Arkansas Senate Districts:  1990 (Exhibit 5).  It had a BVAP of 61.9%.  *See Jeffers v. Tucker*, 847 F. Supp. 655, 661 (E.D. Ark. 1994).  Senator Roy C. "Bill" Lewellen was re-elected in 1992 and 1996.  He was not a candidate in 2000.

In the 2000 election, African-American candidate Alvin Simes was elected to represent Senate District 22.  Voting in the May 2000 Democratic primary was racially polarized.  African Americans voted cohesively for Simes.  Whites voted cohesively for Steve Higginbothom, who was White.  Depending on the statistical method used to estimate the degree of racial polarization, between 76% and 94.2% of African Americans voted for Simes and between 73.9% and 97.3% of Whites voted for Higginbothem.  *See* Handley Decl. (Doc. 70-2) 5 tbl.3; Handley Dep. (Doc. 70-12) 149-50, 178-80.

In 2001, the Board of Apportionment redrew 1991 Senate District 22 with portions of the same counties — Crittenden, Lee, Phillips, and St. Francis — and renumbered it as 2001 Senate District 16.  *See* Board of Apportionment ("BOA") 2001 Senate Map (Doc. 55-17).  Its BVAP was lowered from 61.9% (which 1991 District 22 had) to 55.48%.  *See* BOA 2001 Senate Matrix (Doc. 55-25).  No one sued to challenge the reduction of the African-American population as compared with 1991 District 22.

During the decade from 2002 to 2012, Senate District 16 twice elected an African-American senator, but never the candidate preferred by African American voters.

In 2002, African-American incumbent Alvin Simes was defeated by White candidate Steve Higginbothom.  Simes was the candidate preferred by African-American voters.  *See* Handley Decl. (Doc. 70-2) 5 tbl.3; Handley Dep. (Doc. 70-12) 149-50, 178-80.  Higginbothom did not seek re-election in 2006.

In the 2006 Democratic primary, Representative Arnell Willis finished first in a field of three African-American candidates.  The choice of African-American voters, Alvin Simes, finished third because he was the candidate least favored by White voters.  *See* Handley Decl. (Doc. 70-2) 5.  In the runoff, Jack Crumbly, the candidate favored by Whites, defeated Willis, the candidate most favored by African Americans. *See* Handley Decl. (Doc. 70-2) 5 tbl.3.  Crumbly was unopposed in the general election.

In the 2010 Democratic primary for District 16, African Americans voted cohesively for Alvin L. Simes and Whites voted cohesively for Senator Jack B. Crumbly.  Depending on the statistical method used to estimate who voted for whom, between 51.1% and 61.6% of African Americans voted for Simes and between 72.1% and 82.6% of Whites voted for Crumbly.  *See*

Handley Decl. (Doc. 70-2) 6 tbl.3.  Crumbly was elected.  As in previous contests in 2001 Senate District 16, bloc voting by Whites defeated the candidate preferred by African Americans.  *Id.*

To summarize the elections since 2000:  From 2000 to 2010, voting for the seat from Senate District 22, and its successor, Senate District 16, was racially polarized, and the candidate preferred by African-American voters usually lost.  Results of those elections are shown in the following table:

**Table 5:  Election Results for Senate Districts 22 and 16**

| Contest | Percent Black VAP (2000-2010) | Racially polarized? | Outcome |
|---|---|---|---|
| 2000 Primary in Senate District 22 | 60% | Yes | Black-preferred candidate (Simes) won |
| 2002 Primary in Senate District 16 | 55% | Yes | Black-preferred candidate (Simes) lost |
| 2006 Primary in Senate District 16 | 61% | Yes | Black-preferred candidate (Simes) lost |
| 2006 Runoff in Senate District 16 | 61% | Yes | Black-preferred candidate (Willis) lost |
| 2010 Primary in Senate District 16 | 61% | Yes | Black-preferred candidate (Simes) lost |

*See* Handley Decl. (Doc. 70-2) 8 tbl.5.

**D.     Other Legislative Elections in the Delta – 2002 to 2010**

From 2002 to 2010, in every legislative election in the seven Delta counties that included both an African American and a White candidate, voting was racially polarized.  The candidate preferred by African Americans usually lost.  In fact, the African-American-preferred candidate

5/2/2012
6:22 PM

was defeated in every contest that did not occur in a majority-Black legislative district — and sometimes lost contests in majority-Black districts as well.  *See* Handley Decl. (Doc. 70-2) 6.

