```
0001
 1              IN THE UNITED STATES DISTRICT COURT
 2                 EASTERN DISTRICT OF ARKANSAS
 3                   EASTERN (HELENA) DIVISION
 4
 5
    FUTURE MAE JEFFERS; MARY JEFFERS;           PLAINTIFFS
 6  HENRY PEACOCK; SHIRLEY HARVELL;
    REV. RONALD WILLIAMS; PEGGY R. WRIGHT;
 7  LAURA LOVE; FRANK SHAW; C.W. CAMPBELL;
    LEO CHITMAN; ETTA CAMPBELL; PLEZ LUCAS;
 8  VICKIE ROBERTSON; JOSEPH PERRY; ELBERT SMITH;
    SANDRA BAGLEY; NIKKI DISMUKE; ALICE W. VALLEY;
 9  LAKETHA BROWN FLUKER; KATRINA HARRELL;
    CHESTER HARRELL; EDDIE O'NEAL; CHRISTOPHER
10  FRANKLIN; and JACK BERNARD CRUMBLY
11
12  v.
13                 CASE NO.: 2-12-CV-0016-JLH
14
15  MIKE BEEBE, in his capacity as Governor of Arkansas
    and Chairman of the Arkansas Board of Apportionment;
16  MARK MARTIN, in his capacity as Secretary of State
    of Arkansas and a member of the Arkansas Board of
17  Apportionment; DUSTIN MCDANIEL, in his capacity as
    Attorney General of Arkansas and a member of the
18  Arkansas Board of Apportionment; and ARKANSAS BOARD
    OF APPORTIONMENT                            DEFENDANTS
19
20                    DEPOSITION OF:
21
22                  GOVERNOR MIKE BEEBE
23
24       (Taken March 30th, 2012, at 9:00 a.m.)
25
0002
 1                    APPEARANCES:
 2
            ON BEHALF OF THE PLAINTIFFS:
 3
            J.F. VALLEY, ESQUIRE
 4          PETER S. WATTSON, ESQUIRE
            J.F. Valley, Esquire, P.A.
 5          Wilson, Valley & Etherly, Office Building,
            Suite 4
 6          423 Rightor Street
            P.O. Box 451
 7          Helena, Arkansas 72342-0451
            Phone: (870) 338-8030
 8
 9
            ON BEHALF OF THE DEFENDANTS GOVERNOR MIKE
10          BEEBE, ATTORNEY GENERAL DUSTIN MCDANIEL,
            THE ARKANSAS BOARD OF APPORTIONMENT:
```

Exhibit 1

```
15   Q     Yes.
16   A     I know him.
17   Q     Okay.  All right.  My next question, I guess,
18   is of those names I just shared with you, did any of
19   them talk to you about the redistricting directly?
20   A     Jack Crumbly did.
21   Q     Okay.  Do you recall on how many occasions he
22   spoke to you?
23   A     No.  He was in my office.  Jack -- Jack's in
24   my office frequently.  And he was in my office
25   specifically about redistricting.  My recollection
0019
 1   is he even brought proposals to me, but I can't tell
 2   you whether it was once, twice, three times, I don't
 3   know.
 4   Q     All right.  Now, can you describe the tenor of
 5   those meetings that you had with --
 6   A     Jack was very interested in drawing a district
 7   with lines that -- that he preferred and was very
 8   clear that his requests centered on his district and
 9   his district alone.
10   Q     All right.  What -- what became of his
11   request?
12   A     He was advised -- if memory serves me
13   correctly -- to visit with John Moran and/or James
14   Miller and share that information.  I believe he
15   left a map, may have left more than one map with
16   them.  And there was no -- there was no answer to
17   the question in any of the meetings with me.
18   Nothing definitive was done.  We took his
19   information as we took others.
20   Q     Right.  Now, Senate District 24 is, as
21   currently drawn, a majority-minority district?
22   A     Correct.
23   Q     So you don't dispute that there's enough
24   people, African-American people in the area to draw
25   a senate district?
0020
 1   A     We tried to.
 2   Q     All right.  Do you have an idea whether the
 3   district could include a higher black voting-age
 4   population?
 5   A     I'm sure it could have if you ignored some of
 6   the other factors that we took into consideration.
 7   Q     Okay.  Can you tell me which of those factors
 8   you would have to ignore?
