## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## HELENA DIVISION

FUTURE MAE JEFFERS; MARY JEFFERS;                                    PLAINTIFFS
HENRY PEACOCK; SHIRLEY HARVELL;
REV. RONALD WILLIAMS; PEGGY R. WRIGHT;
LAURA LOVE; FRANK SHAW; C.W. CAMPBELL;
LEO CHITMAN; ETTA CAMPBELL; PLEZ LUCAS;
VICKIE ROBERTSON; JOSEPH PERRY; ELBERT SMITH;
SANDRA BAGLEY; NIKKI DISMUKE; ALICE W. VALLEY;
LAKETHA BROWN FLUKER; KATRINA HARRELL;
CHESTER HARRELL; EDDIE O'NEAL; CHRISTOPHER
FRANKLIN; and JACK BERNARD CRUMBLY

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**SEP 17 2012**

JAMES W. McCORMACK, CLERK
By: _____
D.P CLERK

v.                          No. 2:12CV00016 JLH

MIKE BEEBE, in his capacity as Governor of Arkansas
and Chairman of the Arkansas Board of Apportionment;
MARK MARTIN, in his capacity as Secretary of State
of Arkansas and as a member of the Arkansas Board
of Apportionment; DUSTIN MCDANIEL, in his
capacity as Attorney General of Arkansas and a member
of the Arkansas Board of Apportionment; and
ARKANSAS BOARD OF APPORTIONMENT                                    DEFENDANTS

### Before Three Judge Panel
### District Judge Holmes, Circuit Judge Smith, and District Judge Wright

### OPINION

Following the 2010 census, the Arkansas Board of Apportionment[1] ("Board"), consisting of

Governor Mike Beebe, Attorney General Dustin McDaniel, and Secretary of State Mark Martin,

adopted by a 2-to-1 vote a plan of reapportionment for the Arkansas General Assembly. Relevant

to the present dispute, this plan created new Arkansas State Senate ("Senate") District 24, which

consists of all of Crittenden County and parts of Lee, Phillips, and St. Francis Counties. Twenty-four

---

[1]"The Board of Apportionment is created by Article VIII, Section 1 of the Constitution of Arkansas." *Jeffers v. Clinton*, 730 F. Supp. 196, 199 (E.D. Ark. 1989) ("*Jeffers I*") (three-judge court), *aff'd memo.*, 498 U.S. 1019 (1991).

plaintiffs bring this suit against the Board, claiming that the 2011 Senate plan—specifically Senate District 24—violates § 2 of the Voting Rights Act (VRA) of 1965, as amended 42 U.S.C. § 1973 *et seq.*, and the Fourteenth and Fifteenth Amendments to the Constitution of the United States.

We have thoroughly reviewed the record evidence, including numerous exhibits and expert testimony.[2] "We have carefully considered the proof with due regard to the intensely practical nature of the political process." *Jeffers I*, 730 F. Supp. at 198. We now hold that the plaintiffs failed to meet their burden of proving the *Gingles*[3] preconditions or intentional discrimination and therefore did not demonstrate a violation of their rights under federal law.

## I. *Background*

In Arkansas, "the Delta" encompasses those "districts located along the Mississippi River." *Id.* at 200. Section 2 vote-dilution claims involving the Delta have an extensive history.[4] In 1990, a

---

[2]The court conducted a four-day bench trial from May 7, 2012, to May 10, 2012, in Helena, Arkansas.

[3]*Thornburg v. Gingles*, 478 U.S. 30 (1986).

[4]*See, e.g.*, *Smith v. Clinton*, 687 F. Supp. 1310, 1311 (E.D. Ark. 1988) (three-judge court) ("*Smith I*") (holding that "at-large election of representatives in this multimember structure so dilutes the voting strength of black residents of the district as virtually to guarantee that no black person will ever be elected State Representative in Crittenden County"); *Smith v. Clinton*, 687 F. Supp. 1361, 1363 (E.D. Ark. 1988) (three-judge court) ("*Smith II*"), *aff'd memo.*, 488 U.S. 988 (1988) (ordering Board to implement plaintiffs' plan providing for single-member majority-black district in Crittenden County with "a majority black population of 60.55% among residents of voting age" to "give blacks a fair opportunity to elect the candidate of their choice to the Arkansas House of Representatives [("House")], and help to eradicate the effect of the dual-member, at-large system on participation by blacks in the political process"); *Jeffers I*, 730 F. Supp. at 198 (holding that the plaintiffs, 17 black electors, "demonstrated a violation of their rights under federal law" because the 1981 apportionment plan only created five majority-minority districts—"one in the Senate and four in the House"—when "a total of 16 such districts, three in the Senate and 13 in the House, could have been created") (footnote omitted); *Jeffers v. Clinton*, 756 F. Supp. 1195, 1198–1200 (E.D. Ark. 1990) ("*Jeffers II*") (three-judge court), *aff'd memo.*, 498 U.S. 1019 (1991) (rejecting as legally insufficient Board's proposed remedial plan creating a House district in Monroe and Phillips Counties with a black

three-judge panel of the federal district court found that the State of Arkansas had violated § 2 of the

VRA by "creat[ing] only five legislative positions [in its 1981 apportionment plan], one in the Senate

and four in the House, representing districts in which a majority of the voting-age population was

black" when it could have created "a total of 16 such districts, three in the Senate and 13 in the

House." *Jeffers I*, 730 F. Supp. at 198 (footnote omitted).[5] At the remedy stage, the court ordered that

Crittenden County be divided, with the southern part placed into a new Senate District 30, along with

portions of Cross, Lee, Phillips, and St. Francis Counties. *Jeffers II*, 756 F. Supp. at 1200. The 1990

Senate District 30 had a black voting-age population (BVAP) of 62 percent, according to the 1980

census. *Id.* at 1202–03 (opinion on reconsideration filed Mar. 5, 1990).

In 1991, the Board redrew the boundaries of the 1990 Senate District 30 to include portions

of Crittenden, Lee, Phillips, and St. Francis Counties but to exclude Cross County. The Board

---

voting-age population (BVAP) of 58 percent and a House district in Lee and St. Francis Counties
with a BVAP of 56 percent and adopting plaintiffs' plans for those districts, with a BVAP of 63
percent and 64 percent, respectively, and also rejecting as legally insufficient Board's proposed
remedial plan for a Senate district including portions of Crittenden, Cross, Lee, Phillips, and St.
Francis Counties that had a BVAP of 55 percent and adopting plaintiffs' plan, with a BVAP of 60.5
percent); *Jeffers II*, 756 F. Supp. at 1202 (opinion on reconsideration filed March 5, 1990) (granting
Board's motion for reconsideration to modify the Senate district by "increas[ing] the . . . BVAP
. . . of this District from 61% to 62%" in order "to prevent two incumbent white senior Senators from
being placed in the same district"); *Jeffers v. Tucker*, 847 F. Supp. 655, 660–62 (E.D. Ark. 1994)
(three-judge court) (holding that black voters failed to satisfy *Gingles* compactness precondition for
vote-dilution claim regarding Arkansas's state legislative apportionment plan for both the House and
Senate because the black population was too widely dispersed for there to be a holding that the Board
violated Section 2 by refusing to draw additional House and Senate districts as the black voters
requested).