The contests during that time where there was at least one African American candidate,

other than for Senate District 16,  are summarized in the following table:

**Table 6:  Election Results for Additional State Legislative Contests
in the Delta Counties Area**

| Contest | Percent Black VAP | Racially polarized? | Outcome |
|---|---|---|---|
| **Senate District 17** | | | |
| 2004 Primary in Senate District 17 | 26.9 | Yes | Black-preferred candidate (Jones) lost |
| **House District 13** | | | |
| 2002 Primary in House District 13 | 52.8 | Yes | Black-preferred candidate (Willis) lost |
| 2004 Primary in House District 13 | 52.8 | Yes | Black-preferred candidate (Willis) won |
| 2010 Primary in House District 13 | 58.7 | Yes | Black-preferred candidate (Weaver) lost |
| **House District 51** | | | |
| 2010 Primary in House District 51 | 34.8 | Yes | Black-preferred candidate (Gilchrest) lost |
| **House District 52** | | | |
| 2004 Primary in House District 52 | 57.7 | | Contest with only Black candidates, not analyzed in report |
| 2010 Primary in House District 52 | 59.9 | | Contest with only Black candidates, not analyzed in report (Murdock received over 61.8% of vote thus was probably at least the Black-preferred candidate) |
| **House District 53** | | | |
| 2006 Primary in House District 53 | 33.9 | Yes | Black-preferred candidate (Joiner) lost |
| **House District 54** | | | |
| 2004 General in House District 54 | 65.8 | Yes | Black-preferred candidate (Davis) won (3 contests with only Black candidates not analyzed in report) |

*See* Handley Decl. (Doc. 70-2) 6, 9 tbl.6.

The success of African American candidates in these House districts is correlated to the Black voting-age population in the district — the higher the percent Black VAP, the more success the candidates have had, as shown in the following table:

**Summary of Results for State House Contests in Delta Area Counties**

| State House District (listed by Percent Black VAP) | Percent Black VAP (2000-2010) | Success Rate of black-preferred candidates in contests that included African American candidates |
| --- | --- | --- |
| State House 53 | 20.6-33.9 | 0% (0/1) |
| State House 57 | 21.1-20.8 | No Black candidates |
| State House 51 | 31.7-34.8 | 0% (0/1) |
| State House 13 | 52.8-58.7 | 33% (1/3) |
| State House 52 | 57.7-59.9 | 100% (2/2) |
| State House 54 | 65.8-65.1 | 100% (1/1)  (3 contests not analyzed) |

*See* Handley Decl. (Doc. 70-2) 10 tbl.7; House Plan: House 2001 w 2010 Pop, District Statistics (Exhibit 6).

Just as with the contests in 2001 Senate Districts 16 and 17, voting in these five House districts has been racially polarized.  In every contest with both an African-American candidate and a White candidate, African-American voters have always preferred a candidate different from the one preferred by Whites.  See Handley Decl. (Doc. 70-2) 4-6 tbl.3.

E.     **Statewide Elections in the Delta – 2002 to 2010**

From 2002 to 2010, in the seven Delta counties there were six statewide election contests that included at least one African-American candidate.  *See* Handley Decl. (Doc. 70-2) 2-3 tbl.1.

In all but one of those contests, voting was racially polarized:  African Americans in the Delta counties voted cohesively for one candidate and Whites voted cohesively for a different candidate.  The candidate preferred by African Americans usually lost, due to bloc voting by Whites.  The one exception was the 2002 Democratic primary for lieutenant governor.  *See* Handley Decl. (Doc. 70-2) 3-6 tbls.2-3.

In the 2008 general election for U.S. President, voting was racially polarized.  African Americans voted cohesively for African-American Democratic candidate Barack Obama and Whites voted cohesively for White Republican candidate John McCain.  Depending on the statistical method used to estimate who voted for whom, between 95.9% and 100% of African Americans voted for Obama and between 73.3% and 76.8% of Whites voted for McCain.  *See* Handley Decl. (Doc. 70-2) 3 tbl.2.

Maps 49 to 53, Arkansas Delta, 2008 General Election Polling Place Areas, BVAP% and Votes, Apr. 29, 2012 (Exhibits 7a to 7e), show the number of votes received by Obama and McCain at each polling place in the seven Delta counties and the percentage of the Black voting-age population in the area where those voters reside.

In the seven Delta counties that are the focus of this action, African-American turnout, as a percentage of the voting-age population, is consistently lower than White turnout rates.  The table below lists the turnout rates by race for the elections analyzed in Dr. Handley's declaration.

**Table 4.  Percent Black Voting-age Population Needed to Equalize Black and White Turnout on Election Day**

|  | Turnout Rates by Race (EI estimates) | | Percent Black VAP Needed to Produce Equivalent Numbers of Black and White Voters on Election Day |
|---|---|---|---|
|  | Percent Black | Percent White |  |