 9   A     My recollection is one of his first maps he
10   brought in impacted another African-American
11   incumbent senator's district.  At all times his
12   proposals impacted an elongated district from the
13   Mississippi River into Jackson and White County.
14   That's what I recall.
15   Q     Okay.  Elongated district into -- from
16   Mississippi County over into --
```

```
17   A      From the Mississippi River.
18   Q      From the river to --
19   A      From -- from Crittenden County, from -- from
20   the border with Tennessee --
21   Q      Yes.
22   A      -- all the way over to Jackson County, all the
23   way over to Newport, all the way over into northern
24   White County, is my recollection.
25   Q      Right.  Okay.  And what was the issue with
0021
 1   that particular district?
 2   A      It's very little community of interest, too
 3   elongated, very little, compact identity with the
 4   regions.
 5   Q      Okay.  And when you say communities of
 6   interest, how are you defining that?
 7   A      Well, you know, it's hard to define.  It's --
 8   it's related to the geography, the economics, it's
 9   related to the history, political and otherwise.
10   Q      So on the elongated district, how did you fix
11   that to bring the communities of interest closer?
12   A      Well, we tried to not make it traverse from
13   the Mississippi River to Jackson and White County.
14   Q      All right.  But wouldn't you agree that as it
15   is drawn, it goes still a substantial distance?
16   A      Oh, yeah, it has to just to get to sheer
17   numbers.  What -- what -- you mean his district or
18   that other district?
19   Q      I'm presuming you're talking about the other
20   district.
21   A      Well, I'm talking about what he -- what he
22   proposed would do to other districts.  The -- it
23   goes all the way to Woodruff County, but it had
24   traditionally gone to Woodruff County.  Cross,
25   Woodruff, that had been traditional.
0022
 1   Q      Right.
 2   A      Jackson County traditionally had been with
 3   Independence County and/or White County or portions
 4   of it.  White County had traditionally been with
 5   either Jackson or Independence or Prairie or Lonoke
 6   or Arkansas County.
 7   Q      Right.  So you do realize that Senate District
 8   25 -- that would be Stephanie Flowers' district --
 9   runs from the river to central Arkansas?
10   A      Well, it doesn't run all the way to central.
11   It doesn't run to Pulaski County, if that's what
12   you're talking about.
13   Q      Pulaski County is not the center of the state,
14   maybe the center of government.  But central
15   Arkansas, Jefferson County is central Arkansas,
16   isn't it?  I'm referring to the latitude, longitude
17   standpoint.
18   A      Well, I'm not -- I don't know.  I always
```

19  considered it southeast Arkansas.  They claim
20  they're the capitol of southeast Arkansas.
21  Q     Do they?
22  A     Yes.
23  Q     They're losing ground.  But you do realize
24  that the district runs from the river to Jefferson
25  County?
0023
 1  A     My district originally had run from the river
 2  to Searcy, yes.
 3  Q     Right.  Right.  So how has it changed from
 4  when you served to now that the communities --
 5  A     That -- that district -- that district has not
 6  changed.  That district that you're talking about
 7  traditionally has run only over to Woodruff County.
 8  It never impe -- it never got to Jackson County, to
 9  my knowledge.
10  Q     Okay.
11  A     I mean, you know, it becomes a matter of
12  degree how far is far.
13  Q     Yes, sir.
14  A     A senate district has to by its very nature be
15  large.
16  Q     That's correct.  So I'm trying to get you to
17  give me some meat for this elongation and the
18  communities of interest.
19  A     I've given you all I know to give you.
20  Q     Well, Governor, that's all I can ask for --
21  A     There you go.
22  Q     -- is all you know.
23        This District 24 that we're calling Senator
24  Crumbly's district?
25  A     Yes.
0024
 1  Q     What other communities within it that are
 2  communities of interest?
 3  A     Well, Lee County, Crittenden County,
 4  St. Francis County all have heavy farming interest,
 5  heavy Delta farming interest.  They have a tradition
 6  of having some representation together in the past,
 7  legislative; they tend to gravitate more toward
 8  Memphis with regard to the journalism and television
 9  markets, communication markets.
10  Q     Yes.
11  A     And they tend to have had a history together,
12  in many instances, politically; they have a history
13  together with even sports activities, you know, high
14  school sports activities.
15  Q     Yes, sir.  Now, you mentioned high school
16  sports.  As it relates to high school sports, to the
17  extent that that factors into communities of
18  interest, don't many of these schools in eastern
19  Arkansas compete with schools as far away as
20  Texarkana?

```
21   A      Oh, yeah.
22   Q      I mean, that's part of the same conference?
23   A      Oftentimes, particularly in the larger
24   conferences where you've got a limited number of
25   schools that are of big enough size, you have to go
0025
 1   all the way across the state sometimes.