[5]At the liability stage of the *Jeffers* litigation, the court did "not hold[] that the law requires
the creation of any particular number of majority-black districts." *Jeffers I*, 730 F. Supp. at 217.
Instead, the court found "how many such districts can be created" and learned "that their lines can
be drawn so as to make them reasonably compact and contiguous." *Id.* Thus, the court articulated
"a sort of presumption that any plan adopted should contain that number of majority-black districts."
*Id.*

numbered the new 1991 district Senate District 22. When drawn in 1991, Senate District 22 had a

BVAP of 61.91 percent, according to the 1990 census. *See Tucker*, 847 F. Supp. at 660 n.4.

In 2001, the Board drew Senate District 16, which contained portions of the same

counties—Crittenden, Lee, Phillips, and St. Francis—previously included in the 1991 Senate District

22. According to the 2000 census, the 2001 Senate District 16 had a BVAP of 55.48 percent. The

portions of Crittenden, Lee, and St. Francis Counties that were not included in the 2001 Senate

District 16 were included in Senate District 17, along with all of Cross, Monroe, and Woodruff

Counties and the portions of Phillips County that were not included in Senate District 16 or 5.

According to the 2000 census, the 2001 Senate District 17 had a BVAP of 27 percent.

According to the 2010 census data, blacks constitute 15.4 percent of Arkansas's total

population. Lee, Phillips, Crittenden, and St. Francis Counties each have a 2010 census total

population consisting of an African-American majority.[6] Phillips, Lee, and St. Francis Counties have

---

[6]According to the parties' joint stipulation of facts, Senate "District 16['s] Population by Race by County" is as follows:

Total Population

|  | White | Black | White % | Black % |
|---|---|---|---|---|
| Crittenden | 3,410 | 16,101 | 17% | 81% |
| Lee | 2,934 | 4,970 | 36% | 61% |
| Phillips | 4,568 | 10,375 | 30% | 68% |
| St. Francis | 10,710 | 13,806 | 42% | 54% |
| Total | 21,622 | 45,252 | 31% | 66% |

Voting-age Population

|  | White | Black | White % | Black % |
|---|---|---|---|---|

the first, second, and fifth highest percentage of African-American population of any counties in the state. In Lee County, the total population decreased by 17.1 percent, and the black population decreased by 20 percent. The 2010 BVAP of Lee County is 52.9 percent. In Phillips County, the total population decreased by 17.7 percent, and the black population decreased by 12.1 percent. According to the 2010 census, Crittenden County has a black population of 51.2 percent and a BVAP of 47 percent. And, St. Francis County has a 2010 BVAP of 48.2 percent. Overall, the BVAP for 2001 Senate District 16 increased from 55 percent in 2000 to 61 percent in 2010, according to the 2010 census.

Population shifts in Arkansas necessitated redrawing the boundaries of Senate District 16. Based on Arkansas's population, an ideal Senate district would have a population of 83,312. If the boundaries of Senate District 16 remained the same after the 2010 census, then it would fall short of the ideal population size by over 14,000. Specifically, the 2010 census showed that Senate District 16 had a population of 68,732, which was 14,580—or 17.5 percent—less than the ideal population of 83,312. To meet equal-population requirements so that Senate District 16's population was no more than five percent below the ideal, its boundaries needed to be redrawn to add at least 10,415 people, bringing its total population up to at least 79,147.

After the 2010 census, the Board, in a 2-to-1 vote, adopted a Senate reapportionment plan

| Crittenden | 2,888 | 10,309 | 22% | 77% |
| Lee | 2,573 | 3,737 | 40% | 58% |
| Phillips | 3,775 | 6,814 | 35% | 63% |
| St. Francis | 8,947 | 9,742 | 46% | 50% |
| Total | 18,183 | 30,602 | 36% | 61% |

that created a new Senate district comprised of all of Crittenden County and parts of Cross, Lee, Phillips, and St. Francis Counties. This new district is called Senate District 24.[7] Overall, the Board's 2011 Senate plan has four majority-minority districts—the same number of Senate majority-minority districts as in the 2001 Senate plan.

Governor Beebe and Attorney General McDaniel, both Democrats, voted for the plan, while Secretary Martin, a Republican, voted against the plan. Secretary Martin had submitted his own redistricting plan, which included a BVAP of 56.1 percent for the area that most closely reflects the boundaries of old Senate District 16 and new Senate District 24. Secretary Martin's plan did not unify Crittenden County.

As adopted, Senate District 24 has a black population of 57.05 percent, a BVAP of 52.88 percent, and a minority vote-age population of 55.72 percent. New Senate District 24 includes a state prison unit of the Arkansas Department of Correction called the East Arkansas Regional Unit. According to the 2010 census, the black adult prisoner population of the prison is 849. The non-black adult prisoner population of the prison is 833. On census day, the BVAP of the prison was 50.5 percent. Excluding the prison from the tabulation of new Senate District 24's BVAP would increase the district's BVAP to above 52.88 percent.

New Senate District 24 restores all of Crittenden County to the district. This restoration has significant effects on the size and makeup of the voting-age population. While African Americans comprised about 66 percent of the total population of former Senate District 16 and about 61 percent of its voting-age population, the areas of Crittenden County included in new Senate District 24 that

---

[7]*See* Stipulated Exhibit 3 in Addendum comparing the 2001 Senate District 16 with the 2011 Senate District 24.

were not included in Senate District 16 are about two-thirds white.[8] A voting-age population of approximately 11,952 in St. Francis County that was part of Senate District 16 was not included in Senate District 24. Senate District 24 has the largest population of any Senate district—87,147, which is 3,835 or 4.6 percent more than the target size.[9]

State Representatives Jerry R. Brown, Clark Hall, and Keith Ingram are all white Democratic incumbents residing in the 2001 Senate District 17 during their 2011–2012 term. Representatives Brown and Hall are serving their third term in the House and are term-limited from running for the

---

[8]According to the parties' joint stipulation of facts, the following table shows "Crittenden County Whites Added":

| Total Population | | | | | |
|---|---|---|---|---|---|
| District 16 | Population | White | Black | White % | Black % |
| Crittenden | 19,864 | 3,410 | 16,1011 | 7% | 81% |
| Added | 31,038 | 20,036 | 9,950 | 65% | 32% |
| District 24 | | | | | |
| Crittenden | 50,902 | 23,446 | 26,051 | 46% | 51% |

| Voting-Age Population | | | | | |
|---|---|---|---|---|---|
| District 16 | 18+Pop | White | Black | White % | Black % |
| Crittenden | 13,421 | 2,888 | 10,309 | 22% | 77% |
| Added | 22,672 | 15,371 | 6,654 | 68% | 29% |
| District 24 | | | | | |
| Crittenden | 36,093 | 18,259 | 16,963 | 51% | 47% |

[9]*See* Stipulated Exhibit 66 in Addendum.