| | Turnout Rates by Race (EI estimates) | | Percent Black VAP Needed to Produce Equivalent Numbers of Black and White Voters on Election Day |
|---|---|---|---|
| | Percent Black | Percent White | |
| **General Elections** | | | |
| 2002 Lieutenant Governor | 26.8 | 37.6 | 58.4 |
| 2008 US President | 22.6 | 43.3 | 65.7 |
| 2004 State House District 54 | 30.7 | 26.2 | 46.0 |
| **Primary Elections** | | | |
| 2002 Lieutenant Governor | 19.5 | 28.8 | 59.6 |
| 2004 State Supreme Court  Chief Justice, Place 1 | 20.1 | 27.2 | 57.5 |
| 2006 State Supreme Court Associate Justice, P5 | 18.2 | 25.4 | 58.3 |
| 2008 US President | 18.0 | 15.2 | 45.8 |
| 2000 Senate District 22 | 22.0 | 29.3 | 57.1 |
| 2002 Senate District 16 | 16.3 | 23.5 | 59.0 |
| 2002 House District 13 | 17.5 | 26.3 | 60.0 |
| 2004 Senate District 17 | 26.9 | 33.5 | 55.5 |
| 2006 House District 53 | 6.1 | 1.4 | 18.7 |
| 2006 Senate District 16 | 15.9 | 25.9 | 62.0 |
| 2006 Runoff Senate District 16 | 11.5 | 21.0 | 64.6 |
| 2010 Senate District 16 | 13.0 | 25.6 | 66.3 |
| 2010 House District 13 | 14.8 | 35.1 | 70.3 |
| 2010 House District 51 | 23.2 | 24.0 | 50.8 |

*See* Handley Decl. (Doc. 70-2) 7-8 tbl.4.

In 12 of the 18 contests considered (67%), a Black voting-age population over 57% is required to produce the same number of African-American and White voters on election day. *See* Handley Decl. (Doc. 70-2) 8.

In Senate District 16, the Black percentage needed is at least 59% in all four elections analyzed. *See* Handley Decl. (Doc. 70-2) 8.

## II.   2010  Census

### A.   State of Arkansas

The 2010 Census showed that the population of Arkansas had grown by 9.1% since 2000, but that the growth was not evenly distributed across the state.  For example, Benton County in the northwest increased by 44.3%, but Monroe County in East Arkansas decreased by 20.5%. This uneven growth meant that the land area of Senate districts in the northwest had to shrink, in order to take in less population, while the land area of districts in the East had to grow, to take in more population, in order to meet one-person, one-vote requirements.

The differences in growth rates across the state of the Black population were even greater than the differences in the growth rates of the total population.  Whereas the state population of Blacks had increased by 7.4%, the Black population of Benton County had increased by 347.4 % and the Black population of Woodruff County in East Arkansas had decreased by 25.8%. Changes in Senate district boundaries to meet equal-population requirements would have to consider also the different racial balance in the areas affected.

### B.      Senate District 16

The 2010 Census reported that Senate District 16 had a population of 68,732, which was 14,580, or 17.5%, less than the ideal population of 83,312.   To meet equal population requirements, so that the population of Senate District 16 was no more than five percent below the ideal, its boundaries needed to be redrawn to add at least 10,415 people, to bring its population up to at least 79,147.   Because its Black voting-age population had increased, relative to its White population, the BVAP of District 16 had increased from about 55% in 2000 to 61% in 2020.   To keep its BVAP around 61%, the population added to District 16 to meet equal-population requirements would have to include at least as many Blacks as Whites.

About 73% of the 2010 voting-age population of District 16 was in Lee, Phillips, and St. Francis Counties.   *See* Senate 2001_Dist 16_Plan Components (PSW)_County (Exhibit 8b).   Those three counties had been a major part of each of the predecessors of 2001 Senate District 16:   1991 District 22, 1990 District 30, and 1980 District 30.   Each of those counties had a 2010 total population that was majority-Black, though the voting-age population of St. Francis County was only 48.2% Black.   Adding population from those counties to District 16 would tend to keep its BVAP up.

About 27% of the 2010 voting-age population of District 16 was in Crittenden County; 77% of it was Black.   *See* Senate 2001_Dist 16_Plan Components (PSW)_County (Exhibit 8b).   Crittenden County had been divided in 1990, so that its Black-dominated South could become part of the first Black-majority Senate district in East Arkansas since Reconstruction.   The part of Crittenden County that was not already in District 16 was 68% White.   Adding more of Crittenden County to District 16 would tend to bring its BVAP down.

III.     **Drawing 2011 District 24**

A.       **Arkansas Board of Apportionment**

Under the Arkansas Constitution, Article 8, § 1, the members of the Arkansas Board of Apportionment in 2011 were Governor Mike Beebe, Attorney General Dustin McDaniel, and Secretary of State Mark Martin.  The only employee of the Board was its Executive Director, Joe Woodson.  Governor Mike Beebe served as chair of the Board and supervisor of Joe Woodson.

B.       **Crumbly Discussions with the Governor and Attorney General**

On or about April 4, 2011, Senator Jack B. Crumbly, the incumbent in District 16 and a resident of St. Francis County, emailed to Executive Director Woodson a proposed map for the successor of District 16 (Doc. 28-4) that had a BVAP of 57.2%.

The map emailed to Joe Woodson proposed to alter the boundaries of District 16 by moving further west into St. Francis and Lee counties and further south into Phillips County, areas with high concentrations of African-American voters.  Phillips, Lee, and St. Francis counties have the first, second, and fifth highest percentage of African-American population of any counties in the state.