 2   Q      Right.  In some of the 6A and 7A divisions?
 3   A      Sure.
 4   Q      Would that in some way have been a factor that
 5   you would have considered as part of this
 6   redistricting?
 7   A      No.
 8   Q      All right.  Governor, with your history and
 9   experience as a senator, a lawyer, and attorney
10   general, and all those things, are you familiar with
11   the history of the state of Arkansas as it relates
12   to racial discrimination?
13   A      Somewhat.
14   Q      Somewhat.  All right.  Are you familiar at all
15   with the case of Smith versus Clinton?
16   A      No.
17   Q      What about Jeffers versus Clinton?
18   A      I remember the name.  You'll have to refresh
19   my memory on the substance.
20   Q      Well, Smith versus Clinton would have been the
21   introduction to majority-minority districts in
22   Arkansas.
23   A      Okay.  Okay.
24   Q      And Jeffers would have followed with the
25   watershed, so to speak, where you created the 16
0026
 1   districts across the state.
 2   A      Somewhat familiar.
 3   Q      Yes, sir.
 4   A      I was directly affected by one of those.
 5   Q      So that probably would have been Jeffers, I
 6   would imagine?
 7   A      It was the case that required me to run again
 8   in the middle of a four-year term because it was --
 9   it -- it abutted my district and caused changes to
10   occur.  I want to say in 1992, but I'm not --
11   Q      That -- that sounds about right.
12   A      I'm not --
13   Q      Smith, if I understand it right and my memory
14   is right this morning, involved two house districts.
15   So that wouldn't have affected you.
16   A      No.  I was never in the House.
17   Q      All right.  So how did that make you feel,
18   that you had to run in the middle of your four-year
19   term?
20   A      Well, since I didn't have an opponent, it
21   didn't bother me very much.  But I'd be lying if I
22   didn't say it caused some trepidation to have to
```

```
23   turn around and run again when I finally had a
24   four-year term, because I always seemed to draw a
25   two-year after redistricting.
0027
 1   Q     Yes, sir.  Now, are you familiar with the term
 2   racial polarization?
 3   A     I've heard the term.
 4   Q     Can you tell me what your understanding of it
 5   is?
 6   A     Racial polarization means that the races tend
 7   to polarize together, white -- white people tend to
 8   stay more with white people; black people tend to
 9   stay more with black people, within the definition
10   of what I understand polarization would be.
11   Q     All right.  I believe I may have messed up the
12   question.  Let me try it a different way.
13   A     I probably messed up the answer.
14   Q     Governor, you can't mess up.
15         The -- let me ask you this way:  Racial
16   polarization, as I understand it --
17            THE WITNESS:  Tim?
18            MR. VALLEY:  You need to take a break?
19            THE WITNESS:  No, no, I was just going to
20         get coffee.  Go ahead.
21   BY MR. VALLEY:
22   Q     As I understand it, racial polarization
23   assumes there are two poles, a north pole and a
24   south pole.
25   A     Okay.
0028
 1   Q     And one group of people, whatever they are,
 2   selects one pole; and the other group of people
 3   selects the other pole.
 4   A     Okay.
 5   Q     And that's how you get the polarization.
 6   A     Okay.
 7   Q     In terms of voting.
 8   A     Okay.
 9   Q     Does that sound about right to you?
10   A     If you say so.
11   Q     All right.  Do you know anything about
12   Arkansas' history of racially polarized voting?
13            MR. CORDI:  Object to the form.
14            Go ahead.
15   A     Well, I mean, I have anecdotal observations, I
16   guess.
17   BY MR. VALLEY:
18   Q     Can you give me some of those?
19   A     Yeah, we draw majority-minority districts and
20   tend to elect minority candidates.  I mean, that's
21   my observation.
22   Q     Yes, sir.  And what tends to happen when you
23   don't have a majority-minority district and the
24   minority runs in the district?
```

```
19   started in -- it was started in the corners.  I
20   can't tell you whether it was the northwest or the
21   southeast, I don't specifically recall.  But you
22   start from the corners because you're constrained by
23   that.  I mean, Mississippi County can't go north and
24   east.  Benton County can't go north and west.  So
25   you start in the corners.  As a -- as a practical
0050
 1   matter, you end up almost starting in the corners
 2   and moving to the middle, but I can't tell you which
 3   corner was started first.
 4   Q     Right.  Is there any chance that the
 5   majority-minority districts were drawn first?