House again in 2012. Representative Ingram is currently serving his second term in the House and is not term-limited from running for the House again in 2012. State Senator Jim Luker is a white Democrat elected from the 2001 Senate District 17. He is serving his third term in the Senate and is term-limited from running for the Senate again in 2012. State Senator Jack Crumbly, a plaintiff in the present action, is an African-American Democratic incumbent from St. Francis County elected to the Senate from the 2001 Senate District 16.

Under the adopted 2011 Senate plan, Representative Brown's residence is in Senate District 23, the successor to the 2001 Senate District 17. Representatives Hall's and Ingram's residences are now located in Senate District 24. Likewise, Senator Crumbly's residence is now included in Senate District 24.

On September 14, 2011, Representative Brown announced his intention to run for the Arkansas State Senate from District 23. On October 17, 2011, Representative Hall announced his intention to run for the United States Congress from the First Congressional District. On January 16, 2012, Representative Ingram announced his intention to run for the Arkansas State Senate from Senate District 24. Senator Crumbly, like Representative Ingram, also intended to run for the Arkansas State Senate in Senate District 24.

On January 23, 2012, 24 African-American plaintiffs, all residents, citizens, and registered voters within Crittenden, Lee, St. Francis, and Phillips Counties, filed suit against Governor Beebe, in his capacity as Governor of Arkansas and Chairman of the Board; Secretary Martin, in his capacity as Secretary of the State of Arkansas and as a member of the Board; Attorney General McDaniel, in his capacity as Attorney General of Arkansas and as a member of the Board; and the Board.

In their amended complaint, the plaintiffs allege as their first cause of action that the Board's

-8-

2011 Senate reapportionment plan—specifically Senate District 24—violates § 2 of the VRA, as amended, 42 U.S.C. § 1973 *et seq*. According to the plaintiffs, "[t]he plan denies or abridges the [p]laintiffs' right to vote on account of their race and color, by diluting their voting strength as African[-]American citizens in Arkansas." They claim that the Senate "plan does not afford [p]laintiffs an equal opportunity to participate in the political process and to elect representatives of their choice and denies [p]laintiffs the right to vote without discrimination on account of their race and color, in violation of 42 U.S.C. § 1973."

For their second cause of action, the plaintiffs allege that the Board adopted the Senate plan "with an intent to, and it does, deny or abridge the right of African[-]American citizens residing in northeastern Arkansas to vote on account of their race and color." They allege that this intentional discrimination violates the Fourteenth and Fifteenth Amendments and 42 U.S.C. § 1983.

The plaintiffs request that this court enter (1) a declaratory judgment that the defendants' actions violate their rights under § 2 and the Fourteenth and Fifteenth Amendments, (2) a permanent injunction enjoining and forbidding the use of the 2011 Senate plan, (3) a permanent injunction requiring the defendants "to develop and adopt a redistricting plan for Senate District 24 and adjacent districts that does not dilute African-American voting strength for the office of Arkansas State Senator," (4) an order retaining jurisdiction over the matter until the defendants comply, and (5) an order requiring the defendants to pay the plaintiffs' costs, including reasonable attorney's fees.

II. *Discussion*

A. *Section 2 Claim*

We first address the merits of the plaintiffs' § 2 claim. The plaintiffs argue that the 2011 Senate redistricting plan dilutes the voting strength of African-American citizens within Senate

District 24. According to the plaintiffs, Senate District 24 is not an effective majority-minority district because a BVAP of 52.88 percent in the Delta region does not give African Americans an equal opportunity to elect representatives of their choice. The plaintiffs claim that in their case, as in *Jeffers I* and *II,* an effective majority-minority district in this region requires a BVAP over 60 percent. The plaintiffs' proposed map—Jeffers_03 Proposal[10]—creates a new Senate District 24 with a BVAP of 58.41 percent.

Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Subsection (a) "requires consideration of effects, as it prohibits practices imposed or applied in a manner which results in a denial or abridgement of the right to vote." *Bartlett v. Strickland,* 556 U.S. 1, 10 (2009) (plurality opinion) (quotation, alteration, and citation omitted). Subsection (b) sets forth "a test for determining whether a § 2 violation has occurred." *Id.* It "requires a showing that minorities 'have less opportunity than other members of the electorate to . . . elect representatives of

---

[10]The parties stipulated to the Jeffers _03 Proposal, which is Exhibit 1. *See* Addendum.

their choice.'" *Id.* at 14 (alteration in original) (quoting 42 U.S.C. § 1973(b)).

"Vote[-]dilution claims [under § 2] are 'peculiarly dependent upon the facts of each case,'

requiring 'an intensely local appraisal of the design and impact of the contested electoral

mechanisms.'" *Cottier v. City of Martin*, 604 F.3d 553, 559 (8th Cir. 2010) (quoting *Gingles*, 478

U.S. at 79). "It is the plaintiffs' burden to demonstrate the existence of vote dilution." *Id.* (citing

*Voinovich v. Quilter*, 507 U.S. 146, 155–56 (1993)).

The Supreme Court "first construed the amended version of § 2 in . . . *Gingles*." *Bartlett*, 556

U.S. at 11. The *Gingles* Court set forth

> three "necessary preconditions" for a claim that the use of multimember districts
> constituted actionable vote dilution under § 2:[ ](1) The minority group must be
> "sufficiently large and geographically compact to constitute a majority in a
> single-member district," (2) the minority group must be "politically cohesive," and
> (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the
> minority's preferred candidate."

*Id.* (second alteration in original) (quoting *Gingles*, 478 U.S. at 50–51).