Between July 14 and 21, 2011, Senator Crumbly had four conversations with Defendant Governor Mike Beebe concerning the boundaries of the district that would succeed District 16 and provided him with additional maps that responded to concerns the Governor raised in those conversations.  At least one of the four occurred during each of the times on or about July 14 to 15, July 18 to 19, and July 20 to 21.

5/2/2012
6:22 PM

During those conversations, Defendant Governor Mike Beebe assured Senator Crumbly that the successor to District 16 was the first Senate district drawn by the Defendant Board of Apportionment, and that his concerns would be addressed by the Board in its map for that area.

When Defendant Board of Apportionment released the new plan to the public, on or about July 19, 2011, Senator Crumbly concluded that the concerns of African-American voters in District 16 that it retain its high percentage of Black voting-age population had not been met. He sought an additional meeting with the Governor.

On or about July 20,  2011, at a meeting in the Governor's Office, Defendant Governor Mike Beebe assured Senator Crumbly that Senate District 24 had been the first Senate district drawn by the Defendant Board of Apportionment and that his concerns about the district had been addressed by the Board.

At that meeting, Senator Crumbly disagreed and attempted to present to Defendant Governor Beebe two additional proposed maps of proposed District 24, composed of contiguous territory and meeting equal-population requirements, but with a BVAP percentage higher than in the plan released by the Board but lower than the plan proposed by Senator Crumbly in April:

   a.   CrumblyBLRFallback (Exhibit 11) with a BVAP of 55.4%.

   b.   CrumblyGovOption1 (Exhibit 12), with a BVAP of 55.4%.

Defendant Governor Beebe refused to look at either map.

C.      **Role of Secretary of State**

Defendant Secretary Martin submitted his own plan of apportionment to the Board.  It included a Black voting-age population of 56.1% for the area that most closely reflects the boundaries of old Senate District 16 and new Senate District 24.

D.      **Adoption of the 2011 Plan**

On July 29, 2011, Defendant Board of Apportionment met and by a 2-1 vote adopted the current maps for the state's 35 Senate districts and 100 House of Representatives districts.

Governor Mike Beebe and Attorney General Dustin McDaniel voted in favor of the plans; Secretary of State Mark Martin voted against them.

There is no evidence that Defendant Secretary Martin intentionally discriminated against Plaintiffs, or that he intentionally discriminated in any of his actions as a member of the Board of Apportionment.

IV.     **Description of Senate District 24**

Senate District 24 has a Black population of 57.05% and a Black voting-age population ("BVAP") of 52.88%, significantly less than the 61% BVAP of 2001 District 16 at the time new District 24 was drawn.

The adopted plan includes parts of St. Francis, Lee, and Phillips counties in Senate District 24, but it also includes parts of St. Francis and Lee counties in Senate District 23 and part of Phillips County in Senate District 25.  *See* 2011 Arkansas Senate Districts (Exhibit 13).

Rather than moving west to take in all or more of St. Francis and Lee counties, the boundaries of the new district, 2011 District 24, as compared to 2001 District 16, have been moved north to take in all of Crittenden County.  *See* 2011 Arkansas Senate Districts (Exhibit 13).

The map "Arkansas Senate – 2011 District 24 - 2001 District 16 Comparison" (Doc. 28-2) shows the areas of 2011 District 24 that overlap with 2001 District 16.  It shows that Defendant Board of Apportionment drew District 24 to include the rest of Crittenden County, as well as Parkin and Tyronza in Cross County, which had not been included in 2001 District 16.

Whereas African Americans made up about 66% of the total population of 2001 District 16, and about 61% of its voting-age population, the areas of Crittenden County in 2011 District 24 that were not in 2001 District 16 are about two-thirds White, as shown in the following table:

**Table 8 – Crittenden County Whites Added**

**Total Population**

|  | Population | White | Black | White % | Black % |
| --- | --- | --- | --- | --- | --- |
| District 16 |  |  |  |  |  |
| Crittenden | 19,864 | 3,410 | 16,101 | 17% | 81% |
| Added | 31,038 | 20,036 | 9,950 | 65% | 32% |
| District 24 |  |  |  |  |  |
| Crittenden | 50,902 | 23,446 | 26,051 | 46% | 51% |

**Voting-Age Population**

|  | 18+Pop | White | Black | White % | Black % |
| --- | --- | --- | --- | --- | --- |
| District 16 |  |  |  |  |  |
| Crittenden | 13,421 | 2,888 | 10,309 | 22% | 77% |
| Added | 22,672 | 15,371 | 6,654 | 68% | 29% |
| District 24 |  |  |  |  |  |
| Crittenden | 36,093 | 18,259 | 16,963 | 51% | 47% |

*See* Senate 2001_District Statistics for District 16 (Exhibit 8a); Senate 2011_Dist 24_District Statistics (Exhibit 14a).