 6   A     No.
 7   Q     They were not?
 8   A     They weren't drawn first, but all of the
 9   majority-minority districts were attempted to be
10   maintained.  So from a practical matter, even if
11   they weren't drawn first, consideration was given to
12   try to maximize their continued existence.
13   Q     Now, it's my understanding that District 24,
14   as it is presently comprised -- well, let me pause
15   and ask you something else.
16         When did you first become senator?  Can you
17   tell me the year?
18   A     Election '82, January '83.
19   Q     Okay.  So in 1982, do you recall what the
20   senate district in eastern Arkansas looked like or
21   how they were comprised?
22   A     As it relates to minorities?
23   Q     Yeah, that would be fine.
24   A     My recollection is there were none in eastern
25   Arkansas.
0051
 1   Q     Right.
 2   A     When I went in the Senate, I think we had --
 3   my recollection is we had one black senator, it was
 4   Jerry Jewell.
 5   Q     That's the dentist?
 6   A     That's my recollection, yes, from Little Rock.
 7   Q     Right.
 8   A     Fairly early on in my tenure in the senate,
 9   Bill Lewellen became an African-American senator.
10   And if memory serves me correctly, he was the second
11   one, but don't hold me to that.  He beat Paul
12   Benham.
13   Q     Yeah.
14   A     Who had been a longtime senator from Mariana.
15   Q     Right.  He would have beat Paul Benham
16   following the Jeffers case.
17   A     Okay.
18   Q     So, I guess, early is relative, but that's
19   after you've been there ten years.
20   A     Okay.
```

```
21   Q      Yeah.  So the district in -- Paul Benham
22   represented Lee County and Phillips County, I would
23   imagine?
24   A      And Monroe too, I think.
25   Q      Yeah.  And then who represented the Crittenden
0052
 1   County area?
 2   A      Well, when I first went in, it was Ken Ingram.
 3   Subsequent to that, it was Mike Everett, I believe,
 4   or at least a portion of Crittenden.  I don't think
 5   he represented all of Crittenden.  I think it was --
 6   I think Crittenden was divided.  My recollection is
 7   after Jeffers, Crittenden was divided in a fashion
 8   so as to create the majority part of Crittenden
 9   County that had the majority black population in
10   with a majority-minority district and the white
11   population not in with a majority-minority district.
12   That's my recollection.
13   Q      Right.  Now, do you realize that the district
14   now resembles, in a large fashion, the 1982
15   district?
16   A      No.  I -- if it does, I'm not aware of it.
17   Q      Okay.  All right.  Now, Ken Ingram, would he
18   be related to W.T. Ingram?
19   A      Bill Ingram?
20   Q      I guess.
21   A      Bill Ingram was his father -- was Ken Ingram's
22   father and was a longtime state senator from
23   Crittenden County.  And then Ken Ingram succeeded
24   him after his death in a special election.
25   Q      Oh, okay.  Now, would they be related to Keith
0053
 1   Ingram?
 2   A      Ken Ingram and Keith Ingram are brothers.
 3   Q      Okay.  Now, as I understand it, Governor,
 4   during one of the meetings with Senator Crumbly,
 5   there was an audience of about five or six other
 6   people?
 7   A      Could have been.  I usually try to have staff
 8   in there.
 9   Q      Yeah.  Some of them would have been even some
10   general assembly members as well, maybe Joyce
11   Elliott or somebody like that?
12   A      Perhaps.  I mean, that's not uncommon.
13   Q      And in that particular meeting, did this
14   exchange between you and the senator become, as it's
15   described to me -- of course, I wasn't there --
16   heated?
17   A      That happened frequently with Senator Crumbly
18   and I.
19   Q      Okay.  And if I understand the way that was
20   concluded, you told him that you weren't going to
21   change your mind and not to ask about it anymore?
22   A      I don't recall.  If it had been after things
```

```
23   were decided, that might have been true.  But early
24   on, we were taking into consideration his input.
25   Q     Now, this complaint that we filed, have you
0054
 1   read through it, Governor?
 2   A     No.  I've been briefed on it and been told
 3   parts of it, but I have not read the complaint word
 4   for word.
 5   Q     Okay.  So as we sit here for the deposition
 6   today, you haven't read this complaint?
 7   A     Not word for word, no.
 8   Q     Okay.  What did you do to prepare for this
 9   deposition?
10   A     I visited with my lawyers and told them
11   basically what I've told you.  They asked relatively
12   the same kind of questions you're asking, and I gave
13   them relatively the same kind of answers.
14   Q     All right.  And when you say your lawyers,
15   that would be the staff of the Attorney General's
16   office?