Following *Gingles*, the Supreme Court "held that the three *Gingles* requirements apply

equally in § 2 cases involving single-member districts, such as a claim alleging vote dilution because

a geographically compact minority group has been split between two or more single-member

districts." *Id.* (citing *Growe v. Emison*, 507 U.S. 25, 40–41 (1993)). "In a § 2 case, only when a party

has established the *Gingles* requirements does a court proceed to analyze whether a violation has

occurred based on the totality of the circumstances." *Id.* at 11–12 (citing *Gingles*, 478 U.S. at 79;

*Johnson v. De Grandy*, 512 U.S. 997, 1013 (1994)). "[T]he *Gingles* requirements 'cannot be applied

mechanically and without regard to the nature of the claim.'" *Id.* at 19 (quoting *Voinovich*, 507 U.S.

at 158). They function as "preconditions, consistent with the text and purpose of § 2, to help courts

determine which claims could meet the totality-of-the-circumstances standard for a § 2 violation."

*Id.* at 21 (citing *Growe*, 507 U.S. at 40).

"[Section] 2 can require the creation of" "majority-minority districts [in which] a minority group composes a numerical, working majority of the voting-age population." *Id.* at 13 (citing *Voinovich*, 507 U.S. at 154 ("Placing black voters in a district in which they constitute a sizeable and therefore 'safe' majority ensures that they are able to elect their candidate of choice.")).[11] "Majority-minority districts are . . . required if all three *Gingles* factors are met and if § 2 applies based on a

---

[11]By contrast, "influence districts" are those "in which a minority group can influence the outcome of an election even if its preferred candidate cannot be elected. [The Supreme] Court has held that § 2 does not require the creation of influence districts." *Bartlett*, 556 U.S. at 13 (citing *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 445 (2006)).

And, in a "crossover district,"

> minority voters make up less than a majority of the voting-age population. But in a crossover district, the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate.

*Id.* In *Bartlett*, a plurality of the Supreme Court held that such "crossover districts" do not satisfy the *Gingles* requirement that the minority population be large enough and yet sufficiently geographically compact to constitute a majority in a single-member district because minorities in crossover districts make up less than 50 percent of the voting-age population. *Id.* at 12–20.

Justice Kennedy authored the plurality opinion in *Bartlett*, and Chief Justice Roberts and Justice Alito joined in that opinion. *Id.* at 5. Justice Thomas authored a separate opinion concurring in the judgment in which Justice Scalia joined. *Id.* at 26. The concurring opinion concluded that "[t]he text of § 2 of the Voting Rights Act of 1965 does not authorize any vote dilution claim, regardless of the size of the minority population in a given district." *Id.* (Thomas, J., concurring in the judgment). "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (alteration in original) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). Applying this test, Justice Kennedy's opinion for the three-justice plurality in *Bartlett* reaches the judgment on the narrowest grounds; therefore, we deem it controlling.

totality of the circumstances." *Id.* at 24.

But "[n]othing in § 2 grants special protection to a minority group's right to form political coalitions. '[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground.'" *Id.* at 15 (second alteration in original) (quoting *De Grandy*, 512 U.S. at 1020). "Section 2 [also] *does not* impose on those who draw election districts a duty to give minority voters *the most potential, or the best potential*, to elect a candidate . . . ." *Id.* (emphases added). It "does not guarantee minority voters an electoral advantage." *Id.* at 20. The Supreme "Court [has] rejected the proposition . . . that § 2 entitles minority groups to the *maximum* possible voting strength." *Id.* at 15–16 (emphasis added); *see also id.* at 23 ("When we address the mandate of § 2, . . . we must note it is not concerned with maximizing minority voting strength, *De Grandy*, 512 U.S., at 1022, 114 S.Ct. 2647; and, as a statutory matter, § 2 does not mandate creating or preserving crossover districts."). According to the Court:

> "[R]eading § 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose. One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast."

*Id.* at 16 (alteration in original) (quoting *De Grandy*, 512 U.S. at 1016–17).

"In setting out the first requirement for § 2 claims, the *Gingles* Court explained that '[u]nless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.'" *Id.* at 15 (alteration in original) (quoting *Gingles*, 478 U.S. at 50 n.17). The purpose of the first *Gingles* requirement is "'to establish that the minority has the potential to elect a representative of its own choice in some single-member district.'" *Id.* (quoting *Growe*, 507 U.S. at 40). In the absence of "such

a showing, 'there neither has been a wrong nor can be a remedy.'" *Id.* (quoting *Growe*, 507 U.S. at 41).

"[T]he first *Gingles* factor . . . require[s] a majority-minority standard." *Id.* at 19. "[A] party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is *greater than 50 percent*." *Id.* at 19–20 (emphasis added). "[T]he majority-minority rule relies on an objective, numerical test: Do minorities *make up more than 50 percent* of the voting-age population in the relevant geographic area?" *Id.* at 18 (emphasis added).

"[T]he majority-minority requirement [furthers] the need for workable standards and sound judicial and *legislative* administration. The rule draws clear lines for courts and *legislatures* alike." *Id.* at 17 (emphases added). It "provides straightforward guidance to courts *and to those officials charged with drawing district lines to comply with § 2.*" *Id.* at 18 (emphasis added). This rule is rooted "in principles of democratic governance." *Id.* at 19. In our system of government, "[t]he special significance . . . of a majority means it is a special wrong when a minority group has *50 percent or more* of the voting population and could constitute a compact voting majority *but*, despite racially polarized bloc voting, *that group is not put into a district*." *Id.* (emphases added). "Disregarding the majority-minority rule and relying [instead] on a combination [of other factors like] race and party to presume an *effective majority* would involve the law and courts in a perilous enterprise." *Id.* at 22 (emphasis added).

As a result,

[w]here an election district could be drawn in which minority voters form a majority *but such a district is not drawn*, or where a majority-minority district is cracked by assigning some voters elsewhere, then—assuming the other *Gingles* factors are also satisfied—denial of the opportunity to elect a candidate of choice is a present and discernible wrong . . . .

*Id.* at 18–19 (emphasis added).

In the present case, we conclude that the plaintiffs have not established a claim for vote dilution under § 2 because the 2011 Senate District 24—the challenged district—is *already* a majority-minority district under *Bartlett*'s definition. It has a BVAP of 52.8 percent, which is "greater than 50 percent." *Id.* at 20. Thus, the plaintiffs have not shown that "an election district could be drawn in which minority voters form a majority but such a district [was] not drawn." *Id.* at 18. In other words, the plaintiffs failed to "prove that the alleged vote-dilution practice *prevented the creation* of an election district that would have contained a majority of minority voters." *Backus v. South Carolina*, Case No. 3:11–cv–03120–HFF–MBS–PMD, 2012 WL 786333, at *10 (D.S.C. Mar. 9, 2012) (emphasis added) (citing *Bartlett*, 556 U.S. at 18–20) (notice of appeal to the Supreme Court filed on Mar. 19, 2012). Because the plaintiffs "are unable to make that showing, they cannot satisfy the first *Gingles* precondition and therefore cannot state a § 2 claim." *Id.*[12]

The plaintiffs' expert, Dr. Lisa Handley, never testified that Senate District 24 *was not* a majority-minority district; instead, her contention was that it was not an *effective* one. Dr. Handley testified that she did not believe that the 2011 Senate District 24 was an "effective district" because the 2001 "Senate District 16 *at 60 or 61 percent black voting age population* has not been successful in electing a black-preferred candidate." (Emphasis added.) She admitted "that it's not possible to draw a district that's *greater than that* in black voting age population, *in fact not even to meet that*."