Since District 16 needed only about 10,000 more people to meet equal-population requirements, adding more than 30,000 people from Crittenden County meant that about 20,000 people needed to be removed from some other part of the district.  Crumbly Decl. (Doc. 70-3) ¶ 20.

Defendant Board of Apportionment chose not to include in 2011 District 24 about 15,000 people in St. Francis County who had been included in 2001 District 16.  The population omitted consisted of slightly more Whites than Blacks, as shown in the following table:

**Table 9 – St. Francis County Whites and Blacks Removed**

**Total Population**

|              | Population | White  | Black  | White % | Black % |
| ------------ | ---------- | ------ | ------ | ------- | ------- |
| District 16  |            |        |        |         |         |
| St. Francis  | 25,558     | 10,710 | 13,806 | 42%     | 54%     |
| Omitted      | 15,062     | 7,198  | 7,101  | 48%     | 47%     |
| District 24  |            |        |        |         |         |
| St. Francis  | 10,496     | 3,512  | 6,705  | 33%     | 64%     |

**Voting-Age Population**

|              | 18+Pop | White | Black | White % | Black % |
| ------------ | ------ | ----- | ----- | ------- | ------- |
| District 16  |        |       |       |         |         |
| St. Francis  | 19,509 | 8,947 | 9,742 | 46%     | 50%     |
| Omitted      | 11,952 | 6,079 | 5,230 | 51%     | 44%     |
| District 24  |        |       |       |         |         |
| St. Francis  | 7,557  | 2,868 | 4,512 | 38%     | 60%     |

*See* Senate 2001_District Statistics for District 16 (Exhibit 8a); Senate 2011_Dist 24_District Statistics (Exhibit 14a).

A voting-age population of 11,952 in St. Francis County that had been included in 2001 District 16 is not included in 2011 District 24.   Senate 2001_Dist 16_Plan Components (PSW)_County_VAP    (Exhibit    8c);    Senate    2011_Dist    24_Plan    Components (PSW)_County_VAP (Exhibit 14c).

Senator Crumbly resides in St. Francis County.    St. Francis County is his base of political support.   Removing 11,952 of the voters in his base county removed 61% of his voting base.   *See* Senate 2001_Dist 16_Plan Components (PSW)_County_VAP (Exhibit 8c); Senate 2011_Dist 24_Plan Components (PSW)_County_VAP (Exhibit 14c); Crumbly Decl. (Doc. 70-3) ¶ 23.

Defendant Board of Apportionment, in drawing the Senate plan adopted July 29, 2011, did not remove voters from the base county of any other Democratic member of the Arkansas Senate who is seeking re-election in 2012.   Crumbly Decl. (Doc. 70-3) ¶ 24.

The boundaries of 2011 District 24 in Lee and Phillips counties also differ from those in 2001 District 16.   Those differences affect fewer people than in Crittenden and St. Francis counties, but they include omitting the African-American communities of Haynes and Rondo in Lee County and some African-American neighborhoods in Helena-West Helena in Phillips County.   Crumbly Decl. (Doc. 70-3) ¶ 25.

The resulting District 24 was left by Defendant Board of Apportionment with the largest population of any Senate district:   87,147, which is 3,835, or 4.6%,  more than the ideal.   *See* BOA 2011 Senate Matrix (Doc. 55-1).

As drawn by Defendant Board of Apportionment, the African-American population of 2011 District 24, as compared with 2001 District 16, was reduced from 66% of the total population and 61% of the voting-age population to 57% of the total population and 53% of the voting-age population, as shown in the following table:

**Table 10 – District 24 Population by Race**

**Total Population**

| White | Black | White% | Black% |
|---|---|---|---|
| 35,227 | 49,716 | 40% | 57% |

**Voting-Age Population**

| White | Black | White% | Black% |
|---|---|---|---|
| 28,132 | 33,137 | 45% | 53% |

*See* Senate 2011_Dist 24_District Statistics (Exhibit 14a).

District 24's African-American voting-age population of slightly less than 53%  is six percent less than the 59% needed to equalize turnout between African Americans and Whites on election day.  *See* Handley Decl. (Doc. 70-2) 8.

**V.      Jeffers Plaintiffs' Proposed District 24**

**A.      Jeffers_01**

Plaintiffs' proposed plan Jeffers_01 (Doc. 1-1) is similar to the maps provided to Defendant Governor Beebe as described above.  Rather than adding high concentrations of Whites by moving north into Crittenden County, it moves west into St. Francis and Lee counties

and south into Phillips County, uniting the African-American communities in the Delta, rather than dividing them as 2011 District 24 does.  Crumbly Decl. (Doc. 70-3) ¶ 30.