17   A     Yes, yes.  The counsel of record for the
18   defendant.
19   Q     All right.  Well, there's an allegation in
20   this complaint that this district was drawn to avoid
21   contest between white incumbent legislators.
22   A     To what?
23   Q     This district.
24   A     No, that -- there are -- that district?
25   Q     Twenty-four.  The way it was comprised.
0055
 1   A     What do you mean by that?  It wasn't drawn for
 2   that purpose.  But what do you mean "white incumbent
 3   legislators"?  Do you have specifics?
 4   Q     That would be Keith Ingram.
 5   A     That's absolutely --
 6   Q     Jerry Brown.
 7   A     That's absolutely false.
 8   Q     Clark Hall.
 9   A     If that's your allegation, it's absolutely
10   false.
11   Q     Well, that's one of the allegations.
12   A     Absolutely false.  As a matter of fact --
13   Q     All right.
14   A     -- I was shocked when Keith Ingram announced
15   he was running for the senate.
16   Q     All right.  Do you know whether Brown, Clark,
17   and Ingram were all white incumbents and resided in
18   Senator Luker's district, 17?
19   A     I do not know the answer to that question.  I
20   do know that all three were incumbents in the state
21   House of Representatives, and I do know that all
22   three are white.
23   Q     All right.
24   A     But I don't know whether they all reside in
```

```
25    Luker's district.
0056
 1    Q     What about term limits?  Do you know who was
 2    term limited?
 3    A     I know Luker's term limited.  I know Hall's
 4    term limited.  I know Brown's term limited.
 5    Q     What about Ingram?
 6    A     It is my understanding he was not term limited
 7    and there was a strong indication he was running for
 8    speaker of the house -- or he's had plans to run for
 9    speaker of the house, which would indicate he was
10    running for reelection.
11    Q     Right.  Now, Governor, as I understand it,
12    the --
13              THE WITNESS:  Let me ask you a question.
14              MR. VALLEY:  Yes?
15              THE WITNESS:  How much longer are we going
16         to be, do you know?
17              MR. VALLEY:  Maybe 20 or 30 minutes.
18              THE WITNESS:  Can I go pee, then?
19              MR. VALLEY:  Absolutely.  You can go.
20              (A brief recess is taken.)
21              MR. VALLEY:  Okay.  Governor, we're back
22         on the record after, I guess, a bathroom
23         break.
24    BY MR. VALLEY:
25    Q     I don't remember what my last question was,
0057
 1    but I got a few more, and I hope we can wrap it up.
 2              But I want to show you what I believe to be
 3    a -- the current map adopted by the Board of
 4    Apportionment in July of last year.
 5    A     Okay.
 6              MR. CORDI:  I'm sorry.  May I ask a
 7         question?  You handed him -- there's a
 8         document paperclipped to it.  Are you showing
 9         him both documents or just the one?
10              MR. VALLEY:  I'm just showing him the map.
11         But that's just the matrix, it looks like.
12         But I wasn't going to ask him about the
13         matrix.
14              MR. CORDI:  Thank you.
15    BY MR. VALLEY:
16    Q     Okay.  Governor, there's a couple of districts
17    on there that are elongated substantially.  One
18    starts, I believe, up in Fulton County, I think it's
19    Brown.  I don't know what number it is.
20              Do you see it?
21    A     Yes.
22    Q     Okay.
23    A     Yes.
24    Q     Can you tell how far south from the Missouri
25    line it trends?
0058
```

```
 1   A      It runs all the way into White County.
 2   Q      Okay.  All right.  And then there's another
 3   one, it may be in the area where Jerry Taylor's
 4   district used to be.  It starts at the Louisiana
 5   line and comes north up into Jefferson County?
 6   A      Yes.
 7   Q      And there will be several senate districts
 8   that are very long, I guess we'll say?
 9   A      Big, yeah.
10   Q      Okay.  Okay.  Now, did you give each of the 35
11   districts the same kind of assessment as you
12   consider communities of interest and elongation when
13   you --
14   A      We tried to factor all that in everywhere.
15   Q      All right.  So just by example, the
16   district -- what district number is that that starts
17   in Fulton County, can you tell?
18   A      It looks like 18.
19   Q      Okay.  So District 18 would have been given
20   the same kind of consideration District 24 was
21   given?
22   A      Same factors were considered in all of them.
23   Q      Right, right.  Okay.  All right.
24          Now, that Jeffers versus Clinton case that I
25   mentioned to you earlier --
0059
 1   A      Yes.
 2   Q      -- when you drew your districts, was that case
 3   a consideration for the districts?