---

[12]This case, unlike *Bartlett*, does "involve allegations of intentional and wrongful conduct." *Bartlett*, 556 U.S. at 20 (explaining that the Court "need not consider whether intentional discrimination affects the *Gingles* analysis" and clarifying that the Court's "holding does not apply to cases in which there is intentional discrimination against a racial minority"). But, as discussed *infra*, we conclude that no intentional or wrongful conduct occurred. *See infra* Part II.B. Therefore, the plurality's analysis in *Bartlett* unquestionably applies to the present case.

(Emphases added.) Nevertheless, she "suggest[ed] that you come as close as you can to that *because if 60 percent doesn't work*, certainly 53 percent is not going to work." (Emphasis added.) As *Bartlett* states, the Board has no obligation under § 2 "to give minority voters the most potential, or the best potential, to elect a candidate." *Bartlett*, 556 U.S. at 15. Nor does § 2 require the Board to maximize minority voting strength, *see id.* at 16, 23, which is what Dr. Handley's conclusion that over "60 or 61 percent" is necessary to form an "effective district" essentially requires.

Interestingly, if we applied Dr. Handley's suggestion of a greater-than-61-percent BVAP, even the *plaintiffs'* proposed BVAP would be insufficient to provide minority voters in the proposed district with the ability to elect candidates of their choice. Like the 2011 Senate District 24, the plaintiffs' proposed map creating a new Senate District 24 with a BVAP of 58.41 percent falls short of the over "60 or 61 percent" that Dr. Handley deemed necessary to create an "effective district."[13] The plaintiffs' evidence establishes that the Board could not draw a district with a BVAP that is greater than 60 or 61 percent, and we conclude that, under *Bartlett*, the Board was not *required* to do so. Furthermore, while a BVAP of 58.41 percent would be preferable to 52.8 percent, § 2 does not require it under current controlling Supreme Court precedent. Under *Bartlett*, all that § 2 requires

---

[13]"'[A] rule of thumb has evolved that sets a 65 percent minority population as the basis for an effective majority.'" *Cottier*, 604 F.3d at 566 (Smith, J., dissenting) (alteration in original) (quoting Kimball Brace et al., *Minority Voting Equality: The 65 Percent Rule in Theory and Practice*, 10 Law & Pol'y 43, 45 (1988)). "Scholars have researched the origins of the 65-percent rule but have not found it in a holding of the Supreme Court." *Id.* (Smith, J., dissenting) (footnote omitted). After *Gingles*, "district courts within this circuit expressly applied a 60-percent or 65-percent rule" in the remedial stage of § 2 litigation. *Id.* at 567 (Smith, J., dissenting) (citing *Smith II*, 687 F. Supp. at 1363; *Jeffers II*, 756 F. Supp. at 1198). In the present case, the parties have stipulated that "[t]he percentage minority population needed to create an 'effective minority district' (that is, a district that provides minority voters with the ability to elect candidates of their choice to office) varies depending on the locality— there is no single target (for example, 65 percent) that can be applied universally."

is that "[w]here an election district could be drawn in which minority voters form a majority," and all other *Gingles* factors are satisfied, the Board draw such a district. *Id.* at 18. Here, the Board satisfied this requirement by drawing a district with a BVAP of 52.8 percent.

The second *Gingles* precondition is that the minority group must be "politically cohesive." *Gingles*, 478 U.S. at 51. Here, it is undisputed that this element has been met.

Not so with the third precondition, that the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* Because Senate District 24 is a new district drawn with boundaries substantially different from the prior Senate District 16, we are faced with the difficulty of trying to predict whether white voters in Senate District 24 would vote sufficiently as a bloc so as usually to defeat the minority's preferred candidate. The evidence established that, for various reasons, the turnout rate for voting age blacks is less than that for whites. On the other hand, whites tend to vote less cohesively than blacks. Here, with respect to the third *Gingles* factor, the plaintiffs have the burden of proving that the BVAP in Senate District 24 of approximately 53 percent is so low that whites will vote as a bloc so as usually to defeat the minority-preferred candidate.

To meet their burden on this issue, the plaintiffs relied largely on the expert testimony of Dr. Lisa Handley. To estimate the percentage of black and white voters who voted for particular candidates, Dr. Handley used three mathematical techniques – homogeneous precinct analysis, bivariate ecological regression and ecological inference – involving prior elections in Senate District 16, as well as bi-racial contests (contests that included both African-American and white candidates) in nearby legislative districts as well as in some state and federal races. As noted above, Dr. Handley concluded that in Senate District 24 white voters would usually vote as a bloc so as to

defeat the minority-preferred candidate. Dr. Handley's testimony is unpersuasive, however.

We do not question, for purposes of this opinion, the validity of the three mathematical techniques used by Dr. Handley. We do question, however, the reliability of her results using those mathematical techniques in this specific case. Because voting records do not identify the race of the voters, the analyses performed by Dr. Handley depend upon the assignment of racial composition to polling areas. Racial information must be taken from census data and then assigned to polling areas. The census uses voter tabulation districts, which do not necessarily correspond to polling areas. The validity of Dr. Handley's analyses depends upon the accuracy with which racial information taken from census data was assigned to the polling areas. Dr. Handley did not, however, perform the assignment of racial composition to the polling areas. Instead, that essential step was performed by one of the attorneys of record for the plaintiffs. Dr. Handley neither performed that task nor verified that it was performed correctly. Nor did she testify that experts in her particular field would reasonably rely on lawyers to perform that task.

If there were no reason to doubt the accuracy of the work upon which Dr. Handley relied, Dr. Handley's testimony might suffice to meet the plaintiffs' burden of proof; but the evidence established ample reason to doubt the reliability of the data upon which Dr. Handley relied. For example, on cross-examination Dr. Handley admitted that documents used as input for her analyses included one polling area with a turnout of 3,115, whereas the total voting age population for that voting area was 992. In another polling area, according to the documents upon which Dr. Handley relied, the turnout was 287, whereas the total voting age population was 15,644. There was also evidence that for one of the elections upon which she based her opinion, the votes were reversed for the two candidates in all of the polling areas in one of the counties in the district. In the face of these

kinds of gross errors, and in the absence of any account as to the accuracy of the work by which racial compositions were assigned to polling areas, it is impossible to credit Dr. Handley's work with significant probative value.