How the three different plans — 2001 District 16, 2011 District 24, and Jeffers_01 District 24 — affect African-American voters in the Delta is illustrated in the Arkansas Senate Map of Black Voting Age Population by Census Block (Doc. 28-3).  The 2010 Census figures for the three plans are shown in the following table:

**Table 11 – Population by Race:  2001 Dist. 16, 2011 Dist. 24, Jeffers_01 Dist. 24**

**Total Population**

|  | White | Black | White % | Black % |
|---|---|---|---|---|
| 2001 District 16 | 21,622 | 45,252 | 31% | 66% |
| 2011 District 24 | 35,227 | 49,716 | 40% | 57% |
| Jeffers_01 District 24 | 27,397 | 52,657 | 33% | 64% |

**Voting-Age Population**

|  | White | Black | White % | Black % |
|---|---|---|---|---|
| 2001 District 16 | 18,183 | 30,602 | 36% | 61% |
| 2011 District 24 | 28,132 | 33,137 | 45% | 53% |
| Jeffers_01 District 24 | 22,823 | 35,749 | 38% | 59% |

*See* Senate 2001_District Statistics for District 16 (Exhibit 8a); Senate 2011_Dist 24_District Statistics (Exhibit 14a); Jeffers_01_District Statistics  (Exhibit 15a).

Plaintiffs' proposed plan, Jeffers_01 (Doc. 1-1), has a BVAP of 59.49%.  It has a lower population deviation than 2011 District 24 (-1,105 or -1.33% vs. 3,835 or 4.60%).  It splits the same number of counties (4) as 2001 District 16 and 2011 District 24 do.  It splits fewer precincts (3) than 2011 District 24 (13).  *See* Senate 2001_District Statistics for District 16 (Exhibit 8a); Senate 2011_Dist 24_District Statistics (Exhibit 14a); Jeffers_01_District Statistics (Exhibit 15a).

### B.      Jeffers_03

Plaintiffs' proposed plan Jeffers_03 (Doc. 28-5) has a BVAP of 58.41%.  It is a statewide plan, but impacts only one other district—Senate District 23.  Jeffers_03 District 24 has a lower population deviation than 2011 District 24 (867 or 1.04% vs. 3,835 or 4.60%).  District 24 splits the same number of counties (4) as 2001 District 16 and 2011 District 24 do, and splits fewer precincts (9) than 2011 District 24 does (13).  Jeffers_03 District 23 splits fewer counties (5) than 2011 District 23 does (6), and splits fewer precincts (6) than 2011 District 23 does (10).  *See* Senate 2001_District Statistics for District 16 (Exhibit 8a); Senate 2001_District 16 Plan Components (PSW) (Exhibit 8d); Senate 2011_Dist 24_District Statistics (Exhibit 14a); Senate 2011_Dist 24_Plan Components (PSW) (Exhibit 14d); Senate 2011_Dist 23_Plan Components (PSW)      (Exhibit      14e);      Jeffers_03_Dists23-24_District      Statistics      (Exhibit      16a); Jeffers_03_Dists23-24_Plan Components (PSW) (Exhibit 16d).

At his deposition, Defendant Governor Beebe expressed concern that Senator Crumbly's 2011 proposals for Senate District 24 had caused the adjacent District 23 to be "too elongated" and thus not respect communities of interest.  *See* Beebe Dep. (Exhibit 1) 20:25-21:4.

34

Defendant Governor Beebe expressed the same concern about Districts 23 and 24 in Jeffers_03.  *See* Beebe Dep. (Exhibit 1) 57-70.

### C.      Jeffers_04

Plaintiffs' proposed plan Jeffers_04 (Exhibit 17) was created in response to the criticism of  Jeffers_03 by Defendant Governor Beebe at his deposition.  As compared to Jeffers_03, Jeffers_04 does not change District 24.  Rather, it moves Crittenden County from District 23 to District 22, where it joins Mississippi County and part of Craighead County, and moves Poinsett County from District 22 to District 23 to rebalance the populations.  District 23 becomes more compact than in the adopted plan.  All districts remain composed of contiguous territory and meet equal-population requirements.  The BVAP of District 24 remains at 58.41%, as in Jeffers_03.

## VI.     Intentional Discrimination Based on Race

State Representatives Jerry R. Brown, Clark Hall, and Keith Ingram are all White Democratic incumbents residing in 2001 Senate District 17 during their 2011-12 term.  Crumbly Decl. (Doc. 70-3) ¶ 35.

Representatives Brown and Hall are serving their third term in the House, and thus are term-limited from running for the House again in 2012.  Am. Compl. ¶ 77; Crumbly Decl. (Doc. 70-3) ¶ 36.

Senator Jim Luker is serving his third term in the Senate, and thus is term-limited from running for the Senate again in 2012.  Crumbly Decl. (Doc. 70-3) ¶ 37.

Representative Keith Ingram is currently serving his second term in the Arkansas House of Representatives, and thus is not term-limited from running for the House again in 2012. Am. Compl. § 79; Crumbly Decl. (Doc. 70-3) ¶ 38.

The 2011 Senate plan for Districts 23 and 24, as drawn by Defendant Board of Apportionment, places Representative Jerry R. Brown in the successor to 2001 District 17, which is 2011 Senate District 23, as shown on the Map of Incumbent Residences.  (Doc. 55-7).