 4   A      The law was -- was a consideration.  And to
 5   the extent that the Jeffers case was the precedent
 6   and the law, then the answer would be yes.
 7   Q      All right.  Did you consider the Jeffers case
 8   to be the present law?
 9   A      I didn't consider the Jeffers case
10   specifically.
11   Q      Okay.
12   A      The current law was what we tried to follow.
13   Q      Right.  When you're saying "the current law,"
14   can you tell me what that is that you were trying to
15   follow?  Not what the law is, but what case or
16   whatever it is that you considered.
17   A      There wasn't a specific case.
18   Q      Okay.
19   A      The law, as I understood it, was to try to
20   maximize the African-American representation and try
21   to keep it at least as much as it was.
22   Q      Right.  And when you -- we're talking in
23   quantities here, so let's be a bit more specific.
24   Keeping it as much as it was, you mean in terms of
25   the number of senate districts as in four?  Or you
0060
 1   mean as in black voting-age population?
 2   A      Both.
```

```
 3   Q     Now, one other thing, Governor, something that
 4   strikes me, is that District 24 is the largest, by
 5   population --
 6   A     Yes.
 7   Q     -- district in the state?
 8   A     Yes.
 9   Q     Why is that?
10   A     To increase the African-American population.
11   Q     But didn't you decrease the African-American
12   concentration by going into Crittenden County?
13   A     We increased it is the reason it's larger, the
14   sheer numbers are larger, attempt to increase the
15   African-American population.
16   Q     So is that the reason why the entire
17   Crittenden County was placed into this district?
18   A     No.
19   Q     Well, what would be the reason for the
20   placement of Crittenden County in its entirety in
21   District 24?
22   A     All of the factors that I previously talked
23   about.  You had to get the numbers, the pure census
24   numbers, to make up a senate district.
25   Q     Right.
0061
 1   A     And you're trying not to go so far west, as I
 2   indicated.
 3   Q     West with -- and that's what I'm talking --
 4   I'm a little confused about.  West with District 24
 5   or west with District 23?
 6   A     I wasn't concerned with the numbers on the
 7   districts.
 8   Q     Okay.
 9   A     A district that goes from the Mississippi
10   River to the Ozarks is what we were trying to avoid.
11   That necessitated Crittenden County being more
12   together.  The additional numbers were necessitated
13   by trying to increase the African-American
14   population.
15   Q     Well, Governor, could you have accomplished
16   the same goals by doing -- taking David Burnett's
17   district and going north-south along the
18   Mississippi River?
19   A     No.
20   Q     You couldn't have?
21   A     No.
22   Q     Why?
23   A     Well, David Burnett's district is constrained
24   by Missouri on the north and the Mississippi River
25   on the east and constrained by other population
0062
 1   centers on the west.
 2   Q     But it was not constrained -- David Burnett's
 3   district is in Mississippi County; isn't that
 4   correct?
```

```
 5   A     Correct.  And parts of --
 6   Q     Jackson and Newton, maybe?
 7   A     No.
 8   Q     Craighead?
 9   A     Well, no, no.  Parts of Craighead and
10   Poinsett.
11   Q     Okay.  Craighead, Poinsett.  All right.
12         But it could have gone into Crittenden County,
13   could it not?
14   A     I suppose anything could have happened.
15   Q     Do you need to see the map?
16   A     No.  I'm very familiar with northeast
17   Arkansas.
18   Q     Yes, sir.  Yes, sir.  I understand.  You grew
19   up over there, from 9th through the 12th grade.
20   A     (Nods head up and down.)
21   Q     But as I'm showing you this map --
22   A     Yes.
23   Q     David Burnett's district --
24   A     Yes.
25   Q     -- if it comes south into Crittenden County,
0063
 1   wouldn't that have kept District 23, which is Jerry
 2   Brown's district, wouldn't that have kept that from
 3   going from the river to the Ozarks?
 4   A     What would -- then I don't know what you would
 5   have done with 24.
 6   Q     You would have included all of Lee County and
 7   all of St. Francis Counties where the population was
 8   taken out.
 9         Governor, do you realize that in Forest City,
10   State Senate District 24, if you're standing on the
11   steps of city hall and look across at the police
12   department, you're in two different senate
13   districts?
14   A     No.
15   Q     Well, that's the truth.
16   A     I take your word for it.
17   Q     That's on your GeoCommons Web site.
18         So when you talk about communities of
19   interest, wouldn't it be at the similar interest for
20   the city of Forest City to have city hall and the
21   police and fire station in the same city in the same
22   senate district?