Apart from the issue of the reliability of the data upon which Dr. Handley relied, still another significant issue involves early and absentee ballots in her analyses. The evidence established that 31 percent of the votes cast in the elections analyzed by Dr. Handley were cast by early and absentee ballots; yet, she did not consider those votes when conducting her analyses. Again, it is difficult to credit Dr. Handley's opinions when she disregards nearly one-third of the votes cast in the elections that she analyzed.

There are other issues with Dr. Handley's analyses. In some instances, she stated that white voters voted as a bloc to defeat the minority-preferred candidate when, in fact, the minority-preferred candidate prevailed in the relevant counties but lost statewide. For example, Dr. Handley reported that in the 2008 presidential election, Barack Obama was the minority-preferred candidate in the Delta. She also reported, however, that he received 38.9 percent of the vote, whereas John McCain received 58.7 percent of the vote. The evidence established, however, that those were statewide percentages. For the four counties all or part of which form Senate District 24, Barack Obama received a majority of the vote.[14] There were other such examples.

In short, we do not find Dr. Handley's testimony persuasive.[15] In the absence of persuasive

---

[14]According to Exhibit 47, which is the certified results for the 2008 presidential election for the counties of Crittenden, Lee, Phillips, and St. Francis, Barack Obama received 23,774 votes, while John McCain received 16,118.

[15]The plaintiffs have filed a motion to reopen the record to receive new evidence. The new evidence is a declaration by Dr. Handley regarding the election conducted after the trial in which Representative Ingram defeated incumbent Senator Crumbly in Senate District 24. Dr. Handley's

expert testimony, we are left with the results of a hodgepodge of elections of various sorts in the

general vicinity of Senate District 24, along with the lay testimony regarding voting patterns in the

Delta. The lay testimony was more credible than that of Dr. Handley but not sufficiently conclusive

to meet the plaintiffs' burden of proof.

We conclude that the plaintiffs failed to meet their burden of proof with respect to the third

of the *Gingles* preconditions.

Additionally, we disagree with plaintiffs' suggestion that *Jeffers I* and *II* are sufficiently

similar to this case to warrant a different result. In *Jeffers I*, the plaintiffs challenged both House and

Senate districts throughout the State of Arkansas, alleging that more majority-minority districts *could*

*have* been drawn. By contrast, the present case involves the Board actually drawing a majority-

minority district with a BVAP of over 50 percent. In *Jeffers I*, the plaintiffs argued that the Board

could have created majority-minority districts but did not; in this case, the plaintiffs are arguing that

the Board should have created a larger BVAP within the majority-minority district. As explained

*supra*, this does not constitute a viable § 2 vote-dilution claim. The plaintiffs have not cited a case,

nor can we find one, in which a § 2 vote-dilution claim successfully challenged the drawing of a

district with a BVAP greater than 50 percent.

### B. *Fourteenth and Fifteenth Amendments*

The plaintiffs have also alleged that the Board—specifically, Governor Beebe and Attorney

---

declaration states that, as with her previous analyses, one of the attorneys of record provided her with
election results along with maps and a spreadsheet, as well as the racial composition of each precinct
using data from the 2010 census. Thus, there is no reason to believe that Dr. Handley's declaration
has cured any of the defects in her trial testimony.

General McDaniel[16]—intentionally discriminated against African Americans in violation of the

Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment. They contend

that the Board purposely drew the 2011 Senate District 24 to increase voters in the base counties of

white incumbents— Representatives Ingram, Hall, and Brown—while simultaneously reducing

voters in the base county of the African-American incumbent—Senator Crumbly.

"[A] plaintiff bringing a constitutional vote[-]dilution challenge, whether under the

Fourteenth or Fifteenth Amendment, has been required to establish that the State or political

subdivision acted with a discriminatory purpose."[17] *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471,

481 (1997) ("*Reno I*") (citing *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (plurality opinion)

("Our decisions . . . have made clear that action by a State that is racially neutral on its face violates

the Fifteenth Amendment only if motivated by a discriminatory purpose."); *id.* at 66 ("[O]nly if there

---

[16]Secretary Martin moved for a directed verdict on the intentional discrimination count at the close of the plaintiffs' evidence. The plaintiffs did not object, and we granted the motion.

[17]"It is unclear whether vote dilution claims are cognizable under the Fifteenth Amendment. In recent decisions, the Supreme Court has emphasized that it has never recognized such a claim." *Backus*, 2012 WL 786333, at *13 (citing *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000) ("*Reno II*") ("[W]e have never held that vote dilution violates the Fifteenth Amendment."); *Voinovich*, 507 U.S. at 159 ("This Court has not decided whether the Fifteenth Amendment applies to vote-dilution claims; in fact, we never have held any legislative apportionment inconsistent with the Fifteenth Amendment.")). A circuit split exists "on whether vote-dilution claims are cognizable under the Fifteenth Amendment." *Id.* (citing *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000) ("Indeed, the Supreme Court has rejected application of the Fifteenth Amendment to vote dilution causes of action."); *Page v. Bartels*, 248 F.3d 175, 193 n.12 (3d Cir. 2001) ("We simply cannot conclude that the Court's silence and reservation of these issues clearly forecloses Plaintiffs' Fifteenth Amendment claim . . . .")). Prior to *Reno II*, the Eighth Circuit concluded that "[p]laintiffs' claim of racially discriminatory vote dilution is . . . cognizable under the Fifteenth Amendment." *Perkins v. City of W. Helena, Ark.*, 675 F.2d 201, 205 (8th Cir. 1982). "Even if vote-dilution claims exist under the Fifteenth Amendment, . . . they are essentially congruent with vote-dilution claims under the Fourteenth Amendment." *Backus*, 2012 WL 786333, at *13 (citing *Washington v. Finlay*, 664 F.2d 913, 919 (4th Cir. 1981)). "Both require proof of discriminatory purpose and discriminatory, or dilutive, effect." *Id.* (citing *Washington*, 664 F.2d at 919).

is purposeful discrimination can there be a violation of the Equal Protection Clause of the Fourteenth Amendment."); *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.")). "Because . . . the Constitution requires a showing of intent that § 2 does not, a violation of § 2 is [not] *a fortiori* a violation of the Constitution." *Id.* at 482.