Representatives Hall and Ingram reside in Senate District 24, along with Senator Crumbly.  Crumbly Decl. (Doc. 70-3) ¶ 41.

Representative Brown is the lone incumbent able to run for the Senate in District 23, since the current incumbent, Senator Jim Luker, is term-limited from running in 2012.  Crumbly Decl. (Doc. 70-3) ¶ 42.

During his deposition, in response to a question, Senator Crumbly testified as follows:

Q Okay. Okay. Senator, new topic.

Do you believe that in proposing and voting for the senate plan that the board adopted, the senate districting plan, do you believe that Governor Beebe intended to engage in purposeful discrimination?

A My answer to that would have to be yes.

Q Why do you believe that?

A In previous conversations -- and I've even been quoted in the paper of saying that this was not about me, it's much larger than I am. It's about trying to ensure that this particular area with this concentration of African-American people and basically the only one in the region where you have concentrations enough to actually almost have a 60 percent black voting-

age population senate district only exists in parts of these four counties, certainly.

And the reason I say it was intent, when you present a person with maps, with evidence, if the Bureau of Apportionment, if their director was given maps back in April, if you visited with them, you've shown them, you tried to tell them, you even try to compromise; and then when people -- it's all no, no, no, then I have no other conclusion except to say that, okay, yeah, that -- that would be my reason for saying yes.

Crumbly Dep. (Doc. 70-5) at 104-105.

During this deposition, Senator Crumbly also testified:

[C]an I speak for the Governor?  The answer to that's no. But the end result of him not changing after given opportunity and opportunity to provide, and with his testimony even over his objection that's already recorded, he said that the final senate district was drawn -- because a question that was asked the Governor, was this district drawn to dilute the BVAP, and he said no, it was really designed to maximize the . . . black voting-age population. And I can . . . tell that the final one, he said, was . . . done to do that. And by ending up with 52.88 percent and the Secretary had one that was 56 percent, our Exhibit 3 shows that just by it -- Plaintiffs' Exhibit 6 and also Martin Exhibit 2, that you have the potential of drawing a district with 58.41 by just simply exchanging areas between two senate districts with a very, very simple solution of swapping the area between Senate District 23 and 24 that are adjacent to one another. So to say that statement . . . that would maximize the . . . black voting-age population, would be hard to believe when the end result was only a district that was created that had 52 percent and the current old Senate District 16, when it was formed, had 55 percent; and by the time the 2000 census -- if the 2010 census numbers were applied, it had a black voting-age population of 61 percent. So then to lower it down to 52 percent, how could you say that that was trying to maximize the BVAP?

Crumbly Dep. (Doc. 70-5) at 168-169.

On September 14, 2011, Representative Jerry R. Brown announced his intention to run for the Arkansas Senate from District 23.  Crumbly Decl. (Doc. 70-3) ¶ 43.

On October 17, 2011, Representative Clark Hall announced his intention to run for Congress from the First Congressional District.  Crumbly Decl. (Doc. 70-3) ¶ 44.

5/2/2012
6:22 PM

On January 16, 2012, Representative Keith Ingram announced his intention to run for the Arkansas Senate from District 24.

Defendant Board of Apportionment drew 2011 Senate District 24 so that the number of voters in the base counties of White incumbents was increased, while the number of voters in the base county of the African-American incumbent was reduced.  Crumbly Decl. (Doc. 70-3) ¶ 46.

Senator Crumbly's base county is St. Francis.  As compared to 2001 Senate District 16, the number of voters in St. Francis County within 2011 Senate District 24 was reduced by 11,592, as shown in Table 9 above. *See* Crumbly Decl. (Doc. 70-3) ¶ 48.

The base county of White Representative Keith Ingram is Crittenden.  As compared to 2001 Senate District 16, the number of voters in Crittenden County within 2011 Senate District 24 was increased by 22,672, as shown in Table 8 above.  *See* Crumbly Decl. (Doc. 70-3) ¶ 47.

Crittenden County has been divided into two or more Senate districts ever since this Court, in *Jeffers v. Clinton*, 756 F. Supp. 1195 (E.D. Ark. February 9, 1990), ordered that it be divided to create a Senate district in which African Americans had an equal opportunity to elect a candidate of their choice.  *See* Crumbly Decl. (Doc. 70-3) ¶ 53.

One of the reasons Defendant Governor Beebe gave Senator Crumbly for wanting to put all of Crittenden County into 2011 Senate District 24 was that it had been split for over the last 20 years.  Crumbly Decl. (Doc. 70-3) ¶ 54.  That would be most of the time since Keith Ingram's father and brother represented all of Crittenden County in the Senate, from 1963 to the 1980s.

Crittenden County has 58% of the voting-age population of Senate District 24 (36,073 out of 62,666).  *See* Senate 2011_Dist 24_Plan Components (PSW)_County_VAP (Exhibit 14c) at 10-4 to 10-5; Crumbly Decl. (Doc. 70-3) ¶ 55.