23   A     Dividing cities occurred in other parts of the
24   state by necessity.
25   Q     Yes, sir, I understand division, it's a
0064
 1   necessary part of this process.  But as we speak to
 2   communities of interest and you divide a city right
 3   along its city hall, is that an arbitrary placement
 4   of the line?  How do you get there?
 5   A     The line obviously was there because of
 6   population requirements.
```

```
 7   Q      Right.  Was the Board of Apportionment not
 8   considered?
 9   A      We considered input from everybody.
10   Q      Yes, sir.  All right.  Now, the other thing is
11   that I've been told that areas of St. Francis
12   County, areas of Lee County that included
13   African-American population that were in the former
14   District 16, which is the immediate predecessor to
15   District 24, were taken out?
16   A      Okay.
17   Q      What would be the reason for that?  If you
18   were trying to pick up African-American people --
19   A      I don't have any specific memory of
20   intentionally taking out African-Americans in the
21   areas you're talking about.  All I can tell you is
22   that the factors that I tried to enumerate were
23   present in all the districts.  And the additional
24   factor of trying to maximize minority districts was
25   the only factor that was different from the standard
0065
 1   factors that I already related.  And that only
 2   applied to certain areas of the state, one of which
 3   was Senator Crumbly's district.
 4   Q      All right.
 5          MR. VALLEY:  Let me take just a second.
 6          (A brief recess is taken.)
 7   BY MR. VALLEY:
 8   Q      Governor, I'm showing you a document, it is
 9   filed in the United States District Court in this
10   case, Document No. 28, I guess, Exhibit No. 5 to
11   that document, filed March the 2nd, 2012, which
12   is -- purports to be Plaintiffs' Exhibit 6 to its
13   amended complaint.  Okay?  And it purports to show
14   parts of Arkansas Senate District 23 and 24.
15   A      (Nods head up and down.)
16   Q      As proposed by the plaintiff.
17   A      Yes.
18   Q      This is not your district -- not the Board of
19   Apportionment's currently adopted district.
20   A      Okay.
21   Q      Okay.  As we look at that particular map, Lee
22   County is -- it's a whole -- the whole county's in
23   the district?
24   A      Yes.
25   Q      And St. Francis County; is that correct?
0066
 1   A      Yes.
 2   Q      And then parts of Monroe over by Brinkley?
 3   A      Yes.
 4   Q      Parts of Phillips?
 5   A      Yes.
 6   Q      Parts of Cross, which would be Parkin area?
 7   A      Yes.
 8   Q      And then parts of Crittenden, including Earle,
```

```
 9    Anthonyville, Edmonson, and parts of West Memphis?
10    A     Yes.
11    Q     Okay.  Now, the numbers that it shows is that
12    that district deviates by 867 people.
13    A     Okay.
14    Q     All right?  Part of the deviation, 867 people?
15              MR. CORDI:  Object to the form.  Because
16          deviate from what?
17              MR. VALLEY:  The standard one-man,
18          one-vote deviation that the Governor's said
19          he's tried to have as little deviation as
20          possible.
21              MR. CORDI:  Thank you.
22    BY MR. VALLEY:
23    Q     Do you recall that?
24    A     Yes.
25    Q     Okay.  That's the deviation I'm talking about,
0067
 1    867 people.
 2             In a vacuum, at this point, is that a good
 3    district in terms of its composition?
 4    A     In a vacuum?
 5    Q     Yes, sir.
 6    A     Yes.
 7    Q     Yes, sir.  And in a vacuum, would you agree
 8    that it keeps communities of interest together?  The
 9    entire county of Lee, the entire county of
10    St. Francis, and then relative portions of the other
11    counties?
12    A     As it relates to those two counties, yes.
13    Q     Yes, sir.  Now, as it relates to the other
14    counties, are you saying that the communities of
15    interest are not together?
16    A     Well, to the extent you're talking about whole
17    counties.
18    Q     Okay.  Right.  Okay.  Now, let's step out of
19    the vacuum.  Can you tell me what you find appealing
20    about District 24 as proposed?
21    A     As proposed by the Board of Apportionment or
22    by this map (indicating)?
23    Q     By this map.
24    A     What do I find appealing?
25    Q     Yes, sir.
0068
 1    A     Well, you like it.
 2    Q     That's good enough.
 3    A     Well, I mean --
 4    Q     I'm going to ask you the opposite.
 5    A     I like the deviation number.
 6    Q     Yes, sir.  What about the voting-age
 7    population?