Here, even if we concluded that the plaintiffs had a viable claim for vote dilution under § 2,[18] we would nevertheless conclude that their constitutional vote-dilution claims fail because the record does not support a finding of intentional race discrimination.

During the redistricting process, Governor Beebe indicated that he considered populations, communities of interest, geography, history, incumbency, and minority districts in crafting the new districts. Governor Beebe emphasized that his "goal" was not to "draw [2011 Senate District 24] in a vacuum" but instead "to try to draw 35 districts." Thus, while he "wanted to maintain a minority population in it," he could not maintain such population "in a vacuum without regard to how that affects the other 34 districts." Governor Beebe maintained that he could have drawn Senate District 24 with a greater BVAP if he had "ignored all other factors." As an example, Governor Beebe explained that Senator Crumbly's proposed map "went into another African-American Senat[or's] majority black district[, Senate District 25]." According to Governor Beebe, if the Board had used Senator Crumbly's map, then the Board "would have added more African-American population to [Senator Crumbly's] district," but it would have also "impacted another [majority-]minority district"—Senator Stephanie Flowers's district.

---

[18]"[W]e doubt that any plaintiff . . . can establish a constitutional vote[-]dilution claim where his section 2 claim has failed." *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1344 (11th Cir. 2000).

Governor Beebe emphatically denied drawing Senate District 24 for the benefit of Representative Ingram, characterizing such allegation as "a 100-percent, absolute falsehood." He testified that he had no knowledge that Representative Ingram was going to run for the Senate; instead, his impression was that Representative Ingram was going to run for Secretary of the House. According to Governor Beebe, neither he nor his staff ever discussed Representative Ingram running for the Senate.

Like Governor Beebe, Attorney General McDaniel testified that he considered multiple factors in the redistricting process, including compactness of the districts, communities of interest, ensuring minority-majority districts remained intact, and geographic design. Attorney General McDaniel, like Governor Beebe, testified that the creation of Senate District 24 included consideration of increasing the population of Senator Crumbly's district, as well as the impact on surrounding districts, including Senator Flowers's district. Attorney General McDaniel had discussed with Senator Flowers Senator Crumbly's "desire to take some of her African-American population from her district and put it into [Senator Crumbly's district]," but Senator Flowers was "not happy about that." According to Attorney General McDaniel, when the Senate map was presented to him, he had no "particularly strong feelings one way or the other about" Senate District 24. He only began "paying more attention to the [BVAP] in that district" after Senator Crumbly expressed his concern that the BVAP was not high enough.

Attorney General McDaniel stated that he did not know whether reuniting Crittenden County in Senate District 24 would benefit Representative Ingram. He denied discussing any of the redistricting maps with Representative Ingram. Attorney General McDaniel testified that "no one expected [Representative Ingram] to run for the Senate." Instead, Attorney General McDaniel's

impression was that Representative Ingram would run for Speaker of the House. Attorney General McDaniel also testified that he reassured Senator Crumbly that "Crittenden County is probably your best bet for reelection" and that Senator Crumbly need not worry about Hall, Brown, or Ingram.

Although the plaintiffs suggest that the Board reunited Crittenden County to benefit white incumbents—in particular, Representative Ingram—the preponderance of the record evidence does not support that conclusion. First, we find credible Governor Beebe's and Attorney General McDaniel's testimony that they did not engage in intentional discrimination or know that Representative Ingram, or any other white incumbent, would run for senator against Senator Crumbly in Senate District 24 at the time that the district map was drawn.

Second, Attorney General McDaniel's testimony states the *likely* reason that Governor Beebe and Attorney General McDaniel included all of Crittenden County in Senate District 24 and not, for example, in Senate District 23. Attorney General McDaniel testified that he acted "a little bit in deference to the Governor who is from White County." According to Attorney General McDaniel, Governor Beebe made it clear to Attorney General McDaniel "that he didn't want to see northern White County lumped in with Crittenden County." He explained that "the Governor felt strongly, and [Attorney General McDaniel] had no reason to dispute that . . . Crittenden County and White County are completely different regions and populations." When asked how he learned that Governor Beebe did not want "White County lumped in with Crittenden County," Attorney General McDaniel testified:

> [A]t some point I remember being told, [w]ell, there is a possibility of running some of Crittenden County across Cross and part of Woodruff and Jackson and White County, but the Governor is not going to vote for that. He does not want that.

Both Attorney General McDaniel and Governor Beebe "had areas where [they] exercised greater

influence over one another." Attorney General McDaniel explained, "[T]he Governor and his staff were very deferential to what I wanted to do in Craighead County. Similarly, I regarded what the Governor wanted to do in his home county, and so I think it is fair to say that he had more influence over this particular area of the plan."

Third, the record also reveals an additional reason for the resulting Senate map—partisan politics. Governor Beebe specifically testified that his vote to approve the redistricting map could be characterized as "a partisan vote." Similarly, Attorney General McDaniel testified that the Board's vote "was certainly delineated along party lines," although he claimed that he did not "vote with the Governor because he is a Democrat and I am a Democrat." As to Secretary Martin's final proposed Senate plan, Governor Beebe candidly admitted that he discarded most of Secretary Martin's suggestions. Attorney General McDaniel also confirmed that "virtually no[ ]" consideration was given to Secretary Martin's Senate map. Even Senator Crumbly testified that he saw Governor Beebe and Attorney General McDaniel—not Secretary Martin—"as the big decision-makers on the Board of Apportionment."

Secretary Martin's testimony confirms that Governor Beebe and Attorney General McDaniel gave *no* consideration to his alternative proposals, including his Senate map. We credit Secretary Martin's testimony that Governor Beebe's office and Attorney General McDaniel's office "made perfectly clear that [Secretary Martin's] input was not going to be considered." Secretary Martin "kn[e]w very little about [the enacted maps] except [that] they showed up slightly before it was time to vote on them." At the final Board meeting,

> [t]here was really no debate about what was on the maps or whether or not to consider [Secretary Martin's] maps. It was not even brought up. It was just a matter of this is the way we're going to do it. Here is the motion. We adopt these maps. And

then it was just a matter of disposing with—taking care of the final business of the state Board of Apportionment.

According to Secretary Martin, he considered the *Jeffers* cases to be a vital concern in the redistricting process. Secretary Martin's "guideline" was to ensure that the State "sustain[ed] the districts that were created in *Jeffers*." (Emphasis added.) Secretary Martin wanted the Board "to create a [new Senate] district that approximate[d] the previous *Jeffers* district." (Emphasis added.) He wanted to maintain the BVAP "near the *Jeffers* levels." (Emphasis added.) When asked what BVAP he would have put in place, Secretary Martin testified that he was "[t]rying to maintain what the previous *Jeffers* district had in that . . . , it would have been in excess of 55 percent." (Emphasis added.) "[T]he goal was 57 percent and maintain a good compactness to the district." His central concern was to avoid litigation.