## VII.    Lingering Effects of Past Discrimination

In the Delta counties, there are lingering effects from state-sanctioned racial discrimination. There are still largely Black and White neighborhoods, with Black and White neighborhood schools. These neighborhoods were designed with the approval of local and even state government to keep races of people separated. Whites have been removing their children from the public schools and enrolling them in private and religious schools.  The living patterns have interplay into all of the other facets of life, including school attendance, church attendance, and political party affiliation.  Chitman Decl. (Doc. 70-4) ¶ 10.

## CONCLUSION:

For Plaintiffs to prevail in this case they do not need to establish that the Arkansas Board of Apportionment acted with a discriminatory purpose; it is sufficient to prove that the rendition of Senate District 24 has a discriminatory effect. *Bush vs. Vera*, 517 U. S. 952, 976 (1996); *Gingles*, 478 U.S. at 35-36. Prevailing in this case will not guarantee the Plaintiffs success at the ballot box. *Johnson v. De Grandy*, 512 U.S. 997, 1014 n. 11 (1994). There is a guarantee of a level playing field which includes equal opportunity for victory at the polls as enjoyed by others. *Vecinos de Barrio Uno v. City of Holyoke*, 72. F.3d 973, 979 (1st Cir. 1995).

In proving their case, the Plaintiffs face substantial hurdles as are present in all Voting Rights Cases. In *Gingles*, supra, the Supreme Court limned three threshold conditions, also called preconditions, elements, factors and prongs, which must be fulfilled in order to

successfully show vote dilution. First the Plaintiffs must show that they are a part of a minority group that is "sufficiently large and geographically compact to constitute a majority in a single-member district." 478 U.S. 50. Second, the Plaintiffs must show that the Plaintiffs are "politically cohesive." Id. at 51. Third, Plaintiffs must show that the "white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, such as the minority's preferred candidate running unopposed  -- usually to defeat the minority's preferred candidate." Id. (citation omitted).

Completing the *Gingles* three-step pavane does not guarantee victory for the Plaintiffs. This court must look to the totality of the circumstances to determine whether the Plaintiffs prevail. In reviewing the totality of the circumstances assessment, this Court should be guided by the litany of factors listed in the Senate report which accompanied the amended Voting Rights Act. *Gingles*, 478 U.S. 43-46.

One factor for this Court to consider is proportionality. By proportionality we mean the relationship between the number of majority minority voting districts and the minority group's share of the relevant population. *De Grandy*, 512 U.S. at 1000, 1014 n. 11. Key in this Court's assessment of the factors, we whether the challenged district, Senate District 24, deprives minority voters of an equal opportunity to participate in the electoral process and to elect candidates of their choice.

Finally, it is a rare case where the Plaintiffs can establish the *Gingles* prongs and not prevail in the case.  See *Sanchez v. Colorado*, 97 F.3d 1303, 1310 (10th Cir. 1996). See also, *Solomon v. Liberty County Com'rs*, 166 F.3d 1135 (11th Cir. 1999); *Teague v. Attala County*, 92 F.3d 283, 293 (5th Cir. 1996); *Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995); and

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. Of Educ.*, 4 F.3d 1103, 1135 (3d. Cir. 1993). The Gingles preconditions have been established. The only prong truly questioned by the Defendants in this case is the third prong. Therefore, Plaintiffs will come forward with evidence showing that white bloc voting is sufficient to usually defeat the minority preferred candidate as has happened in District 16 (now District 24) for the last ten years.

Respectfully Submitted,

James F. Valley, Esq
J F VALLEY ESQ PA
P O BOX 451
423 RIGHTOR STREET, SUITE 3
HELENA-WEST HELENA, AR 72342-0451
(870)338-6487 X 7 Telephone
(866)786-9885 Phone and Fax
james@jamesfvalley.com Email

Peter S. Wattson,  Esq.
5495 Timber Lane
Shorewood, MN 55331

peterwattson@gmail.com

(952) 457-6328 (cell)
(952) 474-7988 (home)
(952) 474-7988 (fax)

## CERTIFICATE OF SERVICE

I, James F. Valley, certify that on May 2, 2012, consistent with the requirements of FRCP 5, I served a complete copy of this document with any attachments to counsel as listed below:

Attorneys for Honorable Mike Beebe and
Honorable Dustin McDaniel:

Mr. David Curran, Esq.
david.curran@arkansasag.gov

C. Joseph Cordi, Jr
joe.cordi@arkansasag.gov

Mr. Warren Readour, Esq.
warrenr@arkansasag.gov

Attorneys for Honorable Mr. Martin:
Mr. W. Asa Hutchinson, Esq.
asa@ahlawgroup.com

Mr. W. Asa Hutchinson, III, Esq.
Ahutchinson@ahlawgroup.com

Ms. Kristi Hunter, Esq.
Khunter@Ahlawgroup.com

_____
James F. Valley