 8    A     I liked the increased African-American
 9    voting-age population.
10    Q     Yes, sir.
```

```
11   A     That's appealing.
12   Q     Yes, sir.  Now, what do you find unappealing
13   about it?
14   A     The effect it has on other districts.
15   Q     Well, this affects two districts.
16   A     The effect it has on the district, again, it
17   takes it from the Mississippi River to the Ozarks.
18   Q     Okay.  So that would be your primary concern?
19   A     That is a major concern, yes.
20   Q     Yes, sir.  I'm not minimizing --
21   A     I don't know that I want to say "primary."  I
22   mean, we didn't deal in a vacuum.
23   Q     Yes, sir, I understand.
24   A     Okay.
25   Q     But now we have to deal in a vacuum with these
0069
 1   two districts.
 2   A     We do?
 3   Q     That's all the case is about is two districts.
 4   A     Okay.
 5   Q     Isn't that right?  I mean, we're just asking
 6   to change two districts.
 7   A     Okay.
 8   Q     So what other concerns?  You named one.  I
 9   called it primary because you named one.  You called
10   it "major."  I don't disagree with you calling it
11   major.  What other concern would you have as it
12   relates to the change District 24 imposes on
13   District 23?
14   A     Well, the geography creates the other issues,
15   the community of interest issues.
16   Q     Yes, sir.  I just want you to articulate all
17   of them.  So what I want to know, Governor, at this
18   point, because that's our map, that's the horse
19   we're riding.  And we told your lawyers we're going
20   to ride that horse, so we're going to ride it.
21         And I want to know when and if we get to
22   trial, are you going to articulate something
23   different that concerns you about District 23 and 24
24   as the plaintiffs have proposed?
25   A     As we discussed earlier --
0070
 1   Q     Yes, sir.
 2   A     -- the history and tradition of the relative
 3   senate districts in this part of the state suggested
 4   that Crittenden County and Woodruff County were
 5   about as elongated and far as tradition allowed, as
 6   tradition dictated.
 7         And when you go much further than that, you
 8   really strain the community-of-interest issue, you
 9   strain the geography issue, and it affects what I
10   think is one of the factors that we should consider.
11   Q     Okay.  And one of the factors we should
12   consider --
```

```
13   A      Communities of interest.
14   Q      Okay.  All right.  So have I -- at this point,
15   have I gotten your total position on District 23 and
16   24 as proposed by the plaintiffs?
17   A      I think so.
18          MR. VALLEY:  At this point I believe we
19          pass the witness to either Asa or your
20          lawyers.
21          MR. HUTCHINSON:  Yeah, I'm happy to do it
22          next, unless you have questions.
23          MR. CORDI:  Go ahead.
24                    EXAMINATION
25   BY MR. HUTCHINSON:
0071
 1   Q      I'm Asa Hutchinson, 3d, and I represent
 2   separate defendant Secretary of State Mark Martin in
 3   his official capacity as Secretary of State as well
 4   as his task as a former member of the Board of
 5   Apportionment.  And I'm not going to be redundant or
 6   repetitive of what Mr. Valley covered, but their
 7   allegation in the complaint, that -- state that my
 8   client was part of a board that intentionally tried
 9   to draw a map that diluted the strain of
10   African-American voters in the Delta region,
11   specifically Senate District 24, and I want to focus
12   all my questions around that.
13   A      Sure.
14   Q      And get a better understanding of the process
15   that was involved.  I know you stated earlier that
16   you did not hire an expert consultant or someone to
17   advise the board.
18          How did you go about educating yourself on the
19   legal requirements of redistricting as you went
20   about this process?
21   A      I had some familiarity, as has been mentioned,
22   but input and guidance from my own lawyer, in-house
23   counsel, and guidance from the Attorney General's
24   office.
25   Q      Okay.  Mr. Woodson's name was mentioned
0072
 1   earlier as the executive director of the board.  Did
 2   he have any input with you?
 3   A      You know, I don't recall any input
 4   specifically with me.  But he did have input that
 5   ultimately came to me.
 6   Q      Okay.
 7   A      Either -- either through the AG's office or
 8   through members of my staff.
 9   Q      Okay.  And tell me more about the process.  I
10   know you mentioned to Mr. Valley that when a map was
11   drawn, at least from your office, it was started in
12   one of the corners and may have moved in.  Were you
13   drawing the map or was Mr. -- who did you say,
14   Miller or Mr. Moran drawing the map?
```