The record evidence reflects that the new senate district was constructed primarily to conform to the political priorities of Governor Beebe and, secondarily, Attorney General McDaniel. Governor Beebe prioritized reuniting Crittenden County, and Attorney General McDaniel deferred to his preference. Senate District 24's BVAP was on—but well down—the list of their redistricting concerns. The plaintiffs have failed to show that the diminution in BVAP of the new Senate District 24 is the result of any collusive racial animus of the Board. Instead, the evidence shows that the diminution more likely was an unintended consequence of preferred political concerns leading to comparative disregard for the *Jeffers* cases' history and holdings. This may be regrettable, but it is not unconstitutional.

The same is true for Governor Beebe's and Attorney General McDaniel's dismissive attitude toward Senator Crumbly. Senator Crumbly testified that he met several times with Governor Beebe

to discuss redistricting for Senator Crumbly's district—the 2001 Senate District 16. The first two meetings were cordial, with Senator Crumbly conveying to Governor Beebe his desire to preserve a high BVAP in his district. At the last meeting, the "discussion . . . sometimes got quite heated." We credit Senator Crumbly's version of events regarding this meeting, which is as follows:

> I said, "If my district was drawn first, why did it have to be drawn this particular way?" And I said, "It was supposed to have been drawn first." And then [Governor Beebe] . . . banged on the table, he said, "It was drawn first." And he said, "Well, I'll just tell you, I am sick and tired of you coming in here with these maps. I've looked at them." He said, "I can just tell you this. I'm not going to split Crittenden County. You've asked me. I don't want to look at any more maps. And I wish you wouldn't come back to my office asking me about that again."

Regarding his relationship with Senator Crumbly, Governor Beebe stated that although Senator Crumbly "always asked for way more than anybody else asked for," Senator Crumbly's vote was one that he could count on; "more often than not, [Senator Crumbly] votes in a way that [Governor Beebe] would consider to be an ally." Governor Beebe lacked any knowledge that Senator Crumbly was going to have an opponent or that Representative Ingram was going to run for the Senate. He testified that he never intended to reduce the BVAP of Senator Crumbly's district or adversely affect Senator Crumbly. He did note that, during meetings with Senator Crumbly, both he and Senator Crumbly "would get exasperated with each other."

Attorney General McDaniel also testified that he explained to Senator Crumbly his deferential position to Governor Beebe's desires. After Senator Crumbly voiced his opposition to Attorney General McDaniel about the map, Attorney General McDaniel responded, "[Y]ou can either try to persuade the Governor to make a change or this is the way this map is going to be and you need to go run your reelection and you are going to be fine." In response, Senator Crumbly testified that he urged Attorney General McDaniel "to do the right thing for the people of Arkansas,

not just simply what the Governor says, and do what's right because you are the State's attorney."

Based on the record, we conclude that Governor Beebe's and Attorney General McDaniel's feelings toward Senator Crumbly were not the result of racial animus leading to the creation of an unlawful reapportionment plan but instead reflect political preferences of the majority Board.

### III. *Conclusion*

"'[T]here is a history of racial discrimination in the electoral process in Arkansas.'" *Jeffers I*, 730 F. Supp. at 204 (quoting *Smith I*, 687 F. Supp. at 1317). With that history in mind, we stress that our determination that no illegal vote dilution or intentional discrimination occurred does not mean that the plaintiffs did not raise important concerns about the Arkansas redistricting process. Because the Board acted within the bounds of the law, those concerns are for the voters of Arkansas, not for the courts of the United States, to address.

We hold that the plaintiffs have failed to meet their burden of proving a violation of § 2 of the Voting Rights Act or the Fourteenth and Fifteenth Amendments of the United States Constitution.[19]

DATED this 17th day of September, 2012.

_____
LAVENSKI R. SMITH

---

[19]We deny the motion to reopen the case to hear further testimony from Dr. Lisa Handley. First, the proposed testimony would not alter our conclusion that, under the logic of *Bartlett*, the plaintiff must show that the Board of Apportionment could have created a majority/minority district but failed to do so. Secondly, Dr. Handley's declaration filed with the motion to reopen states that her proposed new testimony relies on the assignment of racial composition to polling areas by an attorney of record. Thus, her declaration indicates that she still has not corrected the deficiencies that led us to conclude that her trial testimony was unpersuasive.

No. 2:12CV00016 JLH

# ADDENDUM TO OPINION

**ADDENDUM to OPINION** – *See n.7*



**Arkansas Senate**

2011 District 24
2001 District 16

**Comparison**

Jeffers v. Beebe, No. 2:12-CV-016 (E.D. Ark.)

**Plaintiffs' Exhibit 3**

February 20, 2012

EXHIBIT

3

No. 2:12-cv-00016-JLH
**ADDENDUM to OPINION** – *See* n.9

## 2010 Adopted Senate Distrct 24 Population Summary by County

|  | TAPERSONS | TAWHITEALN | TABLACKALN | VAPERSONS | VAWHITEALN | VABLACKALN |
|---|---|---|---|---|---|---|
| Crittenden | 50,902 | 23,446 | 26,051 | 36,093 | 18,259 | 16,963 |
| Cross | 1,323 | 460 | 829 | 1,016 | 401 | 590 |
| Lee | 7,602 | 2,739 | 4,657 | 6,021 | 2,403 | 3,476 |
| Phillips | 16,824 | 5,070 | 11,474 | 11,979 | 4,201 | 7,596 |
| St Francis | 10,496 | 3,512 | 6,705 | 7,557 | 2,868 | 4,512 |
| Dist 24 Total | 87,147 | | | | | |

## 2010 TOTAL Population Summary by County

|  | TAPERSONS | TAWHITEALN | TABLACKALN | VAPERSONS | VAWHITEALN | VABLACKALN |
|---|---|---|---|---|---|---|
| Crittenden | 50,902 | 23,446 | 26,051 | 36,093 | 18,259 | 16,963 |
| Cross | 17,870 | 13,495 | 3,972 | 13,376 | 10,364 | 2,761 |
| Lee | 10,424 | 4,381 | 5,761 | 8,264 | 3,703 | 4,368 |
| Phillips | 21,757 | 7,618 | 13,719 | 15,644 | 6,213 | 9,185 |
| St. Francis | 28,258 | 12,502 | 14,667 | 21,581 | 10,337 | 10,393 |
| Total | 129,211 | | | | | |



No. 2:12-cv-00016-JLH
**ADDENDUM to OPINION** – *See* n.10

